**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

FIESTA MART, LLC,

                  Plaintiff,

vs.

WILLIS OF ILLINOIS, INC, *et. al*.,

                  Defendants.

**Civil Action No. 4:20-CV-03484**

**DEFENDANTS WILLIS TOWERS WATSON MIDWEST, INC.**
**(F/K/A WILLIS OF ILLINOIS, INC.) AND WILLIS TOWERS WATSON US, LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

UNDISPUTED FACTS ................................................................................................ 1

    A.    The Property Insurance ........................................................... 2

    B.    Hurricane Harvey .................................................................... 5

    C.    ACON Directed a First Interim Payment be Made to Fiesta. .... 5

    D.    Fiesta was Sold to Bodega Latina Corporation ........................... 5

    E.    ACON Directed that the Second Payment of $4.78 Million be Made to Itself. ................................................................................... 7

    F.    Fiesta Sued ACON, Received $3.1 Million, and was Assigned the Right to Seek Depreciation Holdback Proceeds. ............................ 10

    G.    Fiesta Terminated Willis as its Broker on February 13, 2019. ................. 10

    H.    In the Summer of 2020,  Fiesta Wrote to Willis Regarding its Depreciation Claim. ................................................................................... 11

    I.    Fiesta Filed Suit Against Willis, and Later, the Insurers. .................. 12

ARGUMENT ...................................................................................................... 12

    I.    Willis Did Not Proximately Cause Fiesta to Suffer Any Damages ..................... 12

    A.    Willis Did Not Direct Insurance Proceeds be Paid to ACON. ................. 12

    B.    Summary Judgment Should be Granted on Fiesta's Negligence Claim Because Willis Did Not Breach Any Duties Owed To Fiesta. ................. 15

    C.    Willis is Also Entitled to Summary Judgment on Fiesta's Negligent Misrepresentation Claim Because the Allegedly False Information Concerned a Future Event. ..................................................... 15

    D.    The Economic Loss Doctrine Bars Fiesta's Tort Claims Against Willis. 18

    II.    Willis Did Not Breach the T&Cs, Which Must be Decided Under Illinois Law. 20

    A.    There is No Evidence that Willis Had a Conflict of Interest That Prevented Its Ability to Provide Brokerage Services to Fiesta. ................................ 21

    B.    After Willis Was Terminated as Fiesta's Broker in February 2019, it Owed No Further Obligations to Fiesta and Did not Breach the T&Cs by Not Responding to Fiesta in the Summer of 2020. ....................................... 22

    C.    There is No Evidence in the Record that Willis Provided Fiesta with Inaccurate or Untimely Information. ....................................... 23

    III.    Plaintiff Has Not Sufficiently Pleaded, or Adduced Any Evidence Showing, that Willis Violated the Texas Insurance Code ............................................. 23

    IV.    There is No Basis for an Award of Attorneys' Fees and Willis is Entitled to a Set-Off For the Amount Fiesta Recovered From ACON. ............................... 25

i

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Health, Inc.*, No. CIV.A. H-06-2111, 2007 WL 2220976 (S.D. Tex. Aug. 1, 2007) .........................................................................17

*Atl. Cas. Ins. Co. v. PrimeLending*, No. 3:15-CV-1475-D, 2017 WL 951878 (N.D. Tex. Mar. 10, 2017) ....................................................................................................................................24

*Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719 (5th Cir.), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003)........................................................................................20

*BlackHawk Paving, Inc. v. CPCM, LLC*, No. 4:20-CV-48-SDJ, 2021 WL 1152836 (E.D. Tex. Mar. 26, 2021)....................................................................................................................19

*C-Bons Int'l Golf Grp., Inc. v. Lexington Ins. Co.*, No. 3:19-CV-0663-B, 2019 WL 5427574 (N.D. Tex. Oct. 22, 2019) .......................................................................................................20

*Campbell v. DLJ Mortg. Cap., Inc.*, 628 F. App'x 232 (5th Cir. 2015) ......................................16

*Exhibit Network Int'l Ltd v. Union Ins. Co.*, No. 4:19-CV-4221, 2020 WL 3525192 (S.D. Tex. Apr. 28, 2020)....................................................................................................................24

*Gant v. State Farm Lloyds*, No. 3:21-CV-2164-B, 2022 WL 254353 (N.D. Tex. Jan. 27, 2022)..........................................................................................................................16

*Griggs v. State Farm Lloyds*, 181 F.3d 694 (5th Cir. 1999)...........................................12, 17, 25

*Hern Fam. Ltd. P'ship v. Compass Bank*, 863 F. Supp. 2d 613 (S.D. Tex. 2012)...................16

*HLS Enterprises of Texas, Inc. v. N. Ins. Co. of New York*, No. CV H-04-4754, 2005 WL 8165616 (S.D. Tex. Oct. 18, 2005).........................................................................................17

*Houston Orthopedic Surgical Hosp. v. Steadfast Ins. Co.*, No. CV H-11-3916, 2014 WL 12600169 (S.D. Tex. Mar. 12, 2014) .......................................................................................12

*Insignia/Frain Camins & Swartchild v. Querrey & Harrow, Ltd.*, 36 F. Supp. 2d 1051 (N.D. Ill. 1999) ......................................................................................................................22

*La Verdure & Assocs. v. Depositors Ins. Co.*, No. 4:16-CV-00883, 2017 WL 4698150 (E.D. Tex. Oct. 19, 2017)...................................................................................................................25

*PSG-Mid Cities Med. Ctr., LLC v. Jarrell*, No. 3:20-CV-02477-E, 2020 WL 7398782 (N.D. Tex. Dec. 17, 2020).........................................................................................................12, 14

*Roland v. Transamerica Life Ins. Co.*, 570 F. Supp. 2d 871 (N.D. Tex. 2008), *aff'd*, 337 F. App'x 389 (5th Cir. 2009).................................................................................................19, 24

*Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351 (S.D. Tex. 1994) ....................................................................................................................................16, 17

*Skinny Kid Productions, LLC v. Arthur J. Gallagher & Co.*, 2021 WL 6750915 (W.D. Texas, March 25, 2021)..............................................................................................................19

*Stolts v. Wells Fargo Bank, NA*, 31 F. Supp. 3d 876 (S.D. Tex. 2014) ...............................16

*TIG Ins. Co. v. Sedgwick James of Washington*, 184 F. Supp. 2d 591 (2001) .............................17

*W. Texas Agriplex v. Mid-Continent Cas. Co.*, No. CIV.A. 5:03-CV-199-C, 2004 WL 1515122 (N.D. Tex. July 7, 2004) ..........................................................................................16, 17

*Webb v. UnumProvident Corp.*, 507 F. Supp. 2d 668 (W.D. Tex. 2005)................................15

*Wikoff v. Vanderveld,* 897 F.2d 232 (7th Cir. 1990).....................................................22

*Willcox v. Am. Home Assur. Co.*, 900 F. Supp. 850 (S.D. Tex. 1995) ..................................16

### STATE CASES

*Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Rsch. Corp.*, 299 S.W.3d 106 (Tex. 2009) ...............................................................................................................25, 26

*Brewer v. Allstate Life Ins. Co.*, 2022 IL App (1st) 210932-U...........................................23

*Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282 (Tex. App. 2000) ...................................................................................................................................19

*Howard v. Burlington Ins. Co.*, 347 S.W.3d 783 (Tex. App. 2011).....................................24

*LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234 (Tex. 2014) .........................................19

*Manion v. Sec. Nat. Ins. Co.*, No. 13-01-248-CV, 2002 WL 34230861 (Tex. App. Aug. 15, 2002) ...................................................................................................................................19

*Petras v. Criswell*, 248 S.W.3d 471 (Tex. App. 2008)……………………………………...16

*Scherer v. Angell*, 253 S.W.3d 777 (Tex. App. 2007) .................................................19

*Sterling Chemicals, Inc. v. Texaco Inc.*, 259 S.W.3d 793 (Tex. App. 2007)................................19

*Tetra Tech, Inc. v. M&J Underground, Inc.*, 2012 IL App (1st) 110782-U ................................22

*Vaughan v. State Farm Lloyds*, No. MO-15-CA-17, 2015 WL 13134509 (W.D. Tex. Aug. 5, 2015) ...............................................................................................................17, 25

*W. Houston Airport, Inc. v. Millennium Ins. Agency, Inc.*, 349 S.W.3d 748 (Tex. App. 2011) ........................................................................................................................................15

**FEDERAL STATUTES**

Fed. R. Civ. P. 9(b) ................................................................................................24

**STATE STATUTES**

Tex. Civ. Prac. & Rem. Code § 38.001 ...............................................................25

TEX. INS. CODE ANN. § 541.051 ...........................................................................23

TEX. INS. CODE ANN. § 541.061 ...........................................................................23

TEX. INS. CODE ANN. § 541.152 ...........................................................................25

TEX. INS. CODE ANN. § 541.162 ...........................................................................24

This case arises from a dispute between ACON and Fiesta over which of them was entitled to receive insurance proceeds from property damage suffered by Fiesta from Hurricane Harvey. ACON previously owned Fiesta, and Fiesta was insured under ACON's property insurance policy. ACON, as the named insured, directed the insurers to send the first insurance payment of $7.5 million for damage to Fiesta's properties directly to Fiesta.  When the insurers were ready to make a second payment of approximately $4.78 million, ACON, who at this time had sold Fiesta, directed the insurers to make the payment directly to it and not to Fiesta.  The purchase agreement between ACON and the buyer of Fiesta (Bodega Latina Corporation) did not address whether additional payments for Hurricane Harvey damage to Fiesta's properties should be sent to ACON or Fiesta/Bodega.  As such, ACON, as the named insured, exercised its right to direct payment to itself instead of Fiesta, and the insurers followed that direction and paid $4.78 million to ACON. Willis had no role whatsoever in ACON's decision to direct payment to itself.

Fiesta, believing the $4.78 million should have been paid to it and not ACON, sued ACON in a suit that was removed to this court.  That suit settled with ACON paying Fiesta $3.1 million of the disputed $4.78 million insurance payment.  As part of the settlement, ACON also assigned its right to Fiesta regarding any depreciation holdback that might be recoverable under the insurance policy.

After settling with ACON, Fiesta brought the current suit against Willis and ACON's insurers.  Fiesta seeks to recover approximately $1.68 million from Willis – the difference between the $4.78 million paid to ACON and the $3.1 million Fiesta received from ACON as part of the settlement.  There is no basis whatsoever for Fiesta's claim against Willis.  It is undisputed that Willis had no role and no authority to direct where insurance payments were made.  Rather, the terms of the insurance property policy make it clear that ACON, as the first named insured, had

the sole authority to direct insurance payments.  To the extent Fiesta alleges the second payment should have been made to it instead of ACON, that claim can only legally be brought against ACON (which is what Fiesta did).  Fiesta's decision to accept less than the entire $4.78 million from ACON in its settlement was its choice, but that choice does not lead to claims against Willis.  Again, with Willis having no control or role regarding the fact that the insurers were directed by ACON to make the second payment to ACON, there can be no valid claim against Willis and Willis's motion for summary judgment should be granted.

Fiesta further claims that, to the extent it cannot recover depreciation holdback proceeds from the insurers, Willis should have to pay.  There is likewise no legal basis for a claim against Willis.  As with the property damage payment, Willis has no control over whether the insurers must pay a holdback to Fiesta.  Fiesta claims that Willis delayed in responding to certain requests regarding its claim for a holdback from the insurers.  However, the alleged delay took place almost 1.5 years after Fiesta terminated Willis as its broker thereby extinguishing any duties owed by Willis.  In any event, even if Willis did delay in responding to Fiesta, and even if Willis still had any duties to Fiesta at that time, it is all irrelevant because Fiesta is still able to make its holdback claim and is doing so in this suit.  In other words, whether or not the insurers are required to make the holdback payment to Fiesta will have nothing to do with the alleged delay by Willis.  Accordingly, there can be no legal basis for a claim against Willis and Willis's motion for summary judgment on this claim should be granted as well.

## UNDISPUTED FACTS

### A.    The Property Insurance

In April of 2016, Willis became Fiesta's insurance broker.  Second Amended Complaint ("SAC"), at ¶ 24.  Fiesta operates a chain of Hispanic-focused grocery stores in the Houston region.  SAC, at ¶ 1.  At the time, Fiesta was owned by ACON, an existing brokerage client of Willis.  *Id.*,

2

at ¶ 23.  Willis had assisted ACON in procuring an aggregate property insurance program for its portfolio companies ("Aggregate Property Program").[1]  Ex. 1 (Roberts Transcript), at 36:10-23.[2]

Initially, Willis brokered a standalone property policy for Fiesta with AIG.  Ex. 2.  In connection with the procurement of this policy, Willis provided Fiesta with a copy of its Standard Terms and Conditions for U.S. Property & Casualty Retail Accounts (the "T&Cs").  *Id*.  A copy of the T&Cs was also provided to ACON in connection with the Aggregate Property Program.  Ex. 3.  Although Fiesta was under no obligation to join the Aggregate Property Program, as a portfolio company owned by ACON, Fiesta benefitted from joining the Aggregate Property Program.  Ex. 1 (Roberts Transcript), at 37:6-7 ("It's not a mandate for the portfolio companies to participate in the program").  As compared to the standalone policy with AIG, under the Aggregate Property Program Fiesta saved over $450,000 in annual premium and also obtained various coverage enhancements.  Ex. 4 – 5.

The Aggregate Property Policy at issue took effect on June 1, 2017, and had a one year policy period.  Ex. 6 (Depo Ex. 2).[3]  The Aggregate Property Program was made up of several layers of coverage and included a primary layer that offered a collective $25 million in limits (in

---

[1] Under an aggregate property program, multiple entities and/or properties are covered under the same policy form(s). This consolidation allows companies to "save premium and improve their coverage."  Ex. 1 (Roberts Transcript), at 36:20-21.  It can also enable a company to obtain higher limits and enhanced coverages for a property that, standing on its own, might be cost prohibitive to insure given its particular risks (e.g., located in a county with risk of windstorm and flood).  *Id*., at 40:17-22.

[2] All references to exhibits herein are references to the exhibits attached to the Declaration of Kyra A. Smerkanich ("Smerkanich Dec.") submitted herewith.  As further explained in the Declaration, certain commercially sensitive documents are being submitted for *in camera* review.  Willis is also submitting for *in camera* review certain documents produced by Fiesta and ACON that were marked as "Confidential" in discovery.  Prior to filing this motion, Willis sought ACON and Fiesta's consent to file these documents.  Consent was not granted.

[3] Both Willis and ACON made Fiesta aware of the Aggregate Property Program design.  Exs. 7 – 8.  Wayne Peterson, the Chief Financial Officer for Fiesta, was "extremely inquisitive" about the Aggregate Property Program and "wanted to make sure that…it was in Fiesta's best interest[.]"  Ex. 1 (Roberts Transcript), at 40:11-14.  Ultimately, Fiesta was "impressed with…the program and the premium savings and increased coverage" and decided to join.  *Id*., at 40:12-16; *see also id*., at 37:15-16 ("ultimately Fiesta decided that it would be valuable to join the program").

total, the Aggregate Property Program offered $400 million in available limits).  SAC, at ¶ 37.

The primary layer was made up of seven policies issued by Allied World Assurance Company,

Arch Specialty Insurance Company, Aspen Specialty Insurance Company, Certain Underwriters

at Lloyd's of London entity Hiscox, HDI Global Insurance Company, Indian Harbor Insurance

Company, and Westport Insurance Company, each of which insured a percentage of the primary

layer.  *Id*.

     While the primary layer was made up of seven different policies, each policy contained an

identical "Master Policy" form.  Ex. 6.  The Property Policy identified the "Named Insured":

> This policy does insure ACON Investments, LLC and as per the attached endorsement
> schedule, any subsidiary, associated, allied or affiliated company, corporation, firm,
> organization, partnership, Joint Venture, Limited Liability Company or individual,
> whether wholly or partially owned or controlled by the Insured, where the Insured
> maintains an interest, or where the Insured is required to provide insurance, as now exist
> or are hereafter constituted or acquired, and any other party in interest that is required by
> the contract or other agreement to be named, all hereafter referred to as the "Insured."

*Id*.  Endorsement A1 to the Property Policy states:

| **Endorsement A1** |
| --- |
| **With respects to the entity of, Fiesta Mart, the following terms and conditions shall apply:** |
| **A.**    **Named Insured –** ACON Fiesta Holdings, LLC |

*Id*.[4]

     When the Property Policy incepted, ACON Fiesta Holdings, LLC was owned by ACON.

Ex. 9 (Scielzo Transcript), at 33:4-6.  Fiesta was an affiliated subsidiary of ACON Fiesta Holdings,

LLC.   Ex. 10 (Depo. Ex. 5).

---

[4] The Property Policy includes additional endorsements for the other portfolio companies owned by ACON.

### B.    Hurricane Harvey

On August 25, 2017, Hurricane Harvey caused significant flooding to the Houston region. SAC, at ¶ 33.  Several Fiesta stores suffered extensive damage, as did other ACON portfolio companies.  *Id*., at ¶ 33-34; *see also* Ex. 11.  The Fiesta stores damaged by Hurricane Harvey included Store Nos. 10, 23, and 56 (the "Stores").   SAC, at ¶ 33-34.  On August 29, 2017, at ACON's request, Willis submitted a claim on ACON's behalf that included the damage to the Stores.  Ex. 11.  At the time of the loss – and when the claim accrued – ACON owned Fiesta.  Ex. 10.

### C.    ACON Directed a First Interim Payment be Made to Fiesta.

Given the magnitude of the damage to the Stores, the Insurers quickly agreed to make an interim payment.  Ex. 12.  As the first named insured under the Property Policy, ACON determined to what entity any policy payment should be directed.  Ex. 6; Ex. 13 (Daar Transcript), at 44:11-36:4.  ACON told Willis that they wanted the interim payment to be made to Fiesta Mart.  Ex. 14; Ex. 9 (Scielzo Transcript), at 126:18-127:9.  By email dated September 20, 2017, Willis informed the Insurers through adjuster Boris Loncarevic that ACON had directed that the first interim payment of $7.5 million should be made to Fiesta, not ACON.  Ex. 14 ("Please make sure that the payment is made out to Fiesta and not ACON Investments.  The ACON folks reminded us of that yesterday at the end of the conference call.").

### D.    Fiesta was Sold to Bodega Latina Corporation.

In the summer of 2017, prior to Hurricane Harvey, Bodega Latina Corporation, which also operates Hispanic-focused grocery stores, expressed interest in acquiring Fiesta.  Ex. 15 (Hook Transcript, Vol. I), at 198:24-199:4.  By the fall of 2017, the parties to the transaction – ACON and Bodega – were conducting "major [due] diligence."  *Id*., at 199:15-16.  As part of the due diligence process, Bodega reviewed copies of Fiesta's insurance policies, including the Property

Policy.  *Id*., at 193:24-194:8; 229:13-16.  Willis had no involvement in the due diligence process.  *Id*., at 193:7-10.

Bodega was aware of the open insurance claim relating to the Stores.  Ex. 16.  During due diligence, a "summary of Hurricane Harvey related claims" was flagged by Bodega as a "High" priority.  *Id*.  According to Jack Hook, who was the CFO for Bodega and responsible for assessing Fiesta's insurance program, "it was clear that…Fiesta had suffered a major loss" and Bodega "knew that there were…insurance claims to be had."  Ex. 15 (Hook Transcript, Vol, I), at 204:14-21.

Despite having reviewed the Property Policy prior to the acquisition and having knowledge of the existence of outstanding property damage claims, neither Bodega nor its outside corporate attorneys included a provision in the final purchase agreement (the "MIPA") directing that future property insurance proceeds for the stores would be paid to Fiesta.  The MIPA was completely silent as to whom should receive such payments.  Ex. 17; Ex. 15 (Hook Transcript, Vol I.), at 189:8-10.  According to Hook, Bodega "assumed" Fiesta would receive any proceeds and he did not think it was necessary to document this assumption.  Ex. 15 (Hook Transcript, Vol. I), at 218:24-219:11; *id*., at 220:9-11 ("You don't call out what's assumed, you only deal with items that are unusual or different").[5]  The MIPA also did not address entitlement to depreciation holdback

---

[5] Hook testified about "negotiation[s]…between the parties," which included a conversation with "external counsel, internal folks, [and] internal counsel" where it was discussed that business interruption proceeds would be "separated from the pending property payments and that these were specifically called out to go to ACON with the understanding that all other insurance proceeds would go to Fiesta Mart."  Ex. 15 (Hook Transcript, Vol. I), at 216:7-20.  While ACON's attorneys included a provision documenting that ACON would receive any business interruption proceeds, Fiesta's attorneys did not: the MIPA is silent as to what entity is entitled to receive insurance proceeds for property damage and/or depreciation holdback.  Ex. 17, at §7.14.  The MIPA contains an integration clause, stating that it constitutes the entire agreement among the Parties and supersedes any prior agreements, negotiations, understandings or discussions among the parties.  *See id*., at § 12.4.  In light of this, it is all the more confusing as to why Fiesta's attorneys did not draft language memorializing Fiesta's alleged assumption and the parties' purported understanding.  Had they done so, this entire litigation could have been avoided.

proceeds, sometimes referred to as Replacement Cost Value or "RCV." Ex. 17.  Due to the absence

of a provision in the MIPA to the contrary, the terms of the Property Policy controlled the

distribution of insurance proceeds, leaving ACON with the right under the Property Policy to

determine whether it or Fiesta should receive any policy payments.  *See* Ex. 6 ("LOSS PAYABLE

– Loss, if any, shall be adjusted with and payable to the Insured, or as directed by them.").[6]

Through the transaction, Bodega acquired Fiesta Mart, LLC and certain subsidiary entities

only; it did not acquire ACON or ACON Fiesta Holdings, LLC.  *Id*., at Ex. 15 (Hook Transcript,

Vol. I), at 230:2-7; Ex. 9 (Scielzo Transcript), at 39:18-19.

### E.   ACON Directed that the Second Payment of $4.78 Million be Made to Itself.

When the Insurers were ready to make their second interim payment for the property

damage to the Stores, Fiesta had been sold to Bodega.  The total amount of this second payment

was $4,780,347.  Ex. 18.  Initially, the Insurers reached out to Willis to confirm the payment

instructions.  *Id*.  ("Please confirm the payment instructions (not sure whether anything changed

re: payments since the ownership change of Fiesta)").  Willis reached out to ACON, forwarding it

unexecuted proofs of loss and advising that because of the sale, the Insurers would need a letter

from ACON if any future payments should be made to Bodega.  Ex. 19.  This was based on explicit

instruction Willis received from the Insurers.  Ex. 21 ("In discussions with the adjuster and the

Insurers, they will not recognize any other interested party unless they receive a letter directing

them to do so. The letter needs to come from ACON Investments on their letterhead. Until said

letter is received, all communications, payments, etc. regarding Fiesta will continue thru ACON

Investments.").

---

[6] Willis had no involvement in the drafting of the MIPA and was not provided a copy of it until November 2018.
Ex. 20 (Depo. Ex. 143); Ex. 15 (Hook Transcript, Vol. I), at 193:20-23.

On August 31, 2018, ACON submitted executed proofs of loss directly to the Insurers.  Ex.

22.  ACON instructed that the money should be wired to "Fiesta Holdings Investment, L.L.C.",

which is the successor-in-interest entity to ACON Fiesta Holdings, LLC.  *Id*.; *see also* Ex. 10.  In

response, the Insurers asked ACON for "clarification," writing:

> The Named Insured in the policy is ACON Fiesta Holdings, LLC.  The proofs of loss
> appear to have been executed by ACON Investments, LLC representative not Fiesta.  I
> understand Fiesta was sold to El Super several months ago.  I am not aware of what the
> arrangement was between ACON and Fiesta (and/or their new owner El Super) in
> connection with the proceeds and resolution of this claim.  Kindly provide some insight
> into this and whether anyone else has an interest that should be addressed with any future
> payments.  Also, for those carriers that will be issuing a check payment vs wire transfer,
> please advise who should be named on the check and where to send the check.  Thanks.

Ex. 23.  ACON responded to the Insurers directly, advising that "Fiesta Holdings Investments,

LLC is still owned by ACON. We sold the operating company to El Super. As such, **the proceeds**

**will still be coming to ACON**."  *Id*. (emphasis added).  Based upon this instruction from ACON,

the Insurers made payment to ACON.  *See, e.g*., Ex. 24.

On September 4, 2018, Willis informed Fiesta that ACON had "instructed the adjuster…to

direct payment to ACON."  Ex. 25.  Willis also explained that it "does not control funds or release

them."  *Id*.  ("I am sorry but Willis cannot be in the middle of this potential dispute.").

On September 11, 2018, Fiesta CFO Jack Hook and General Counsel Joe Angulo called

Willis to discuss Fiesta's position that "Harvey Claim proceeds should have gone to Fiestamart

[sic], not ACON."  Ex. 26 ("They were adamant that Willis needs to assist them in obtaining the

proceeds").  Although Willis had no control over who should receive the second payment,

following this call, Fiesta sent a letter to Willis and the Insurers, in which it "instruct[ed] Willis…to

direct the insurers to pay such insurance proceeds to Fiesta Mart."  Ex. 27.  Fiesta sent the letter to

the Insurers to put them "on notice" because the Insurers "are the ones cutting the physical checks."

Ex. 15 (Hook Transcript, Vol. I), at 256:13-25.  At that time, ACON had not received payment

from at least four of the seven Insurers.  Ex. 28 (September 18, 2018 email from ACON to Boris

Loncarevic) ("We are still awaiting payments from…Arch Specialty Ins. Co.; Aspen Specialty Ins.

Co.; Certain U/w Lloyds (Hiscox); and HDI Global Ins. Co.").

Willis responded by email dated September 15, 2018, again making clear that it was not

responsible for directing loss payments:

> Please be advised that **Willis Towers Watson has no control over how any insurance
> funds are distributed – that is a matter decided solely by the insurers involved**. To
> the extent that you believe any outstanding claim funds should be distributed to you, that
> is an issue that should be addressed directly with those insurers and ACON Investments,
> LLC. Per your request, I have forwarded your letter to the carriers in the program for
> their review and response. To reiterate, however, **Willis Towers Watson cannot direct
> the insurers with regard to payment of the claim as that is a decision made solely by
> those insurers**.

Ex. 29 (emphasis added).  Fiesta did not challenge this at that time.  *Id.*  ("Jeff, per your email, we

will reach out to the insurers, whom you indicated make payment decisions.").

Instead, in the weeks that followed, Fiesta requested a bevy of information, including

documentation that Willis did not maintain (a claims file); communications that were already in

Fiesta's possession; and documents that had been provided during due diligence (e.g., policies).

Exs. 29 - 35.  Willis provided Fiesta with the information it had.  Exs. 36 – 43.

Fiesta also pressed the Insurers and ACON for payment of the $4.78 million and sought

clarification as to the depreciation holdback proceeds.  Ex. 44 (October 4, 2018 Letter from Fiesta

to ACON); Ex. 45 (October 24, 2018 Letters from Fiesta to the Insurers) ("In order to ensure funds

are available and to otherwise order its affairs, Fiesta wishes to confirm to which entity – Fiesta or

ACON – your company will make any further insurance payments for this loss, including any

applicable replacement cost payments.").

**F.      Fiesta Sued ACON, Received $3.1 Million, and was Assigned the Right to Seek Depreciation Holdback Proceeds.**

On November 16, 2018, Fiesta sued ACON in Harris County District Court.  Ex. 46.  The case was eventually removed to this Court.  *Id.*  On February 14, 2020, ACON and Fiesta entered into a settlement agreement through which ACON agreed to pay Fiesta $3.1 million of the $4.78 million ACON received from the Insurers to which Fiesta alleged it was entitled.  *Id.*  ACON also agreed to assign Fiesta its rights to depreciation holdback, then estimated to be $6.6 million.  *Id.*

**G.      Fiesta Terminated Willis as its Broker on February 13, 2019.**

In late 2018, Fiesta began moving certain lines of coverage that had been placed by Willis to the existing brokers for the acquiring company, Bodega.  Ex. 47.  On February 13, 2019, Fiesta formally terminated Willis as its broker:

> Hello Jeff, Fiesta will no longer use WTW's brokerage or services.
> Albert Moreno will reach out to you regarding the policy release forms and any other administrative items that need addressed during the transition.

Ex. 48.  The T&Cs address the obligations owed to Fiesta by Willis on termination.  SAC, at Ex. 1.  The T&Cs provide that "[i]n the event of termination":

> …[Willis's] obligation to render services under the agreement ceases on the effective date of termination of the agreement…Claims and premium or other adjustments may arise after our relationship ends. Such items are normally handled by the insurance broker serving you at the time the claim or adjustment arises.  However, it may be mutually agreed that we will provide services in these areas after the termination of our relationship for mutually agreed upon compensation. …

SAC, at Ex. 1.  No such agreement was reached between Fiesta and Willis following Willis's termination, nor did Fiesta pay Willis any additional compensation.  Ex. 49 (Hook Transcript, Vol. II), at 20:24-21:12.[7]

---

[7] According to Fiesta, notwithstanding the terms of the termination provision in the T&Cs, Willis was still responsible for servicing the policies that it had brokered and which were still in place.  Ex. 49 (Hook Transcript, Vol. II), at 17:2-6.  This, however, is not industry custom or practice, and Fiesta also conceded that it never discussed this understanding with Willis. *Id.*, at 27:6-8.

**H.      In the Summer of 2020,  Fiesta Wrote to Willis Regarding its Depreciation Claim.**

On June 23, 2020 – nearly a year and a half *after* Fiesta terminated Willis as its broker – Fiesta wrote Willis asking for a call to discuss Fiesta's "restoration and repair efforts" at Store No. 23 and "the submittal process to receive…depreciation holdback[.]" Ex. 50.[8]  It is undisputed that, at that time (nor since), Fiesta had not made any "restoration [or] repair efforts" at any of the Stores, which it acknowledged is a prerequisite for recovering depreciation holdback under the Property Policy.  Ex. 15 (Hook Transcript, Vol. I), at 38:25-39:20.  Willis did not respond to this letter or to two follow-up requests by Fiesta because Willis was no longer Fiesta's broker.  *See* Ex. 51.

Fiesta alleges Willis's "failure to respond" breached the duties it owed Fiesta under the T&Cs and the Texas Insurance Code.  SAC, at ¶¶ 86-87.  Fiesta also claims that "by ignoring Fiesta Mart's multiple requests for assistance," Willis has "block[ed]" Fiesta from receiving depreciation holdback proceeds.  *Id*., at ¶ 88.

Fiesta has not made repairs at the Stores.  Ex. 15 (Hook Transcript, Vol. I), at 39:8-20.  Two of the stores (Store No. 56 and Store No. 10) remain closed today.  SAC, at ¶ 34.  Under the Property Policy, "[i]f the property is not repaired, rebuilt or replaced with similar property on the same or another side, the [Insurers] shall not be liable for more than the actual cash value of the property damaged or destroyed."  Ex. 6, at Section 10(h).  Fiesta has acknowledged that it "would

---

[8] It is unclear why Fiesta waited more than four months after its settlement with ACON to contact Willis, or why it contacted Willis at all as Fiesta had terminated its relationship with Willis.  Fiesta acknowledges that it misunderstood that Willis was responsible for claims relating to policies it placed, even though those claims arose years after the policy period in issue and after Willis was terminated as its broker.  Ex. 49 (Hook Transcript, Vol. II), at 23:2-21.  It is also unclear why Fiesta sought Willis's assistance given the direct communications between its coverage counsel and the Insurers.  Ex. 45.

have to spend those funds in order to receive them from the insurers." Ex. 15 (Hook Transcript, Vol. I), at 39:4-6.

## I.      Fiesta Filed Suit Against Willis, and Later, the Insurers.

On September 4, 2020, Fiesta filed suit against Willis in Harris County District Court. Willis removed the case to this Court. ECF 1.   Fiesta later amended its complaint to bring a claim for breach of contract against the Insurers, seeking depreciation holdback proceeds. *See* ECF 12.[9] Fiesta's complaint against Willis consists of three claims: (1) violation of the Texas Insurance Code; (2) breach of contract; and (3) negligence/negligent misrepresentation.  Willis now moves for summary judgment on all three claims.

## ARGUMENT

## I.      Willis Did Not Proximately Cause Fiesta to Suffer Any Damages

### A.      Willis Did Not Direct Insurance Proceeds be Paid to ACON.

To prevail Fiesta must show Willis's actions proximately caused its damages. *See, e.g., Houston Orthopedic Surgical Hosp. v. Steadfast Ins. Co*., No. CV H-11-3916, 2014 WL 12600169, at *7 (S.D. Tex. Mar. 12, 2014).  Fiesta's statutory claims also require it to prove causation. *See Griggs v. State Farm Lloyds*, 181 F.3d 694, 702 (5th Cir. 1999); *PSG-Mid Cities Med. Ctr., LLC v. Jarrell*, No. 3:20-CV-02477-E, 2020 WL 7398782, at *3 (N.D. Tex. Dec. 17, 2020). Fiesta cannot sustain its burden because Willis could not possibly be the cause of any alleged losses from the insurance claim payments.

It is undisputed the Insurers made the second payment to ACON because ACON directed that the payment be made to it and the terms of the Property Policy provide that ACON has the

---

[9] Fiesta was granted leave to file a Second Amended Complaint, which corrected the name of one of the Insurers. *See* ECF 45-47.  The current operative complaint is Plaintiff's Second Amended Complaint.

right to direct where payment was made.  Ex. 52 (Evans Transcript), at 98:4-12; 119:24-120:2; *see also* Ex. 53 (Ashton Transcript), at 116:24-117:3 ("We were just operating under the direct instruction of our policyholder").  It is further undisputed that Willis had no role in the Insurers' decision to make the second payment to ACON instead of Fiesta.

It is axiomatic that an insurance broker is not responsible for, and has no control over, how insurance funds are distributed.  Ex. 52 (Evans Transcript), 97:8-10 ("I don't believe Willis…has an ability to…direct us one way or the other in terms of making a payment"); *see also* Ex. 53 (Ashton Transcript), at 172:2-9 (noting that while brokers "do make suggestions or…pass information along from…the client," they "don't control" payment of insurance proceeds).  Those decisions are made by the insurers, not Willis, in accordance with the terms and provisions of the policies that Fiesta received and reviewed.

ACON did not receive payment from several of the Insurers until *after* September 18, 2018, *i.e*., **after** receiving the September 11, 2018 letter from Fiesta where they were put on notice of the dispute between ACON and Fiesta.  Ex. 28.  The fact that these Insurers nevertheless decided to make their payment to ACON and not Fiesta further demonstrates that it was the Insurers who made the decision regarding who would receive the payment and that Willis cannot be held responsible by Fiesta for that decision.  If Fiesta has any claim for not receiving the second payment, such claim can only properly be brought against ACON and/or the Insurers.

Fiesta bases much of it legal claim against Willis on the fact the first payment was made to it, not ACON.  This ignores the fact that the first payment was made to Fiesta **at ACON's direction**.  *See, e.g*., Ex. 14 ("Please make sure that the payment is made out to Fiesta and not ACON Investments.  The ACON folks reminded us of that yesterday at the end of the conference call."); Ex. 53 (Ashton Transcript), at 148:11-18 (first payment was made to Fiesta "[s]olely at the

direction of the client."). If anything, this is further evidence that ACON, as the first named insured, had the right to direct where payments were made and again demonstrates Willis had no role in the decision as to who received the payments.

While Plaintiff's statutory claims should also be summarily dismissed for failure to identify any affirmative misrepresentation by Willis concerning a specific policy provision, there is simply no evidence that any of Willis's alleged statements were a proximate cause of Fiesta's damages. *PSG-Mid Cities*, 2020 WL 7398782, at *3. Fiesta is seeking to recover the delta between the amount paid to ACON by the Insurers (approximately $4.78 million) and the amount that ACON paid to Fiesta under the settlement agreement ($3.1 million), as well as depreciation holdback proceeds. *See* Ex. 15 (Hook Transcript, Vol. I), at 47:21-25. Nothing that Willis did or did not do caused the second payment to be made to ACON over Fiesta. Nor did Willis induce Fiesta to accept an amount lower than what it believed it was entitled to recover from ACON. It is undisputed ACON directed the Insurers to make payment to it, as was its right under the Property Policy. Had Fiesta wanted to ensure that any post-acquisition payments would go to it, it should have included a provision in the MIPA just as it did in the settlement agreement it entered into with ACON. Because Fiesta and its attorneys chose not to do so, the terms of the Property Policy – which Willis is not a party to – control.

This litigation also includes a claim against the Insurers for the depreciation holdback proceeds. Fiesta will either be entitled to these proceeds or it will not, and nothing Willis did or did not do prevented Fiesta from bringing this claim. To the extent this Court finds Fiesta is not entitled to depreciation holdback because it did make the repairs, Willis had no control over whether or not the repairs were made and "normal course is to expend funds before getting those funds back." Ex. 49 (Hook Transcript, Vol. II), at 43:14-19, 44:22-45. In other words, it was

Fiesta's decision not to make repairs – not any actions or representations by Willis – that prevented the recovery of depreciation holdback proceeds.

**B.      Summary Judgment Should be Granted on Fiesta's Negligence Claim Because Willis Did Not Breach Any Duties Owed To Fiesta.**

The third cause of action alleged against Willis is negligence/negligent misrepresentation. "Texas courts have generally recognized that an insurance broker owes the following common-law duties to a client for whom the broker undertakes to procure insurance: (1) to use reasonable diligence in attempting to place the requested insurance; and (2) to inform the client promptly if unable to do so." *W. Houston Airport, Inc. v. Millennium Ins. Agency, Inc.*, 349 S.W.3d 748, 751 (Tex. App. 2011); *Webb v. UnumProvident Corp.*, 507 F. Supp. 2d 668, 683 (W.D. Tex. 2005).[10]

There are no allegations that Willis breached its common law broker duties, or that it had a special relationship with Fiesta and therefore owed additional duties.  *Webb*, 507 F. Supp. 2d at 683.   Willis placed the Aggregate Property Program which ACON requested and which Fiesta agreed to.  Fiesta has offered no evidence to the contrary.  Because Willis fulfilled all of its legal duties to Fiesta, there is no basis for Fiesta's negligence claim.

**C.      Willis is Also Entitled to Summary Judgment on Fiesta's Negligent Misrepresentation Claim Because the Allegedly False Information Concerned a Future Event.**

Fiesta does not specifically identify the alleged "false information" that Willis provided. At the deposition of Fiesta's 30(b)(6) representative, Fiesta was asked to do so.  According to Fiesta, during an August 2, 2018 telephone call, Conant (of Willis) told Fiesta that "the second payment would go to Fiesta Mart[.]"  Ex. 49 (Hook Transcript, Vol. II) at 41:13-21.  In August of

---

[10] While a broker can owe its client duties "broader than [its] common law duties," this "depends on the facts and circumstances surrounding the agent's dealings with an insured."  *Webb,* 507 F. Supp. 2d at 683.  Here, there are no allegations – nor any evidence of – a special relationship, or that Willis undertook additional duties on behalf of its insured.

2018, Willis had not seen the MIPA and was unaware that the MIPA was silent concerning payment of proceeds for property damage and depreciation holdback.  *See* Ex. 20.

Even if Conant had told this to Fiesta, it does not affect summary judgment.[11]  As a matter of law, this statement cannot form the basis for a negligent misrepresentation claim.  "The type of 'false information' contemplated in a negligent misrepresentation case is a misstatement of existing fact."  *Willcox v. Am. Home Assur. Co.*, 900 F. Supp. 850, 860 (S.D. Tex. 1995).  "[A] promise of future action…cannot form the basis of a negligent-misrepresentation tort as a matter of law."  *Stolts v. Wells Fargo Bank, NA*, 31 F. Supp. 3d 876, 882, fn. 5 (S.D. Tex. 2014); *Campbell v. DLJ Mortg. Cap., Inc.*, 628 F. App'x 232, 236 (5th Cir. 2015) ("A promise about the future is not a statement of existing fact").

Here, the alleged "false information" was a statement about an anticipated, future payment that would be made by the Insurers.  This is the exact type of statement that Texas courts routinely reject as the basis for a negligent misrepresentation claim.  *See, e.g., Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1360 (S.D. Tex. 1994) (representations that a barge could be loaded in 18-24 hours were "guesses as to future unknown happenings; they were not information and as such, are not actionable under a theory of negligent misrepresentation"); *Hern Fam. Ltd. P'ship v. Compass Bank*, 863 F. Supp. 2d 613, 631 (S.D. Tex. 2012) ("Defendant's alleged promise was to act or not act in the future; therefore, it cannot form the basis of a negligent misrepresentation claim"); *Petras v. Criswell*, 248 S.W.3d 471, 476 (Tex. App. 2008) (same).[12]

---

[11] Willis also had no part in ACON deciding to direct the payment to itself, nor was it responsible for the Insurer's decision to make that payment to ACON.  Those were superseding and intervening events, and the lack of causation is another reason to grant summary judgment.  *See* Section I.  The Insurers were bound to make payment as instructed by the first named insured, regardless of any objections by Fiesta.

[12] Additionally, because the alleged August 2 representation occurred after the loss at issue, it cannot form the basis for a misrepresentation claim.  *See Gant v. State Farm Lloyds*, No. 3:21-CV-2164-B, 2022 WL 254353, at *4 (N.D. Tex. Jan. 27, 2022) ("post-loss statements generally cannot serve as the basis for fraud or misrepresentation claims because the insured did not rely on or take action based on such statements to their own detriment."); *W. Texas Agriplex*

The only other alleged misrepresentation identified by Fiesta is the claim that Willis purportedly told Fiesta that "it had secured insurance for Fiesta Mart [when] it clearly did not." Ex. 49 (Hook Transcript, Vol. II), at 33:11-16.   However, not only was the Fiesta 30(b)(6) representative unable to identify who at Willis specifically made this alleged representation (*id.*, at 33:17-34:1) or when the representation was made, Fiesta was unable to identify any specific conversation or document where this representation was made; to the contrary, according to Fiesta, it was Willis's "actions," that supposedly caused Fiesta to believe it had insurance coverage.  *Id.*, at 34:13-35:14.[13]

A claim for negligent misrepresentation requires that there be an actual disclosure or representation; without this, "there [can] be no 'supplying' of false information to support a negligent misrepresentation claim."   *Sergeant Oil*, 861 F. Supp. at 1360 (granting summary judgment where the defendant "did not make any affirmative representations"); *Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Health, Inc.*, No. CIV.A. H-06-2111, 2007 WL

---

*v. Mid-Continent Cas. Co.*, No. CIV.A. 5:03-CV-199-C, 2004 WL 1515122, at *13 (N.D. Tex. July 7, 2004) ("an insured normally cannot bring a misrepresentation claim for any alleged representations made after a loss"); *HLS Enterprises of Texas, Inc. v. N. Ins. Co. of New York*, No. CV H-04-4754, 2005 WL 8165616, at *2 (S.D. Tex. Oct. 18, 2005).

For this reason, too, Plaintiff's claims under the Texas Insurance Code (discussed more fully in section III below) must also be dismissed.  *See Griggs v. State Farm Lloyds*, 181 F.3d 694, 701 (5th Cir. 1999) (to be actionable, a misrepresentation under the Texas Insurance Code must occur "prior to a loss"); *Vaughan v. State Farm Lloyds*, No. MO-15-CA-17, 2015 WL 13134509, at *2 (W.D. Tex. Aug. 5, 2015) ("liability attaches only if the agent misrepresents specific policy terms prior to a loss").

[13] Fiesta also suggests Willis misrepresented that Fiesta was an insured when it issued Certificates of Insurance that identified Fiesta Mart, LLC as an Insured.  *See* SAC, at ¶ 46.  This ignores the fundamental purpose of Certificates of Insurance, which are for the benefits of third parties.  Ex. 54 (Collins Transcript), at 125:20-126:4.  Further, Certificates of Insurance do not confer any rights, as the prominently displayed disclaimer language and case law make clear.  *Id.*, at Ex. 55; *see also TIG Ins. Co. v. Sedgwick James of Washington*, 184 F. Supp. 2d 591 (2001) ("It is well-established under Texas law that when a certificate of insurance contains language stating that the certificate does not amend, extend, or alter the terms of any insurance policy mentioned in the certificate, the terms of the certificate are subordinate to the terms of the insurance policy.").  It also ignores the testimony of Fiesta's corporate representative that there were no emails, letters, or oral representations from Willis to this extent.  Ex. 15 (Hook Transcript, Vol. I), at 183:14-184:19.

2220976, at *6 (S.D. Tex. Aug. 1, 2007) (same).  To the extent that Fiesta is relying on Willis's alleged actions as opposed to some specific (albeit unidentified) statement Willis made, that cannot form the basis for a negligent misrepresentation claim as a matter of law.

Moreover, even if Fiesta could meet its burden of proof here, it is undisputed that when Willis brokered the Property Policy, Fiesta was owned by ACON, the Named Insured and parent company of the subsidiary entity identified in Endorsement A.1, and there was in place insurance that covered the damage to the Stores (through which the Insurers paid more than $12 million). The acquisition of Fiesta served as an intervening and superseding event.  Indeed, this litigation likely would not have arisen had Fiesta not been sold to Bodega and it would surely have been avoided had Fiesta and/or Bodega simply included in the MIPA provisions addressing which entity would be entitled to depreciation holdback and any future insurance proceeds.

Fiesta's suggestion that it was somehow misled by Willis into agreeing to be part of Aggregate Property Program also has no basis in fact.  SAC, at ¶¶ 75-78.  The Fiesta representative was unable to recount *any* representations Willis made in 2016 regarding the program design; in fact, he could not even identify who at Willis Fiesta spoke with in connection with joining the Aggregate Property Program.  Ex. 15 (Hook Transcript, Vol. I), at 165:19-23, 166:10-15. "Without factual allegations regarding the alleged misrepresentations Defendants made concerning policy coverage and how these misrepresentations induced Plaintiff's reliance, Plaintiff's [negligence] claim must fail."  *Skinny Kid Productions, LLC v. Arthur J. Gallagher & Co.*, 2021 WL 6750915, at *3 (W.D. Texas, March 25, 2021).

### D.   The Economic Loss Doctrine Bars Fiesta's Tort Claims Against Willis.

To the extent Fiesta seeks redress for representations made by Willis in the T&Cs, those claims sounds in contract, not tort.  *See, e.g.*, SAC, at ¶¶ 28-29 (citing to the T&Cs and the "promise[s]" therein to "respond to Fiesta Mart's requests for coverage information as well as act

on Fiesta Mart's behalf as the insured" and to "inform Fiesta Mart and withdraw from the Fiesta Mart relationship" "if Willis became aware of any conflict of interest between Fiesta Mart and another entity with a relationship with Willis"); *Scherer v. Angell*, 253 S.W.3d 777, 782 (Tex. App. 2007) ("any failure to live up to representations would be a breach of that contract and not a negligent misrepresentation.").[14]

"Texas enforces a robust economic loss rule to prevent parties from using artful pleading to recast contract claims as tort claims." *BlackHawk Paving, Inc. v. CPCM, LLC*, No. 4:20-CV-48-SDJ, 2021 WL 1152836, at *1 (E.D. Tex. Mar. 26, 2021); *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 243 (Tex. 2014). "Under the economic loss rule, a plaintiff may not bring a claim for negligent misrepresentation unless the plaintiff can establish that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Sterling Chemicals, Inc. v. Texaco Inc.*, 259 S.W.3d 793, 797 (Tex. App. 2007); *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 285 (Tex. App. 2000). Here, Fiesta takes issue with the representations that Willis allegedly made in connection with the services it provided as Fiesta's broker. These services are unquestionably the subject of the parties' T&Cs and therefore the Court should reject Fiesta's attempt to recast its breach of contract claim as one for negligent misrepresentation and instead grant summary judgment on this issue.[15]

---

[14] To the extent that Fiesta may argue that Willis made misrepresentations in the lead-up to its decision to retain Willis as its broker and join the Aggregate Property Program, the T&Cs contain an integration clause which expressly provides that the terms and conditions of the T&Cs control unless there is "a separately negotiated and assigned agreement[.]" SAC, at Ex. 1. There are no allegations by Fiesta of any other agreements between Willis and Fiesta other than the T&Cs. Thus, the T&Cs clearly supersede any representations or understandings predating the "decision to utilize Willis Towers Watson to purchase insurance coverage, products and/or services[.]" *Id.*

[15] Moreover, Fiesta – which concedes that it had and reviewed the policies at issue – is charged with having "knowledge of the policy terms and conditions." *Manion v. Sec. Nat. Ins. Co.*, No. 13-01-248-CV, 2002 WL 34230861, at *3 (Tex. App. Aug. 15, 2002)); *Roland v. Transamerica Life Ins. Co.*, 570 F. Supp. 2d 871, 881 (N.D. Tex. 2008), *aff'd*, 337 F. App'x 389 (5th Cir. 2009) ("An insured is deemed to be on notice of all terms of an insurance policy."). Texas law is clear: "[a] claim for misrepresentation cannot stand when the party asserting the claims is legally charged with knowledge of the true facts." *Manion*, 2002 WL 34230861, at *3. To the extent that Fiesta's claim for negligent misrepresentation is premised on representations made about the Property Policy, because it is

19

## II.     Willis Did Not Breach the T&Cs, Which Must be Decided Under Illinois Law.

The T&Cs – which Fiesta describes as a "valid, enforceable contract" (SAC, ¶ 112) – contain a choice of law provision that provides:

> Our agreement for services shall be governed by and construed in accordance with the laws of the state in which our office is located.

SAC, at Ex. 1.  "To determine the applicable law, a federal court sitting in diversity applies the choice of law rules of the forum."  *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir.), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003).  "Texas law gives effect to choice of law clauses regarding construction of a contract."  *Id*.; *see also C-Bons Int'l Golf Grp., Inc. v. Lexington Ins. Co*., No. 3:19-CV-0663-B, 2019 WL 5427574, at *4 (N.D. Tex. Oct. 22, 2019).

Here, the law of Illinois governs Fiesta's second cause of action.  The Property Policy was brokered by Willis of Illinois, Inc., an Illinois corporation with its principal place of business in Chicago.  Ex. 56.  In accord with Texas law, because Illinois is the state in which Willis's office is located, Fiesta's breach of contract claim must be decided under Illinois law.

Willis does not dispute that the T&Cs constitute a valid and enforceable contract, but the contract was terminated by Fiesta effective February 13, 2019.  Any conduct by Willis after that date cannot form the basis for a breach of contract claim.

Fiesta identifies three alleged breaches of the T&Cs by Willis: (1) Willis failed to notify Fiesta of a conflict of interest; (2) Willis failed to provide Fiesta with accurate and timely facts, information, and direction; and (3) Willis failed to promptly respond to Fiesta's requests for

---

undisputed that Fiesta was provided with a copy of the Property Policy and had knowledge of the policy terms and conditions, there is no reliance and no basis for liability as to Willis.

coverage information.  SAC, at ¶ 114.  Willis is entitled to summary judgment on each of the alleged breaches.

### A.     There is No Evidence that Willis Had a Conflict of Interest That Prevented Its Ability to Provide Brokerage Services to Fiesta.

Fiesta alleges in its Second Amended Complaint that Willis had a conflict of interest when it "said nothing to Fiesta Mart about its insurance proceeds going directly to ACON…until after ACON had already been paid."  SAC, at ¶ 79.  This simply is not true.  By email dated September 4, 2018, Willis informed Fiesta that ACON had "instructed the adjuster and Willis to direct payment to ACON."  Ex. 25.  There is no evidence indicating that any payments were made before that date.  To the contrary, at the time, the Insurers were asking for additional information concerning to whom they should make payment.  Ex. 23.

The T&Cs state:

> The insurance market is complex, and there could be other relationships which are not described in this document which might create conflicts of interest.  If a conflict arises for which there is no practicable way of complying with this commitment, we will promptly inform you and withdraw from the engagement, unless you wish us to continue to provide the services and provide your written consent.  Please let us know in writing if you have concerns or we will assume that you understand and consent to providing our services pursuant to these terms.

SAC, at Ex. 1.  There are no allegations – nor has any evidence been produced – that it was impracticable for Willis to comply with its obligations.  While there may have been a conflict between Fiesta and ACON as a result of Bodega and its attorneys failing to address payment of insurance proceeds in the MIPA, that did not result in Willis being unable to perform its duties to Fiesta.  Ex. 1 (Roberts Transcript), at 67:8-68:8.

**B.      After Willis Was Terminated as Fiesta's Broker in February 2019, it Owed No Further Obligations to Fiesta and Did not Breach the T&Cs by Not Responding to Fiesta in the Summer of 2020.**

Fiesta alleges in its Second Amended Complaint that Willis breached the T&Cs by failing to promptly respond to Fiesta's requests for coverage information in 2020.  However, on February 13, 2019, Fiesta terminated Willis as its broker.  At that point, any duties and obligations owed by Willis to Fiesta ceased, as the T&Cs make clear.[16]  Despite this, Fiesta takes issue with the fact that Willis did not respond to a handful of emails sent by Jack Hook of Fiesta in June and July of 2020 in connection with Fiesta's claim for depreciation holdback proceeds, more than 15 months *after* Fiesta terminated Willis as its broker.

Illinois law on this point is clear: where a contract is terminated, conduct occurring after that date cannot form the basis for a breach of contract claim.  *See Tetra Tech, Inc. v. M&J Underground, Inc*., 2012 IL App (1st) 110782-U, ¶ 30 (May 11, 20212); *Wikoff v. Vanderveld,* 897 F.2d 232, 241 (7th Cir. 1990) (applying Illinois law).

The fact that Willis did not respond to Fiesta's inquiries in June and July of 2020 did not result in any injury to Fiesta.  Fiesta includes in this litigation a claim against the Insurers for depreciation holdback proceeds.  This shows that Willis's purported delay had no impact on Fiesta's claim.  Indeed, the Second Amended Complaint indicates that Fiesta began seeking

---

[16] Hook's subjective belief – *i.e*., that termination was only as to future services, and that Willis was responsible for assisting a former client with claims arising under any policies it placed, a belief that he admits that he never discussed with anyone at Willis – is contrary to the plain and unambiguous terms of the T&Cs, which explicitly note that "Claims…may arise after our relationship ends" and that they "are normally handled by the insurance broker serving you at the time the claim or adjustment arises."  *See* SAC, at Ex. 1; Ex. 49 (Hook Transcript, Vol. II), at 27:2-8; *see also Insignia/Frain Camins & Swartchild v. Querrey & Harrow, Ltd*., 36 F. Supp. 2d 1051, 1053 (N.D. Ill. 1999) (applying Illinois law) ("When the language in the contract is clear and unambiguous our inquiry ends because we must give effect to contracts as written").  Further, the T&Cs lay out that a former client may use Willis's services, provided that there is a "mutual agree[ment]," including "mutually agreed additional compensation."  *See* SAC, at Ex. 1.  It is undisputed that Fiesta never entered into any agreement with Willis for continuing services nor did Fiesta ever pay Willis any additional compensation. Ex. 49 (Hook Transcript, Vol. II), at 20:23-21:12 ("I don't recall additional compensation…I don't recall any agreement…").

these proceeds directly from the Insurers in early 2020, independent of – and without the need for assistance from – its former broker.  *See* SAC, at  ¶¶ 96 – 100.

To the extent there was any delay, it was attributable to Fiesta and its agents, not Willis. Fiesta, Bodega, and their attorneys could have chosen to account for depreciation holdback proceedings in the MIPA (as it did as part of the Settlement Agreement); indeed, the MIPA – which was highly comprehensive at over 600 pages in length – included representations concerning the damage to Store Nos. 10 and 56.  *See* Ex. 17, at Schedule 4.7, Schedule 7.1(a).  For whatever reason, they did not address the depreciation holdback in their agreement and Willis cannot be liable for the resulting dispute.

### C.  There is No Evidence in the Record that Willis Provided Fiesta with Inaccurate or Untimely Information.

Fiesta alleges that Willis failed to provide it "with accurate timely facts, information and direction[.]"  SAC, at ¶ 114.  Fiesta fails to identify in its Second Amended Complaint the inaccurate and untimely information Willis allegedly provided, nor does it identify the provisions of the T&Cs that Willis is alleged to have breached.  This alone justifies disposal of Plaintiff's breach of contract claim.  *See Brewer v. Allstate Life Ins. Co*., 2022 IL App (1st) 210932-U, ¶ 19.[17]

## III.  Plaintiff Has Not Sufficiently Pleaded, or Adduced Any Evidence Showing, that Willis Violated the Texas Insurance Code.

Fiesta's first cause of action against Willis is for violation of section 541.051 and 541.061 of the Texas Insurance Code.  In its Second Amended Complaint, Fiesta does not identify the specific subsection of the Code that Willis allegedly violated, nor does it identify the specific

---

[17] Nor has discovery adduced any facts possibly supporting this theory.  While Willis concedes that, for a brief time prior to its termination, there was some delay caused by Conant's illness, it is undisputed that other members of the Willis team stepped in, helped manage the claim, and otherwise provided services to Fiesta.  *See, e.g.*, Ex. 13 (Daar Transcript), at 75:22-76:23.  To the extent that Fiesta may argue that Willis mispresented its status as an insured under the Property Policy, as set forth above, Fiesta's own corporate representative cannot point to any specific occasion where Willis did so.  *See supra* p. 17.

misrepresentation made.[18]  Instead Fiesta relies entirely on vague and conclusory allegations.  *See* SAC, at ¶¶ 105-109 ("Willis knowingly made statements misrepresenting the terms of the policies…"; "Willis knowingly made statements misrepresenting the benefits or advantages promised by the policies…").[19]

Summary judgment should enter, as the Texas Insurance Code requires Fiesta to show "**an affirmative misrepresentation** about a specific aspect of the policy."  *La Verdure & Assocs. v. Depositors Ins. Co*., No. 4:16-CV-00883, 2017 WL 4698150, at *4 (E.D. Tex. Oct. 19, 2017) (emphasis added).  "Under…the Insurance Code, the general rule is that in the absence of an affirmative misrepresentation, a mistaken belief about the scope of coverage is not actionable…" *Atl. Cas. Ins. Co. v. PrimeLending*, No. 3:15-CV-1475-D, 2017 WL 951878, at *5 (N.D. Tex. Mar. 10, 2017) ; *see also Howard v. Burlington Ins. Co*., 347 S.W.3d 783, 798 (Tex. App. 2011).

At the deposition of its corporate representative (Jack Hook), Fiesta was specifically asked to identify the misrepresentations underlying its claim for violations of the Texas Insurance Code. In response, Hook testified:

---

[18] "Texas Insurance Code Claims predicated on misrepresentation [are required] to satisfy the heightened pleading standard set out in Rule 9(b) of the Federal Rules of Civil Procedure," including "allegations of time, place, and contents of the alleged false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby."  *Exhibit Network Int'l Ltd v. Union Ins. Co*., No. 4:19-CV-4221, 2020 WL 3525192, at *3 (S.D. Tex. Apr. 28, 2020).  The SAC fails to meet this standard.  Accordingly, Willis should be granted summary judgment on this claim.

[19] As set forth *supra* at p. 18, Fiesta was unable to identify *any* statements made to Fiesta in connection with its decision to join the Aggregate Property Program in 2016, let alone, any specific misrepresentations.  And, because no statements or misrepresentations are identified, it is impossible to determine when these statements were made, or by whom.  Moreover, even if these were properly pleaded (they are not), any statements about the Aggregate Property program design and the terms and conditions of the Property Policy are likely barred by the Code's two-year statute of limitations.  *See* TEX. INS. CODE ANN. § 541.162 ("A person must bring an action under this chapter before the second anniversary of the following: (1) the date the unfair method of competition or unfair or deceptive act or practice occurred; or (2) the date the person discovered or, by the exercise of reasonable diligence, should have discovered that the unfair method of competition or unfair or deceptive act or practice occurred.")  It is undisputed that Fiesta received a copy of the Property Policy and is therefore charged with knowledge of its terms and conditions.  *Roland*, 570 F. Supp. 2d at 881.

> Q.     What statements representing the benefits or advantages promised by the policies secured for Fiesta did Willis make?
>
> A.     Willis told us we had insurance.  Willis didn't – Willis didn't tell us that we didn't have insurance.
>
> ***
>
> Q.     And what is – what is your understanding that Willis' position is you didn't have insurance based upon?
>
> A.     Well, discussions, e-mails, the fact that I was told we were insured, the fact that I would receive $4.78 million in 30 days and never happened, and finding out the money went to ACON and not us.

Ex. 15 (Hook Transcript, Vol. I), at 167:13-168:4.  Hook went on to describe the August 2, 2018 call with Blaine Conant discussed above, in which Conant allegedly told Fiesta it should "expect the money within 30 days, 4.78 million."  *Id*., at 169:7-9.  Hook could not identify any other specific representations made by Willis during that call, and he was only able to speak to other discussions in the abstract, conceding that he was relying on Willis's "actions," and not any specific representation.  *Id*., at 172:11-15 ("actions speak louder than words, clearly"); *see also id*., at 169:9-19, 170:15-22.

None of these representations concern "specific policy terms," as is required for an actionable claim under the Texas Insurance Code.  *See Griggs*, 181 F.3d at 701; *Vaughan*, 2015 WL 13134509, at *2.   Accordingly, summary judgment is appropriate.

## IV.   There is No Basis for an Award of Attorneys' Fees and Willis is Entitled to a Set-Off For the Amount Fiesta Recovered From ACON.

Fiesta seeks attorneys' fees from Willis under Tex. Civ. Prac. & Rem. Code § 38.001 and Tex. Ins. Code § 541.152.  At the deposition of the Fiesta representative, no other basis for attorneys' fees was identified.  *See* Ex. 49 (Hook Transcript, Vol. II), at 56:11-57:6.  The T&Cs do not permit recovery of attorneys' fees, and no other contract has been identified in discovery or in the SAC as providing a basis for an award of fees. *Akin, Gump, Strauss, Hauer & Feld, L.L.P.*

25

*v. Nat'l Dev. & Rsch. Corp.*, 299 S.W.3d 106, 120 (Tex. 2009).  If the Court dismisses Fiesta's claims under the Texas Insurance Code, it must also dismiss Fiesta's request for attorneys' fees.

To the extent that any of the claims against Willis survive this Motion, Willis is entitled to a set-off of $3.1 million, which is the amount of the $4.78 million that the Insurers paid to ACON which ACON then paid to Fiesta under the settlement agreement.  *See* Ex. 49 (Hook Transcript, Vol. II), at 53:12-54:10 (amount of actual damages sought of Willis by Fiesta is "the difference between the 4.78 and the 3.1"); *id.*, at Ex. 15 (Hook Transcript, Vol. I), at 47:21-23 ("of the 4.78, right, we received through negotiations with ACON, 3.1 million, and my understanding is the suit is for the delta between those two amounts").

For all of these reasons, Willis respectfully requests that the Court grant this motion and enter judgment in its favor on all claims.

Respectfully submitted,

/s/ *Christopher W. Martin*
Christopher W. Martin
SBOT No. 13057620
Federal ID No. 13515
MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.
808 Travis, Suite 1100
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101
E-mail: martin@mdjwlaw.com

*Counsel for Defendants Willis Towers Watson Midwest, Inc. and Willis Towers Watson US, LLC*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument has been served upon all counsel of record via electronic mail delivery on October 11, 2022.

<u>/s/</u> *Christopher W. Martin*

Christopher W. Martin

27