# EXHIBIT 7

Message

| | |
|---|---|
| **From**: | Galla, Peter [/O=WILLIS/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=PETER.GALLA] |
| **Sent**: | 5/19/2016 5:13:58 PM |
| **To**: | Wayne S. Peterson [petersonw@fiestamart.com] |
| **CC**: | Szydlowski, Meagan [meagan.szydlowski@willistowerswatson.com]; Roberts, Jeffrey [jeffrey.roberts@willistowerswatson.com] |
| **Subject**: | RE: ACON Property Program |
| **Attachments**: | ACON Investments - Proposed Property Portfolio Program for Fiesta Holdings as of 5.19.16.xlsx |

Wayne –

Attached is a copy of the ACON program that Jeff mentioned below.

Look forward to discussing with you.

Thanks,

Pete

**Pete Galla**
**Willis Towers Watson**
M&A Group
Direct: 212-915-8185
Mobile: 201-344-1047

---

**From:** Roberts, Jeffrey
**Sent:** Thursday, May 19, 2016 10:50 AM
**To:** Wayne S. Peterson
**Cc:** Galla, Peter
**Subject:** ACON Property Program

Hi Wayne,

I hope all is well. We have finalized the ACON Property program. Do you have some time tomorrow afternoon to review? Please let me know your availability.

Best,

Jeff

**Jeffrey Roberts**
**Willis Towers Watson**
**M&A Practice**
Cell: 312-339-2953

CONFIDENTIAL

# ACON Investments, LLC - Property Portfolio Program
### June 1, 2016 - June 1, 2017
### All Risk Property inlcuding Equipment Breakdown and Terrorism



**Terrorism**

Hiscox
33,500
100%
33,500

**Layer markers:** $400m 100% | $300m 100% | $200m 100% | $125m 100% | $50m 100% | $25m 100%

**$400m / $300m layer**

| Market Layer % Part Share | | |
|---|---|---|
| Mitsui 50,000 40% 20,000 | Great American 50,000 40% 20,000 | Swiss Re 1,600,000 20% 320,000 |

One Beacon 45,000 80% 36,000

Markel 60,000 45% 27,000

Markel 60,000 35% 21,000 / Munich Re 60,000 45% 27,000

Scottsdale 250,000 35% 87,500 / Munich Re 150,000 45% 67,500

Berkley 165,000 40% 66,000 / Maxum 220,000 40% 88,000

**Primary layer (Market / Layer / % Part / Share):**

| XL 1,000,000 15% 150,000 | Aspen 1,100,000 12% 132,000 | Arch 1,000,000 10% 100,000 | Hiscox 1,035,000 15% 155,250 | Ironshore 1,000,000 15% 150,000 | Munich Re 850,000 13% 110,500 |

Deductible(s)

**ACON INVESTMENTS Property Portfolio**

**Exposure / Rate / Premium Comparison (Current vs. Portfolio)**

| Portfolio Company | Current Exposure | ACON Portfolio Exposure | Difference | % | Current Average Rate | ACON Portfolio Average Rate | Difference | % | Current Premium | Est. Surplus Lines Taxes & Fees | Est. Total Current Cost | ACON Portfolio Premium | Est. Surplus Lines Taxes & Fees | Est. ACON Total Cost | Difference | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACON Fiesta Holdings | $762,117,301 | $698,367,933 | -$63,749,368 | -9% | $0.18 | $0.13 | -$0.053 | -29% | $1,400,000 | $0 | $1,400,000 | $915,000 | $16,470 | $931,470 | -$468,530 | -33% |
| Totals for Current Program vs. Portfolio Program | $762,117,301 | $698,367,933 | -$63,749,368 | -9% | $0.18 | $0.13 | -$0.05 | -29% | $1,400,000 | $0 | $1,400,000 | $915,000 | $16,470 | $931,470 | -$468,530 | -33% |

**Willis Property Program Notes:**

**1) Various sublimits apply and deductible changes compared to current programs: ACON Office, FUNKO, IWP, Refac and SuzoHapp will have a $25,000 AOP Deductible, Igloo $50,000 and Fiesta $250,000.**
2) Willis program includes estimated applicable taxes, surcharges, etc.
3) ACON Fiesta bound a new a program 4/27/16 with AIG for $1,008,000 gross.

# PROPERTY / BOILER AND MACHINERY COVERAGE
## Terms and Conditions Tracking Sheet
### Prepared for ACON Investments

**POLICY PROVISIONS**

| | ACON Portfolio Terms | Fiesta Mart - AIG Quoted Terms |
|---|---|---|
| Carrier(s) | Layered 6/1/16-17 | AIG 4/27/16-17 |
| | | |
| **Limits (per occurrence)** | | |
| Real and Personal | 400,000,000 | 600,000,000 |
| Stock (Raw Materials, WIP, Finished Goods) | Included except for Igloo | Included |
| Business Interruption | Included | Included |
| Rental Value | Included | 1,000,000 |
| Ordinary Payroll | as declared | 180 days |
| Contingent Time Element | | 1,000,000 applying separately to Named & Unnamed suppliers |
| Extra Expense | 5,000,000 | 10,000,000 |
| Expediting Expense | 100,000,000 | 1,000,000 |
| Accounts Receivable | 100,000,000 | 2,500,000 |
| Brands and Labels | Included | 100,000 |
| Building Materials Off Premises for Prop Under Construction | Misc. Unnamed Location Sublimit Applies | 250,000 |
| Contractors Equipment | 5m | 25,000 per item / 250k per occ max |
| Debris Removal | as declared | lesser of 5,000,000 or 25% of PD |
| Demolition, Increased Cost of Construction - Coverage A | greater of 10m or 25% of PD | Included |
| Demolition, Increased Cost of Construction - Coverage B&C | Included | 5m each |
| EDP Media | 10,000,000 | 2.5M for Covered Cause of loss / 250k for Cyber Perils |
| | Included except for Cyber Perils | |
| Fairs or Exhibitions | Misc. Unnamed Location Sublimit Applies | |
| Fine Arts | 5m | 500,000 |
| Fine Valuables for Theft | Included | 500,000 |
| Fire Brigade Charges and Extinguishing Expenses | Included | 100,000 |
| Fungus, Mold or Spore | Included | 100,000 |
| Inland Transit | 5m resulting from covered peril | 500,000 |
| | 1,000,000 | 500,000 |
| Installation Coverage | Misc. Unnamed Location Sublimit Applies | |
| Land Improvements | 5m | 500,000 |
| Leasehold Interest | as declared | unknown |
| Locks and Keys | Included | unknown |
| | Included | 100,000 |
| Machinery or Equipment Startup Option | 200,000,000 | 5,000,000 (applies to separate occurrence only) |
| Miscellaneous Unnamed Locations | 5,000,000 | 2,500,000 |
| Money & Securities | no coverage | 100,000 |
| Newly Acquired Property | 10,000,000 | 10,000,000 |
| Outdoor Property | as declared | 100,000 |
| Pairs and Sets | Included | Included |
| Pollutant Clean Up (aggregate) | 500,000 | 100,000 |
| Preservation of Property | Included | 500,000 |
| Professional Fees/Loss Adjustment Expense | 500,000 | 100,000 |
| Personal Property Not at a Covered Location | Misc. Unnamed Location Sublimit Applies | 1,000,000 |
| Property Removed From a Covered Location | Included | 100,000 |

AmWINS Brokerage of Georgia, LLC

| | | | |
|---|---|---|---|
| Railroad Rolling Stock | 1,000,000 | | |
| Research and Development | Included | | |
| Royalties | Included | | |
| | 100,000 | | |
| Salesperson Samples | Misc. Unnamed Location Sublimit Applies | | |
| Service Interruption | 5m | | |
| Sinkhole | 50,000,000 | | |
| Soft Costs | Included | | Included in Earth Movement Agg |
| Spoilage | 1,000,000 | | 1,000,000 |
| Unintentional E&O | Included | | 250,000 |
| | Included | | 2,500,000 |
| | 25% of direct physical loss subject to 500,000 max which includes Time Element | | |
| Upgrade to Green | no coverage | | |
| Valuable Papers | 10,000,000 | | 2,500,000 |
| Warehouseman Legal Liability | | | 250,000 |
| | Replacement Cost | | |
| **Time Element Extensions** | | | |
| Attraction Property | Contingent TE Sublimit of 5m would apply | | 30 days 500,000 max |
| Crisis Management | Extra Expense Sublimit of 100m would apply | | 30 days 50,000 max |
| Ingress/Egress | 45 days / 5m | | 30 days 2.5M max |
| Civil Authority | 45 days / 5m | | 30 days 2.5M max |
| Logistics Extra Cost | Extra Expense Sublimit of 100m would apply | | 100,000 |
| **Perils** | | | |
| All Risks | 400,000,000 | | 600,000,000 |
| Earth Movement (annual aggregate) | 25,000,000 | | 50,000,000 |
| Earth Movement in CA (annual aggregate) | 125,000,000 PNW and NM, 2,500,000 CA | | Excluded |
| Flood (annual aggregate) | 125,000,000 | | 50,000,000 |
| Flood Zone A,V (annual aggregate) | 40,000,000 | | 10,000,000 |
| Named Windstorm | 400,000,000 | | 600,000,000 |
| Named Windstorm in Harris county (annual aggregate) | 125,000,000 per occurrence | | 125,000,000 |
| Breakdown | 200,000,000 | | 600,000,000 |
| Terrorism | 200,000,000 annual aggregate | | Excluded |
| **Valuation** | | | |
| Real and Personal | RCV | | RCV |
| Stock (Raw Materials, WIP, Finished Goods) | Selling Price for Finished Goods | | Unknown |
| Time Element | ALS / Gross Earnings | | ALS |
| Coinsurance | None | | Unknown |
| Extended Period of Indemnity | 365 days | | 120 days |
| Occurrence Limit of Liability | blanket | | blanket |
| **Deductibles (per occurrence)** | | | |
| All Other Perils | Scheduled by Entity - see below | | 250,000 |
| Earth Movement | $100,000 except $250,000 for Fiesta | | 250,000 |
| Earth Movement in CA | 5% per unit / 100k min | | Excluded |
| Earth Movement in PNW and NM (see note below for PUNKO) | 2% per unit / 100k min | | Excluded |
| All Other Flood | $100,000 except $250,000 for Fiesta | | 250,000 |
| Flood Zones A,V | 3% per unit / 250k min | | 3% TIV / 250k min |
| Named Windstorm outside of tier 1 | Scheduled by Entity | | 2% TIV / 250k min |
| Named Windstorm in Harris county (annual aggregate) | 2% per unit / 250k min | | 2% TIV / 250k min |
| All Other Wind/Hail | AOP deductible applies except for Igloo $250,000 | | 250,000 |
| Breakdown | scheduled by entity except - 24 Hour waiting period for Service Interruption | | 250,000 |
| Inland Transit | 25,000 | | 250,000 |
| Service Interruption Qualifier | 12 hours | | 24 hours |
| **Form** | | | |
| | Manuscript | | American Home |

Please note this document is for your ready reference only. For
specific terms and conditions please refer to the actual quotes,
policy forms, and applicable endorsements.

Entity AOP Deductibles

| Fiesta Mart | 250,000 |
|---|---|

**ACON**
**Schedule of Values**

| Entity | Loc # | Street Address | City | State | Zip | County | Tier 2 Wind County | Flood Zone | EQ Zone | Building Value | BPP (incl Furn & Fix & Contents) | Leasehold Improvements | Stock/Inventory (Average) | Sign | Rental Income | Business Income | Total | Construction | Occupancy | Year Built | Sq Ft | # of Stories | Sprinklered | Burglar/Smoke Alarms | Ownded/Leased | Stock (Maximum Value) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiesta Mart | 25 | I-35 @ 38 1/2 | Austin | TX | 78722 | Travis | | X | | 11,627,000 | 5,285,000 | 5,285,000 | 1,561,556 | 60,000 | 239,947 | 5,675,734 | **29,734,237** | MNC | Retail Store | 1993 | 132,125 | | Yes | | Leased But Fiesta to Insure All of shopping Center | 66,045,830 |
| Fiesta Mart | 11* | 4711 Airline | Houston | TX | 77022 | Harris | Harris | X | | 8,279,706 | 4,044,800 | 4,044,800 | 1,525,234 | | 393,154 | 7,621,981 | **25,909,675** | MNC | Retail Store | 1984 | 101,120 | | Yes | | Ground Lease | |
| Fiesta Mart | 7 | 6200 Bellaire | Houston | TX | 77081 | Harris | Harris | X | | | 4,172,000 | 4,172,000 | 1,653,070 | 50,000 | 632,875 | 11,695,591 | **22,375,536** | MNC | Retail Store | 1982 | 104,300 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 10* | 12201 East Frwy | Houston | TX | 77029 | Harris | Harris | X | | 8,384,512 | 4,096,000 | 4,096,000 | 1,226,091 | 50,000 | 275,751 | 4,053,003 | **22,181,357** | MNC | Retail Store | 1984 | 102,400 | | Yes | | Ground Lease | 38,788,821 |
| Fiesta Mart | 8 | 2323 Wirt | Houston | TX | 77055 | Harris | Harris | X | | | 4,280,000 | 4,280,000 | 1,372,684 | 50,000 | 433,203 | 6,628,444 | **17,044,331** | MNC | Retail Store | 1982 | 107,000 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 82 | 2331 FM 529 | Cypress | TX | 77433 | Harris | Harris | X | | 6,500,000 | 2,532,920 | 2,800,000 | 1,163,561 | 35,000 | 31,041 | 2,600,000 | **15,662,522** | MNC | Retail Store | 2015 | 63,323 | | Yes | | Lease | |
| Fiesta Mart | 9* | 10401 Jensen Dr | Houston | TX | 77093 | Harris | Harris | AE | | | 2,994,960 | 2,994,960 | 1,400,489 | 50,000 | 307,935 | 7,626,667 | **15,375,011** | MNC | Retail Store | 1983 | 74,874 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 20 | 8320 FM 1960 @ 249 | Houston | TX | 77070 | Harris | Harris | X | | | 3,712,720 | 3,712,720 | 1,603,043 | | 243,116 | 6,073,899 | **15,345,498** | MNC | Retail Store | 1989 | 92,818 | | Yes | | Leased | |
| Fiesta Mart | 79 | 12584 Westheimer Road | Houston | TX | 77077 | Harris | Harris | X | | 4,897,570 | 2,392,560 | 2,800,000 | 1,168,105 | 35,000 | 27,957 | 3,122,875 | **14,444,067** | MNC | Retail Store | 2012 | 59,814 | | Yes | | Leased | |
| Fiesta Mart | 66 | 333 So. Mason Rd | Katy | TX | 77450 | Harris | Harris | X | | | 2,708,760 | 2,708,760 | 1,368,689 | 35,000 | 69,101 | 6,945,132 | **13,835,442** | MNC | Retail Store | | 67,719 | | Yes | | Leased | |
| Fiesta Mart | 22 | 12355 So. Main @ Post Oak | Houston | TX | 77035 | Harris | Harris | X | | | 4,157,680 | 4,157,680 | 1,202,732 | 50,000 | 216,924 | 3,936,756 | **13,721,772** | MNC | Retail Store | 1991 | 103,942 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 32 | 9727 Webb Chapel | Dallas | TX | 77520 | Harris | Harris | X | | 3,538,035 | 1,728,400 | 1,728,400 | 849,907 | 50,000 | 117,251 | 5,545,042 | **13,557,035** | MNC | Retail Store | 1997 | 43,210 | | Yes | | Leased But Fiesta to Insure All | |
| Fiesta Mart | 59 | 1200 E Parker Rd | Plano | TX | 75074 | Collin | | X | | 3,606,405 | 1,761,800 | 1,761,800 | 923,563 | 30,000 | 34,121 | 5,386,280 | **13,503,969** | MNC | Retail Store | 2002 | 44,045 | | Yes | | Leased But Fiesta to Insure All | |
| Fiesta Mart | 8 | 2333 Wirt | Houston | TX | 77055 | Harris | Harris | X | | | 4,909,920 | 4,909,920 | 3,514,689 | | | | **13,334,529** | MNC | Retail Store | 1982 | 122,748 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 18** | 8130 Kirby | Houston | TX | 77054 | Harris | Harris | X | | | 3,227,040 | 3,227,040 | 1,401,249 | 50,000 | 156,317 | 5,271,929 | **13,333,575** | MNC | Retail Store | 1988 | 80,676 | | Yes | | Leased | |
| Fiesta Mart | 74 | 11445 Garland Rd | Dallas | TX | 75218 | Dallas | | X | | 4,805,947 | 2,347,800 | 2,347,800 | 904,433 | 35,000 | 93,335 | 2,608,791 | **13,143,106** | MNC | Retail Store | 2008 | 58,695 | | Yes | | Leased | |
| Fiesta Mart | 60 | 1300 East Pioneer Parkway | Arlington | TX | 76010 | Tarrant | | X | | 2,163,433 | 1,056,880 | 1,056,880 | 1,051,925 | 35,000 | 119,090 | 7,502,756 | **12,985,964** | MNC | Retail Store | 2002 | 26,422 | | Yes | | Leased But Fiesta to Insure All | |
| Fiesta Mart | 67 | 421 West Bolt | Ft. Worth | TX | 76115 | Tarrant | | X | | | 2,340,000 | 2,340,000 | 1,019,554 | 35,000 | 151,868 | 6,681,878 | **12,568,300** | MNC | Retail Store | | 58,500 | | Yes | | Leased | |
| Fiesta Mart | 57 | 2951 S. Buckner Blvd | Dallas | TX | 75227 | Dallas | | X | | | 2,144,400 | 2,144,400 | 1,075,340 | 35,000 | 103,455 | 6,995,189 | **12,497,784** | | Retail Store | 2003 | 53,610 | | Yes | | Leased | |
| Fiesta Mart | 29 | 611 W. Jefferson | Dallas | TX | 75208 | Dallas | | X | | | 2,464,680 | 2,464,680 | 977,756 | 50,000 | 239,147 | 5,774,146 | **11,970,409** | MNC | Retail Store | 1993 | 61,617 | | Yes | | Leased | |
| Fiesta Mart | 71 | 3434 W. Illinois | Dallas | TX | 75211 | Dallas | | X | | | 2,236,640 | 2,236,640 | 845,739 | 35,000 | 150,015 | 6,253,410 | **11,757,444** | MNC | Retail Store | 2008 | 55,916 | | Yes | | Leased | |
| Fiesta Mart | 39 | 8710 Bellaire | Houston | TX | 77036 | Harris | Harris | AE | | | 1,664,760 | 1,664,760 | 1,006,373 | 40,000 | 103,534 | 6,562,750 | **11,042,177** | MNC | Retail Store | 1994 | 41,619 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 3* | 800 S. Wayside | Houston | TX | 77023 | Harris | Harris | X | | | 2,392,840 | 2,392,840 | 1,121,408 | 50,000 | 171,087 | 4,655,298 | **10,783,473** | MNC | Retail Store | 1979 | 59,821 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 4 | 1603 Spencer Hwy | Houston | TX | 77054 | Harris | Harris | X | | | 3,078,880 | 3,078,880 | 1,186,267 | 50,000 | 255,429 | 3,068,149 | **10,717,605** | MNC | Retail Store | 1978 | 76,972 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 23 | 9419 Mesa | Houston | TX | 77028 | Harris | Harris | X | | | 2,564,800 | 2,564,800 | 978,124 | 50,000 | 132,217 | 4,327,851 | **10,617,792** | MNC | Retail Store | 1991 | 64,120 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 61 | 2700 8th Ave. | Ft. Worth | TX | 76110 | Tarrant | | X | | 3,749,040 | 1,831,480 | 1,831,480 | 816,997 | 35,000 | 59,022 | 2,250,875 | **10,573,894** | MNC | Retail Store | 2002 | 45,787 | | Yes | | Leased But Fiesta to Insure All | |
| Fiesta Mart | 64 | 5510 I-35 | Austin | TX | 78745 | Travis | | X | | | 2,501,200 | 2,501,200 | 1,239,902 | 35,000 | 110,996 | 3,776,374 | **10,164,672** | MNC | Retail Store | 2007 | 62,530 | | Yes | | Leased | |
| Fiesta Mart | 17 | 4200 San Jacinto | Houston | TX | 77004 | Harris | Harris | X | | 3,398,184 | 1,660,080 | 1,660,080 | 964,775 | 50,000 | 69,102 | 2,346,851 | **10,149,072** | MNC | Retail Store | 1988 | 41,502 | | Yes | | Leased | |
| Fiesta Mart | 53 | 975 Irving Blvd. @ Nursery Rd | Irving | TX | 75060 | Dallas | | X | | | 1,410,400 | 1,410,400 | 748,177 | 50,000 | 38,066 | 6,413,241 | **10,070,284** | MNC | Retail Store | 2000 | 35,260 | | Yes | | Leased | |
| Fiesta Mart | 65 | 2224 W. Ledbetter | Dallas | TX | 75224 | Dallas | | X | | | 2,488,960 | 2,488,960 | 970,793 | 35,000 | 57,277 | 3,894,019 | **9,935,009** | MNC | Retail Store | 2005 | 62,224 | | Yes | | Leased | |
| Fiesta Mart | 77 | 3460 Webb Chapel | Dallas | TX | 75220 | Dallas | | X | | | 2,145,280 | 2,145,280 | 925,430 | 35,000 | 191,799 | 4,044,438 | **9,487,227** | MNC | Retail Store | 2008 | 53,632 | | Yes | | Leased | |
| Fiesta Mart | 5 | 5600 Mykawa | Houston | TX | 77033 | Harris | Harris | X | | | 2,767,520 | 2,767,520 | 1,009,630 | | 129,258 | 2,469,623 | **9,143,551** | MNC | Retail Store | 1979 | 69,188 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 75 | 1332 S Plano Rd | Richardson | TX | 75081 | Dallas | | X | | | 2,450,960 | 2,450,960 | 918,114 | 35,000 | 30,337 | 3,256,589 | **9,141,960** | MNC | Retail Store | 2008 | 61,274 | | Yes | | Leased | |
| Fiesta Mart | 58 | 8060 Spring Valley | Dallas | TX | 75240 | Dallas | | X | | | 1,956,000 | 1,956,000 | 925,606 | 25,000 | 145,942 | 4,081,732 | **9,090,280** | MNC | Retail Store | 2002 | 48,900 | | Yes | | Leased | |
| Fiesta Mart | 76 | 4245 E. Berry St | Ft. Worth | TX | 76105 | Tarrant | | X | | | 2,078,480 | 2,078,480 | 864,437 | 35,000 | 106,443 | 3,913,367 | **9,076,207** | MNC | Retail Store | 2008 | 51,962 | | Yes | | Leased | |
| Fiesta Mart | 2 | 2300 N. Shepherd | Houston | TX | 77008 | Harris | Harris | X | | | 2,715,840 | 2,715,840 | 984,516 | 50,000 | 84,709 | 2,432,179 | **8,983,084** | MNC | Retail Store | 1975 | 67,896 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 28 | 11006 Airline | Houston | TX | 77037 | Harris | Harris | X | | | 1,335,520 | 1,335,520 | 806,077 | 25,000 | 99,712 | 5,346,318 | **8,948,147** | MNC | Retail Store | 1992 | 33,388 | | Yes | | Leased | |
| Fiesta Mart | 14 | 14315 Bellaire | Houston | TX | 77083 | Harris | Harris | X | | | 3,100,960 | 3,100,960 | 1,269,614 | | 168,903 | 1,266,426 | **8,906,863** | MNC | Retail Store | 1987 | 77,524 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 50 | 5815 Lockwood | Houston | TX | 77026 | Harris | Harris | AE | | 3,031,689 | 1,481,040 | 1,481,040 | 561,475 | 25,000 | 67,941 | 2,168,786 | **8,816,971** | MNC | Retail Store | 1998 | 37,026 | | Yes | | Leased But Fiesta to Insure All | |
| Fiesta Mart | 46 | 275 NE 28th St. | Ft. Worth | TX | 76106 | Tarrant | | X | | | 1,758,280 | 1,758,280 | 757,710 | 40,000 | 69,404 | 4,420,749 | **8,804,423** | MNC | Retail Store | 1998 | 43,957 | | Yes | | Leased | |
| Fiesta Mart | 68 | 6401 Abrams | Dallas | TX | 75231 | Dallas | | X | | | 2,337,280 | 2,337,280 | 926,044 | 35,000 | 112,941 | 2,970,365 | **8,718,910** | MNC | Retail Store | 2008 | 58,432 | | Yes | | Leased | |
| Fiesta Mart | 6 | 3707 Ave H. | Rosenberg | TX | 77471 | Fort Bend | | X | | | 1,502,760 | 1,502,760 | 655,499 | 50,000 | 58,408 | 4,907,238 | **8,676,665** | MNC | Retail Store | 1982 | 37,569 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 40 | 5334 Ross Ave. | Dallas | TX | 75206 | Dallas | | X | | | 1,945,080 | 1,945,080 | 927,003 | 50,000 | 88,243 | 3,618,535 | **8,573,941** | MNC | Retail Store | 1996 | 48,627 | | Yes | | Leased | |
| Fiesta Mart | 73 | 1145 W. Airport | Irving | TX | 75062 | Dallas | | X | | | 1,713,080 | 1,713,080 | 939,306 | 35,000 | 50,310 | 4,091,154 | **8,541,930** | MNC | Retail Store | 2008 | 42,827 | | Yes | | Leased | |
| Fiesta Mart | 54 | 2940 South 1st St. | Garland | TX | 75041 | Dallas | | X | | | 1,686,880 | 1,686,880 | 775,444 | 50,000 | 44,223 | 4,143,949 | **8,387,376** | MNC | Retail Store | 1905 | 42,172 | | Yes | | Leased | |
| Fiesta Mart | 37 | 7510 Bellfort | Houston | TX | 77061 | Harris | Harris | X | | | 1,877,360 | 1,877,360 | 848,886 | 50,000 | 61,449 | 3,295,232 | **8,010,287** | MNC | Retail Store | 1994 | 46,934 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 49 | 4114 Fulton | Houston | TX | 77009 | Harris | Harris | X | | 2,536,233 | 1,239,000 | 1,239,000 | 590,905 | 30,000 | 64,503 | 2,096,636 | **7,796,277** | MNC | Retail Store | 1998 | 30,975 | | Yes | | Ground Lease | |
| Fiesta Mart | 78 | 102 NW 28th St. | Ft. Worth | TX | 76106 | Tarrant | | X | | | 2,135,800 | 2,135,800 | 795,430 | 35,000 | 87,688 | 2,207,986 | **7,397,704** | MNC | Retail Store | 2008 | 53,395 | | Yes | | Leased | |
| Fiesta Mart | 56 | 4330 Hwy 6 N. | Houston | TX | 77084 | Harris | Harris | X | | | 1,567,880 | 1,567,880 | 864,811 | 15,000 | 30,961 | 3,314,548 | **7,361,080** | MNC | Retail Store | 2001 | 39,197 | | Yes | | Leased | |
| Fiesta Mart | 70 | 1235 S. Josey Lane | Carrollton | TX | 75006 | Dallas | | X | | | 1,381,880 | 1,381,880 | 682,635 | 35,000 | 22,185 | 3,666,175 | **7,169,755** | MNC | Retail Store | 2008 | 34,547 | | Yes | | Leased | |
| Fiesta Mart | 41 | 1728 W. Mt. Houston | Houston | TX | 77038 | Harris | Harris | AE | | 1,862,770 | 910,000 | 910,000 | 630,294 | 20,000 | 54,273 | 2,747,253 | **7,134,590** | MNC | Retail Store | 1995 | 22,750 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 24 | 11240 Fondrer | Houston | TX | 77096 | Harris | Harris | AE | | | 1,317,920 | 1,317,920 | 781,733 | 25,000 | 59,435 | 3,515,250 | **7,017,258** | MNC | Retail Store | 1992 | 32,948 | | Yes | | Leased | |
| Fiesta Mart | 12* | 5800 Lyons | Houston | TX | 77020 | Harris | Harris | X | | | 1,625,640 | 1,625,640 | 721,666 | 50,000 | 86,954 | 2,812,291 | **6,922,191** | MNC | Retail Store | 1984 | 40,641 | | Yes | | Leased | |
| Fiesta Mart | 81 | 210 E. Davis Conroe | Conroe | TX | 77301 | Montgomery | | X | | | 1,924,500 | 900,000 | 376,820 | 25,000 | 51,288 | 3,404,238 | **6,681,846** | MNC | Retail Store | 2013 | 23,316 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 34 | 3030 So. Lancaster | Dallas | TX | 75216 | Dallas | | X | | | 1,500,000 | 1,500,000 | 696,823 | 35,000 | 58,796 | 2,810,584 | **6,601,203** | MNC | Retail Store | 1995 | 37,500 | | Yes | | 2ML RealEstate New Lease | |
| Fiesta Mart | 1 | 1020 Quitman | Houston | TX | 77009 | Harris | Harris | X | | | 1,313,040 | 1,313,040 | 638,873 | 50,000 | 59,769 | 2,811,814 | **6,186,536** | MNC | Retail Store | 1984 | 32,826 | | Yes | | LL provides Fire Coverage | |
| Fiesta Mart | 69 | 7809 Camp Bowie | Ft. Worth | TX | 76116 | Tarrant | | X | | | 1,643,400 | 1,643,400 | 738,125 | 35,000 | 32,910 | 2,070,137 | **6,162,972** | MNC | Retail Store | 2008 | 41,085 | | Yes | | Leased | |
| Fiesta Mart | 47 | 1530 Independence Blvd | Missouri City | TX | 77489 | Fort Bend | | X | | | 1,453,760 | 1,453,760 | 720,266 | 20,000 | 42,800 | 2,455,510 | **6,146,096** | MNC | Retail Store | 1998 | 36,344 | | Yes | | Leased But Fiesta to Insure All | |
| Fiesta Mart | 31.1 | 1175 Edgebrook | Houston | TX | 77034 | Harris | Harris | X | | | 1,235,640 | 1,235,640 | 633,248 | 15,000 | 48,528 | 2,156,001 | **5,324,057** | MNC | Retail Store | 1992 | 30,891 | | Yes | | Leased | |
| Fiesta Mart | 51** | 9420 Cullen | Houston | TX | 77051 | Harris | Harris | X | | | 832,160 | 832,160 | 471,751 | 25,000 | 65,687 | 2,929,390 | **5,156,148** | MNC | Retail Store | 1998 | 20,804 | | Yes | | LL provides Fire Coverage | |
| Fiesta Mart | 43 | 8650 S. Braeswood | Houston | TX | 77031 | Harris | Harris | AE | | | 1,239,160 | 1,239,160 | 579,779 | 25,000 | 45,127 | 1,839,315 | **4,967,541** | MNC | Retail Store | 1996 | 30,979 | | Yes | | Leased | |
| Fiesta Mart | 99 | 5235 Katy Frwy | Houston | TX | 77007 | Harris | Harris | X | | | 2,053,400 | 2,053,400 | 245,552 | | | | **4,352,352** | MNC | Corporate Office | 1989 | 51,335 | | No | | 2ML RealEstate New Lease | |
| Fiesta Mart | 825 | 3909 N. I35 Service Rd | Austin | TX | 78722 | Travis | | X | | 2,589,848 | 10,000 | | | | 741,100 | | **3,340,948** | SFR | Real Estate | | 39,086 | | Yes | | | |

ACON
Schedule of Values

| Entity | Lot # | Street Address | City | State | Zip | County | Tier 2 Wind County | Flood Zone | EQ Zone | Building Value | BPP (incl Furn & Fix & Contents) | Leasehold Improvements | Stock/Inventory (Average) | Sign | Retail Income | Business Income | Total | Construction | Occupancy | Year Built | Sq Ft | # of Stories | Sprinklered | Burglar/Smoke Alarms | Owned/Leased | Stock (Maximum Value) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiesta Mart | 107 | 6416 Westcott (ACON HQ) | Houston | TX | 77007 | Harris | Harris | X | | 2,315,776 | | | | | 421,216 | | 2,836,992 | NC | Retail Lease | | | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | AAA Poultry | 140 Archwood Drive | Houston | TX | 77060 | Harris | Harris | AE | | 2,824,051 | | | | | | | 2,824,051 | MNC | Retail Store | | | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | 5 | 2323 Irh | Houston | TX | 77093 | Harris | Harris | X | | 1,016,186 | 1,016,186 | 1,016,180 | 155,070 | 15,000 | | | 2,187,360 | MNC | Retail Store | | 25,404 | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | 6.1 | 2024 A 188 FM 529 | Cypress | TX | 77433 | Harris | Harris | X | | 1,600,000 | | | | | | | 1,600,000 | MNC | Retail Store | | 5,600 | | | | 25K-Real Estate New Lease | |
| Fiesta Mart | 18.1** | 8807 So. Main | Houston | TX | 77025 | Harris | Harris | X | | 464,731 | 227,545 | 227,545 | 565,854 | 15,000 | | | 1,499,695 | MNC | Retail Store | 1988 | 5,676 | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | 4.1 | 9411 Sycamore Hwy | Houston | TX | 77054 | Harris | Harris | AE | | 376,122 | 184,720 | 184,720 | 494,449 | 10,000 | | | 1,252,011 | MNC | Retail Store | 1978 | 4,618 | | Yes | | UNDP Urban Shopping Centers Lease | |
| Fiesta Mart | 7.1 | 6200 Bellaire | Houston | TX | 77081 | Harris | Harris | X | | | 240,200 | 240,200 | 542,714 | 10,000 | | | 1,033,114 | MNC | Retail Store | 1982 | 5,005 | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | 2.1 | 2907 N. Shepherd | Houston | TX | 77008 | Harris | Harris | X | | | 166,720 | 166,720 | 548,671 | 25,000 | | | 947,311 | MNC | Retail Store | 1975 | 4,668 | | No | | 25K-Real Estate New Lease | |
| Fiesta Mart | 5.1 | 9005 Mykawa | Houston | TX | 77033 | Harris | Harris | X | | | 240,940 | 240,940 | 303,466 | | | | 834,746 | MNC | Retail Store | 1979 | 6,016 | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | 22.1 | 12301 So. Main | Houston | TX | 77035 | Harris | Harris | X | | | 138,500 | 138,500 | 476,094 | 15,000 | | | 765,094 | MNC | Retail Store | 1981 | 3,420 | | Yes | | 25K-Real Estate New Lease | 3,400,000 |
| Fiesta Mart | 20.1 | 6201 A FM 1960 West | Houston | TX | 77069 | Harris | Harris | X | | | 140,596 | 140,596 | 489,831 | | | | 762,738 | MNC | Retail Store | | 1,932 | | | | 25K-Real Estate New Lease | |
| Fiesta Mart | 14.1 | 14517 Baldwin | Houston | TX | 77083 | Harris | Harris | X | | 188,997 | 205,683 | 205,640 | 380,399 | | | | 781,829 | MNC | Retail Store | 1987 | 5,141 | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | 15.1 | 4211 Aldine | Houston | TX | 77022 | Harris | Harris | X | | 188,552 | 90,360 | 92,600 | 350,838 | | | | 722,325 | MNC | Retail Store | 1984 | 2,359 | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | 18.1 | 12901 East Frwy | Houston | TX | 77015 | Harris | Harris | X | | | 92,800 | 347,876 | | 5,000 | | | 737,436 | MNC | Retail Store | | 2,175 | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | 6.1 | 2323 A. Wirt | Houston | TX | 77055 | Harris | Harris | X | | 197,598 | 160,000 | 160,000 | 352,207 | 5,000 | | | 717,207 | MNC | Retail Store | 1982 | 4,300 | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | 2.1 | 8702 Wilcrest | Houston | TX | 77099 | Harris | Harris | X | | | 93,600 | 93,600 | 205,937 | 10,000 | | | 496,136 | MNC | Retail Store | 1985 | 1,340 | | Yes | | 25K-Real Estate New Lease | 2,000,000 |
| Fiesta Mart | 23.1 | 9415 Mesa | Houston | TX | 77078 | Harris | Harris | X | | 159,599 | 156,000 | 156,000 | 338,318 | 20,000 | | | 621,318 | MNC | Retail Store | 1981 | 3,400 | | Yes | | Leased | |
| Fiesta Mart | 82 | 3013 W. Jefferson | Dallas | TX | 75208 | Dallas | Dallas | X | | | | | | 10,000 | 139,282 | | 676,577 | SFR | Retail Cafe | | 6,919 | | Yes | | 25K-Real Estate New Lease | |
| Fiesta Mart | 12.1 | 5005 Lyons | Houston | TX | 77020 | Harris | Harris | AE | | 430,424 | 205,640 | 205,640 | 165,664 | | | | 616,944 | MNC | Retail Store | | 5,141 | | | | Leased | |
| Fiesta Mart | 9 | 10401 Jordan Dr | Houston | TX | 77064 | Harris | Harris | AE | | | 63,660 | 63,660 | 318,979 | | | | 446,299 | MNC | Retail Store | | 1,551 | | | | 25K-Real Estate New Lease | |
| Fiesta Mart | 3.1 | 6416 Westpark | Houston | TX | 77063 | Harris | Harris | X | | | 32,920 | 32,920 | 147,796 | | | | 213,636 | | Retail Store | | 923 | | Yes | | 25K-Real Estate New Lease | |

| | | | | Subtotal: | | | | | | 60,206,674 | 161,897,153 | 141,667,133 | 97,589,972 | 2,376,600 | 4,635,580 | 152,055,178 | 406,267,333 | | | | | | | | | |

Igloo Products 80    61,783,848
Funds 80    11,088,086
SumMap 80    1,970,180

GRAND TOTAL: _780,137,135_

NOTES: Refer, retail locations covered on unscheduled location basis

**Summary by Entity**

| Row Labels | No of Locs | TIV | % of TIV |
|---|---|---|---|
| Fiesta Mart | 84 | 698,367,933 | 54.93% |
| Igloo Products | 4 | 361,773,425 | 28.45% |
| Funko | 6 | 124,696,565 | 9.81% |
| Refac (US Vision | 9 | 57,321,983 | 4.51% |
| IWP | 4 | 14,590,000 | 1.15% |
| Suzo-Happ | 2 | 13,587,294 | 1.07% |
| ACON | 2 | 1,070,508 | 0.08% |
| Grand Total | 111 | 1,271,407,708 | 100.00% |

**Summary by State**

| Row Labels | No of Locs | TIV | % of TIV |
|---|---|---|---|
| TX | 88 | 1,063,066,358 | 83.61% |
| WA | 2 | 118,616,565 | 9.33% |
| NJ | 3 | 48,492,783 | 3.81% |
| MA | 2 | 12,320,000 | 0.97% |
| IL | 2 | 11,457,267 | 0.90% |
| AZ | 6 | 10,142,200 | 0.80% |
| NV | 1 | 2,130,027 | 0.17% |
| (blank) | 1 | 2,000,000 | 0.16% |
| CA | 4 | 1,548,993 | 0.12% |
| DC | 1 | 1,041,515 | 0.08% |
| PA | 1 | 337,000 | 0.03% |
| GA | 1 | 255,000 | 0.02% |
| Grand Total | 111 | 1,271,407,708 | 100.00% |

**Summary by Sprinklers**

| Row Labels | No of Locs | TIV | % of TIV |
|---|---|---|---|
| Yes | 96 | 1,251,842,541 | 98.46% |
| (blank) | 13 | 14,265,504 | 1.12% |
| No | 2 | 5,299,663 | 0.42% |
| Grand Total | 111 | 1,271,407,708 | 100.00% |

**Summary by Tier 2 Wind County**

| Row Labels | No of Locs | TIV | % of TIV |
|---|---|---|---|
| Harris | 54 | 406,844,701 | 100.00% |
| Grand Total | 54 | 406,844,701 | 100.00% |

**Summary by Flood Zone**

| Row Labels | No of Locs | TIV | % of TIV |
|---|---|---|---|
| X | 98 | 1,206,061,331 | 94.86% |
| AE | 9 | 58,875,869 | 4.63% |
| (blank) | 4 | 6,470,508 | 0.51% |
| Grand Total | 111 | 1,271,407,708 | 100.00% |

**Summary by EQ Zone**

| Row Labels | No of Locs | TIV | % of TIV |
|---|---|---|---|
| CA | 4 | 1,548,993 | 1.29% |
| B2 | 2 | 1,095,000 | 0.91% |
| D | 1 | 425,000 | 0.35% |
| B1 | 1 | 28,993 | 0.02% |
| WA | 2 | 118,616,565 | 98.71% |
| Snohomish | 2 | 118,616,565 | 98.71% |
| Grand Total | 6 | 120,165,558 | 100.00% |

**Summary by Construction**

| Row Labels | No of Locs | TIV | % of TIV |
|---|---|---|---|
| MNC | 80 | 724,940,179 | 57.02% |
| Conc Tilt-Up | 5 | 362,393,425 | 28.50% |
| JM | 10 | 129,205,792 | 10.16% |
| (blank) | 13 | 47,870,555 | 3.77% |
| SFR | 2 | 3,959,665 | 0.31% |
| NC | 1 | 3,038,092 | 0.24% |
| Grand Total | 111 | 1,271,407,708 | 100.00% |

**Summary by Occupancy**

| Row Labels | No of Locs | TIV | % of TIV |
|---|---|---|---|
| Retail Store | 82 | 687,609,824 | 54.08% |
| Office/Manufacturing | 2 | 270,488,425 | 21.27% |
| Manufacturing | 2 | 108,421,884 | 8.53% |
| Office/Warehouse | 5 | 88,634,241 | 6.97% |
| Warehouse | 5 | 73,476,908 | 5.78% |
| (blank) | 4 | 18,895,000 | 1.49% |
| Real Estate | 2 | 6,997,757 | 0.55% |
| Office | 5 | 6,433,317 | 0.51% |
| Corporate Office | 1 | 4,352,352 | 0.34% |
| Medical Office | 2 | 2,982,500 | 0.23% |
| Medical Center | 2 | 2,045,500 | 0.16% |
| Office/Pharmacy | 1 | 1,070,000 | 0.08% |
| Grand Total | 111 | 1,271,407,708 | 100.00% |

# EXHIBIT 8

Message
_____

| | |
|---|---|
| **From:** | Drew Scielzo [dscielzo@aconinvestments.com] |
| **Sent:** | 4/20/2016 10:04:29 AM |
| **To:** | Roberts, Jeffrey [jeffrey.roberts@willistowerswatson.com] |
| **CC:** | Rusas, Mark [mark.rusas@willistowerswatson.com]; Galla, Peter [peter.galla@willistowerswatson.com]; Batzer, Bruce [bruce.batzer@willistowerswatson.com] |
| **Subject:** | Re: ACON Property Portfolio Program |

I just spoke to Wayne. He is onboard. I just sent him the BOR. Haven't spoken to Igloo yet.

Drew

On Apr 20, 2016, at 4:37 PM, Roberts, Jeffrey <Jeffrey.Roberts@WillisTowersWatson.com> wrote:

Good morning Drew. Have you spoken with Fiesta and Igloo teams?

**Jeffrey Roberts**
**Willis Towers Watson**
**M&A Practice**
Cell: 312-339-2953


On Apr 18, 2016, at 2:55 PM, Drew Scielzo <dscielzo@aconinvestments.com> wrote:

Getting intense pressure to go ahead and bind Fiesta with AIG. I need to have specifics fairly soon.

On Apr 18, 2016, at 1:53 PM, Roberts, Jeffrey <Jeffrey.Roberts@WillisTowersWatson.com> wrote:

Drew- I don't know at the moment and I am not sure this will come together by Next Tuesday now. Can we have a call later today to discuss?

Thanks,


**Jeffrey Roberts**
Executive Vice President

**Willis Towers Watson**
**M&A Practice**
Cell: 312-339-2953
_____

**From:** Drew Scielzo [mailto:dscielzo@aconinvestments.com]
**Sent:** Monday, April 18, 2016 1:51 PM
**To:** Roberts, Jeffrey
**Cc:** Galla, Peter; Batzer, Bruce
**Subject:** Re: ACON Property Portfolio Program

When do you think you will have it?

On Apr 18, 2016, at 1:46 PM, Roberts, Jeffrey <Jeffrey.Roberts@WillisTowersWatson.com> wrote:

We will not have info ready in the next hour, I am sorry Drew, but the Fiesta situation is really challenging and we need more time

CONFIDENTIAL                                                                 WTW_00005173

**Jeffrey Roberts**
Executive Vice President

**Willis Towers Watson**
**M&A Practice**
Cell: 312-339-2953

---

**From:** Drew Scielzo [mailto:dscielzo@aconinvestments.com]
**Sent:** Monday, April 18, 2016 1:34 PM
**To:** Roberts, Jeffrey
**Cc:** Galla, Peter; Batzer, Bruce
**Subject:** Re: ACON Property Portfolio Program

Jeff,

When do you think you will have the info ready today? I will be with Suma for the next hour.

Thanks,

Drew

On Apr 14, 2016, at 12:38 PM, Roberts, Jeffrey <Jeffrey.Roberts@WillisTowersWatson.com> wrote:

Drew,

We will have a document for you on Monday showing projected pricing and terms and conditions. We just yesterday received all of Fiesta's data and because they are such a big part of this we needed everything from them. To that point, this will likely get very close to their renewal date, but Wayne should not succumb to pressure from Beecher to bind coverage. They will be fine. Interesting point we learned yesterday is that all of Beecher's scare tactics about an open claim...that claim probably won't go beyond the $250,000 deductible. Should I contact Wayne about holding off from binding anything?

Thanks,
jeff

**Jeffrey Roberts**
**Willis Towers  Watson**
M&A Practice
312-339-2953

---

**From:** Drew Scielzo [mailto:dscielzo@aconinvestments.com]
**Sent:** Monday, April 11, 2016 1:13 PM
**To:** Roberts, Jeffrey
**Subject:** Re: ACON Property Portfolio Program

Jeff,

Just wanted to check in and see how things are coming.

Thanks,

Drew

CONFIDENTIAL
WTW_00005174

On Apr 6, 2016, at 6:33 PM, Roberts, Jeffrey <Jeffrey.Roberts@WillisTowersWatson.com> wrote:

And policy from Fiesta. Easy stuff

**Jeffrey Roberts**
**Willis Towers Watson**
**M&A Practice**
Cell: 312-339-2953


On Apr 6, 2016, at 6:28 PM, Drew Scielzo <dscielzo@aconinvestments.com> wrote:

Ok. Did Wayne start sending you stuff?

On Apr 6, 2016, at 6:18 PM, Roberts, Jeffrey <Jeffrey.Roberts@WillisTowersWatson.com> wrote:

Drew- This is odd... neither Helen or Jennifer have a binder for their Property renewal on 3/31. I will keep trying.


**Jeffrey Roberts**
Executive Vice President

**Willis Towers Watson**
**M&A Practice**
Cell: 312-339-2953

---

**From:** Andrews, Jennifer [mailto:jandrews@usvision.com]
**Sent:** Tuesday, April 05, 2016 4:09 PM
**To:** Roberts, Jeffrey
**Cc:** Bidol, Helen; DiFazio, Joseph; Galla, Peter
**Subject:** RE: ACON Property Portfolio Program

Jeff-
We renewed with Chubb on the same terms as the policy I sent over.  I don't have anything other than emails to confirm the coverage was bound.  What info can I provide specifically?
Thank you,
Jennifer

---

**From:** Roberts, Jeffrey [mailto:Jeffrey.Roberts@WillisTowersWatson.com]
**Sent:** Tuesday, April 05, 2016 3:12 PM
**To:** Andrews, Jennifer <jandrews@usvision.com>
**Cc:** Bidol, Helen <hbidol@usvision.com>; DiFazio, Joseph <Joseph.DiFazio@WillisTowersWatson.com>; Galla, Peter <Peter.Galla@WillisTowersWatson.com>
**Subject:** RE: ACON Property Portfolio Program

Jennifer- It appears that your Property policy expired on 3/31. Can you please send us your renewal binder, so we can update our analysis?


Thanks<
Jeff

CONFIDENTIAL

**Jeffrey Roberts**
Executive Vice President

**Willis Towers Watson**
**M&A Practice**
Cell: 312-339-2953

---

**From:** Andrews, Jennifer [mailto:jandrews@usvision.com]
**Sent:** Thursday, March 31, 2016 3:42 PM
**To:** Roberts, Jeffrey
**Cc:** Bidol, Helen
**Subject:** RE: ACON Property Portfolio Program

Hi Jeffrey-

Attached please find the requested information.  I do not have anything on the Business Income worksheets, so please let me know in more detail what I can provide.

Let me know if any additional questions, and again, apologies for the delay in getting you this information.

Regards,
Jennifer

*Jennifer L. Andrews*
Senior Vice President of Finance
<image001.png>
1 Harmon Drive
Blackwood, NJ 08012
(856) 228-1000 x8910 – Office
(856) 232-1848 – Fax
(856) 340-8774 - Mobile
jandrews@usvision.com

---

**From:** Roberts, Jeffrey [mailto:Jeffrey.Roberts@WillisTowersWatson.com]
**Sent:** Tuesday, March 29, 2016 12:52 PM
**To:** Andrews, Jennifer <jandrews@usvision.com>
**Cc:** Bidol, Helen <hbidol@usvision.com>
**Subject:** Re: ACON Property Portfolio Program

Thanks!!

**Jeffrey Roberts**
**Willis Towers Watson**
**M&A Practice**
Cell: 312-339-2953

On Mar 29, 2016, at 9:31 AM, Andrews, Jennifer <jandrews@usvision.com> wrote:

Jeffrey
We will have most of the information to you on Thursday. Apologies fot the delay.
Regards
Jennifer

CONFIDENTIAL

On Mar 29, 2016, at 11:00 AM, Roberts, Jeffrey <Jeffrey.Roberts@WillisTowersWatson.com> wrote:

Helen- I hope all is well with you. Do yiou think we might be able to collect some of the requested property insurance data?

Thanks,
Jeff

**Jeffrey Roberts**
**Willis Towers  Watson**
M&A Practice
312-339-2953

---

**From:** Bidol, Helen [mailto:hbidol@usvision.com]
**Sent:** Friday, March 18, 2016 10:27 AM
**To:** Roberts, Jeffrey
**Cc:** Andrews, Jennifer
**Subject:** RE: ACON Property Portfolio Program

Hi Jeff,

I am out of the office, but will get back to you next week, when I return.

Thank you,
Helen

---

**From:** Roberts, Jeffrey [mailto:Jeffrey.Roberts@WillisTowersWatson.com]
**Sent:** Monday, March 14, 2016 4:33 PM
**To:** Andrews, Jennifer <jandrews@usvision.com>; Bidol, Helen <hbidol@usvision.com>
**Cc:** Scielzo, Drew Ext <dscielzo@aconinvestments.com>; Galla, Peter <Peter.Galla@WillisTowersWatson.com>
**Subject:** RE: ACON Property Portfolio Program


Jen and Helen- Just checking in on the below email. Do you have any questions regarding the ACON Property Portfolio data collection? Please let me know how I can help.

Best,
Jeff

**Jeffrey Roberts**
Executive Vice President

**Willis Towers Watson**
**M&A Practice**
Cell: 312-339-2953

---

**From:** Roberts, Jeffrey
**Sent:** Friday, March 04, 2016 6:50 PM
**To:** Jennifer Andrews; Helen Bidol
**Cc:** Drew Scielzo; Galla, Peter
**Subject:** ACON Property Portfolio Program

Jen and Helen,

CONFIDENTIAL

I hope you are well! As you know, Willis is currently working with US Vision (Refac) on their D&O coverage via the ACON D&O portfolio program. I am happy to be emailing you about another portfolio program we are structuring for ACON portfolio companies. We are collecting the necessary data from each portfolio company to assess the economic value in structuring the program and we are bullish that the value will be evident to you and your team at US Vision! We are trying to have a roll out of the program for April 27th, so we are asking if each company can have our data request complete by next Friday March 11th. I am sure you have some questions and I am available at your convenience to talk anytime. For now though, below is the data we will need:

We would need the following items for a property program analysis for ACON.

?   Current Property Policy
?   Statement of Values including COPE Information
?   Business Income Worksheets
?   Property Loss Runs for past 5 years
?   Engineering Reports for locations over $50M in values

Best,
Jeff


**Jeffrey Roberts**
**Willis Towers Watson**
**M&A Practice**
Cell: 312-339-2953

_____

For information pertaining to Willis' email confidentiality and monitoring policy, usage restrictions, or for specific company registration and regulatory status information, please visit http://www.willis.com/email_trailer.aspx

We are now able to offer our clients an encrypted email capability for secure communication purposes. If you wish to take advantage of this service or learn more about it, please let me know or contact your Client Advocate for full details. ~W67897

_____

NOTICE: This email transmission may contain confidential health information that is privileged and legally protected from disclosure by the Health Insurance Portability and Accountability Act (HIPAA). This information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that reading, disseminating, disclosing, distributing, copying, acting upon or otherwise using the information contained in this email is strictly prohibited. If you have received this information in error, please notify the sender immediately and destroy this email.

WTW_00005178

# EXHIBIT 9

1               H. Scielzo

2        THE UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF TEXAS

4              HOUSTON DIVISION

5

6   _____

7   FIESTA MART, LLC,                )
            Plaintiff,               )Civil Action No.
8                                    )
            V.                       )4:20-CV-03484
9                                    )
    WILLIS OF ILLINOIS, INC.,        )
10  WILLIS TOWERS WATSON US, LLC,    )
    ALLIED WORLD ASSURANCE COMPANY   )
11  (U.S.) INC., ARCH SPECIALTY      )
    INSURANCE COMPANY, CERTAIN       )
12  UNDERWRITERS AT LLOYD'S OF       )
    LONDON (HISCOX), HFI GLOBAL      )
13  INSURANCE COMPANY, INDIAN        )
    HARBOR INSURANCE COMPANY, and    )
14  WESTPORT INSURANCE               )
    CORPORATION,                     )
15                                   )
            Defendants.              )
16                                   )
            v.                       )
17                                   )
    ACON INVESTMENTS, L.L.C.,        )
18                                   )
            Additional Counterclaim  )
19          Defendant                )

20  _____

21       DEPOSITION OF HENRY ANDREW SCIELZO

22              Held remotely

23              May 11, 2022

24  REPORTED BY:  Barbara Moore, CRR, RMR

25  JOB NO. 210972

Page 30

H. Scielzo

1
2       MR. WEISS:  Page 17.
3       Q.    Do you see it says "master property
4    program"?
5       A.    Yes.
6       Q.    Once again, the named insured is
7    ACON Investments, LLC; correct?
8       A.    Yes.
9       Q.    And let's now turn to Westport
10   page 145.  This is endorsement A-1.
11      A.    What page is that?
12            MR. WEISS:  Fifty of 64.
13            THE WITNESS:  Thank you.  I see
14       it.
15   BY MR. KALINER:
16      Q.    Do you see it says endorsement A-1,
17   and says, "With respect to the entity of Fiesta
18   Mart, the following terms and conditions shall
19   apply"?
20      A.    I do.
21      Q.    And then it says, "Named insured,
22   ACON Fiesta Holdings, LLC."
23      A.    Correct.
24      Q.    So could you please explain for me
25   the relationship between ACON Investments, LLC, the

Page 31

H. Scielzo

1
2    named insured, and ACON Fiesta Holdings, LLC?
3            MS. CONSOLINO:  Object to the
4       form.
5       Q.    When I say "relationship," I mean
6    business relationship.
7       A.    Okay.  Let me -- this is where I get
8    my org chart out.
9       Q.    For your org chart, is there a Bates
10   stamp number on it?
11      A.    Let me check.
12            MS. CONSOLINO:  No, this would not
13       have been produced.
14            MR. KALINER:  We're going to want
15       a copy of that.
16            MS. CONSOLINO:  Sure, we can
17       provide a copy and would like to designate
18       that as confidential.
19            MR. KALINER:  Is there a way you
20       can share it on the screen?  I'm talking
21       to you, Counsel.
22            MS. CONSOLINO:  Let me see if I
23       have a copy.  All right.  Let me know if
24       you can see my screen.  Can you all see my
25       screen?

Page 32

H. Scielzo

1
2            MR. KALINER:  Yes, hold on.
3            MS. LeROY:  Serine, could you zoom
4       in a little bit, it's really hard to read.
5            MR. KALINER:  So we would like to
6       mark a copy of this and I understand it
7       will be confidential, just so we know what
8       the witness is referring to.  Is that
9       okay?
10           MS. CONSOLINO:  Yes, if you're
11      asking me, that's fine.
12           MR. KALINER:  Serine, could you
13      email this to Sam?
14           We'll continue with the witness,
15      and while it's happening after Sam gets
16      this, we'll go ahead and we'll mark this.
17   BY MR. KALINER:
18      Q.    So Mr. Scielzo, would you like the
19   court reporter to repeat back the question to you?
20      A.    Yes, if you would, that would be
21   great.
22           MR. KALINER:  Sure, and to the
23      court reporter could you just read back
24      the last question, please.
25           (Record read)

Page 33

H. Scielzo

1
2            MS. CONSOLINO:  Object to the
3       form.
4            THE WITNESS:  So ACON Investments,
5       LLC, through different subsidiaries is an
6       owner of ACON Fiesta Holdings.
7    BY MR. KALINER:
8       Q.    When you say "ACON," that's what,
9    what's the name of that, full name of that entity?
10      A.    ACON Investments, LLC.
11            MR. KALINER:  Serine, you just
12       sent me two PowerPoints.  Which one are
13       you looking at?
14            MS. CONSOLINO:  Correct me if I'm
15       wrong --
16            MR. KALINER:  Prestructure.
17            MS. CONSOLINO:  There is one that
18       reflects the corporate structure before
19       the Bodega acquisition and one post the
20       Bodega acquisition; correct?
21            THE WITNESS:  Correct.
22            MS. CONSOLINO:  Right now we're
23       looking at the one before the Bodega
24       acquisition.
25            MR. KALINER:  So we're going to

Page 38

```
1                    H. Scielzo
2        A.    Yes.
3        Q.    And there's that footnote 4 next to
4  it?
5        A.    Yes.
6        Q.    And then under footnote 4 it says
7  with respect to Fiesta Holdings Investments, LLC,
8  "Name change preclosing to ACON Fiesta Holdings,
9  LLC."
10       A.    Yes.
11       Q.    Is that an accurate statement?
12       A.    It is.
13       Q.    So it was changed -- I'm sorry.  It
14 was changed from ACON Fiesta Holdings, LLC, to
15 Fiesta Holdings Investments, LLC; correct?
16       A.    Correct.
17       Q.    And then do you see there's a box,
18 it says, "Entities proposed by ACON to be
19 transferred to BLC."
20       A.    Yes.
21       Q.    What does Newco stand for?
22       A.    New company.
23       Q.    And what does BLC stand for, please?
24       A.    Bodega.
25       Q.    Would that be Bodega Latina
```

Page 39

```
1                    H. Scielzo
2  Corporation?
3        A.    It would be.
4        Q.    And then is this -- can you tell if
5  this is what happened with the proposed transfer?
6            MS. CONSOLINO:  Object to the
7         form.
8            THE WITNESS:  Were these the
9         entities that were sold to bodega?
10     BY MR. KALINER:
11       Q.    Yes.
12       A.    I believe so, but I would need to
13 verify that, but I believe so.
14       Q.    When you say "those entities," would
15 it be the three boxes below Fiesta Mart
16 Investments, LLC, Fiesta Mart Holdings, LLC and
17 Fiesta Mart, LLC?
18       A.    It would be, yes.  Fiesta Holding
19 Investments was not sold to Bodega.
20       Q.    Thank you for that clarification.
21 So the company in the middle that's circled
22 is not?
23       A.    Right.
24       Q.    Fiesta Holdings LLC with the
25 footnote 4 was not sold?
```

Page 40

```
1                    H. Scielzo
2        A.    Correct.
3        Q.    When you say "not sold," not sold to
4  Bodega Latina Corporation?
5        A.    Correct.
6        Q.    And this entity on the bottom,
7  Fiesta Mart, LLC, is that the entity that runs the
8  Fiesta Mart stores?
9            MS. CONSOLINO:  Objection, form,
10        time frame.
11           MR. KALINER:  At the time of the
12        hurricane.
13           THE WITNESS:  Yes, I believe so.
14     BY MR. KALINER:
15       Q.    What about after the hurricane?
16       A.    Yes, until we sold to Bodega, so
17 yes.  After it was sold to Bodega, I don't know.
18       Q.    Why do you say you don't know after
19 it was sold?
20       A.    I'm not sure what Bodega did.
21       Q.    And when you say it was sold, does
22 that relate to a MIPA, a membership interest
23 purchase agreement?
24       A.    Yes, sir, it does.
25       Q.    What exactly is a MIPA in this
```

Page 41

```
1                    H. Scielzo
2  instance, when ACON sold certain entities to
3  Bodega?
4        A.    Correct.  It sold our interest in
5  those entities to Bodega.
6        Q.    Is it correct that ACON had no
7  involvement post-MIPA with regard to the Fiesta
8  Mart stores?
9            MS. CONSOLINO:  Object to the
10        form.
11           THE WITNESS:  In operating our
12        stores, we had no interest, economic or
13        otherwise.
14     BY MR. KALINER:
15       Q.    What about with respect to any
16 repairs to those stores after the sale?
17       A.    We were not involved in them.
18       Q.    And that would include stores 10, 23
19 and 56 in Houston, the Fiesta Mart stores?
20       A.    That is correct.  We weren't
21 involved in the repairs.
22     BY MR. KALINER:
23       Q.    We're going to go ahead and mark the
24 next exhibit.  This is the MIPA, and this is under
25 the Bates stamp numbers WTW867 through -1479.  It's
```

H. Scielzo

1
2    Did you agree that Mr. Peterson and the
3  Fiesta team were diligent in their work?
4        A.    I know they were working on the
5  claim, yes.
6        Q.    Did you think that they were being
7  less than diligent as they worked on the insurance
8  claim?
9        A.    I did not, no.
10       Q.    You can put that exhibit aside.
11       Sir, I want to turn back to the first proof
12 of loss and the first payments issued in the wake
13 of Hurricane Harvey under the insurance policies.
14 You testified earlier today that in response to the
15 first proof of loss you directed payment to Fiesta.
16 Do you remember that testimony?
17       A.    I do, yes.
18       Q.    Do you recall which Fiesta entity
19 you directed payments to?
20       A.    I do not.  I don't remember.  What I
21 did is I verbally told Jeff Roberts from Willis
22 that the payments could be directed to Fiesta and
23 let Wayne -- and to Wayne Peterson.  Figure out
24 where it goes.
25       Q.    And were you directing the payments

H. Scielzo

1
2  to the operating company?
3              MS. CONSOLINO:  Objection to form.
4              THE WITNESS:  Yes.  I believe --
5              and I directed it to that Wayne could
6              direct the funds to where he wanted.  And
7              I assume as operating company they would
8              give specific directions on exactly which
9              entity to give it to.
10 BY MS. LeROY:
11       Q.    Sitting here today, are you aware of
12 which specific Fiesta company the checks were made
13 out to by carriers in payment on those, on the
14 first proof of loss?
15       A.    I do not.
16             MS. LeROY:  I'm going to try to
17             upload an exhibit.  So if everyone can
18             bear with me while I try to do this
19             mechanically I will, hopefully, be able to
20             do this quickly.
21             MR. WEISS:  If it becomes an
22             issue, just email it to me.
23             MS. LeROY:  I'm going to rename
24             it.  We're on Exhibit 18 now, aren't we?
25             MR. WEISS:  No, we've gone through

H. Scielzo

1
2        21.  So you can do 22.
3              MS. LeROY:  You said Exhibit 22?
4              MR. WEISS:  Yes.
5              MS. CONSOLINO:  Thank you.
6              MS. LeROY:  I just uploaded it so
7              you all should see it in a minute.  When
8              it comes it's an email Bates stamped
9              Fiesta Mart 3095 through -97.  Let me know
10             when you all --
11             (Exhibit 22, Document
12             Bates-stamped Fiesta Mart 3095
13             through -97, was marked for
14             identification.)
15 BY MS. LeROY:
16       Q.    Feel free to read the whole string,
17 but I'm going to direct your attention to the last
18 string that shows up at the top of page 1 of
19 Exhibit 22.  Is this email as shown on Exhibit 22
20 an email that you received on or around
21 September 27, 2018?
22       A.    It is.
23       Q.    And is this something that you
24 received in the course of your ordinary work for
25 ACON?

H. Scielzo

1
2        A.    It is.
3        Q.    Does this appear to be an exact copy
4  of the email string?
5        A.    It is.
6        Q.    So at the top of the first page,
7  Mr. Roberts is writing to you and copying two
8  gentlemen from Willis.  And he says, "Drew, because
9  Fiesta Mart is an insured under the policy and
10 received the prior proceeds on this claim, WTW is
11 obligated to provide pertinent information to
12 Fiesta Mart/El Super."
13       Do you see that?
14       A.    I do.
15       Q.    Do you disagree that Fiesta was an
16 insured under the policy?
17       A.    Yes.
18             MS. CONSOLINO:  Objection.
19       Q.    Do you think Willis was wrong about
20 that?
21       A.    I do, yes.
22       Q.    Do you disagree that Fiesta Mart
23 received the prior proceeds on the claim?
24       A.    I'm not sure who received that.  I
25 don't know where exactly they went.

# EXHIBIT 10

*Submitted In Camera*

# EXHIBIT 11

Message
_____

| | |
|---|---|
| **From:** | Carroll, Joyce A. [joyce.carroll@willistowerswatson.com] |
| **Sent:** | 8/29/2017 7:32:12 AM |
| **To:** | Roberts, Jeffrey [jeffrey.roberts@willistowerswatson.com]; Szydlowski, Meagan [meagan.szydlowski@willistowerswatson.com]; Galla, Peter [peter.galla@willistowerswatson.com]; Batzer, Bruce [bruce.batzer@willistowerswatson.com]; Tom Tio [tom.tio@amwins.com] |
| **CC:** | Conant, Blaine [blaine.conant@willistowerswatson.com]; Daar, Henry [henry.daar@willistowerswatson.com] |
| **Subject:** | FW: NEW LOSS: ACON Investments--Various Locations (DOL: 26 Aug 2017/CAT 1743) |
| **Attachments:** | 2017-08-26 FNOL ACON Investments-Various Locations.pdf; image001.png |

Hi everyone.  To close the loop for you, this claim has been reported.

As per our usual protocol, Blaine and I will work with the insured contacts and the adjuster to populate the list of the affected locations.

Please let us know if you have any questions.

Kind regards,


**Joyce A. Carroll**
**Assistant Vice President & Senior Consultant**
**National Property Claims - Risk Control and Claim Advocacy Practice**

**WillisTowersWatson** l.l'l'l.l
Willis North America Inc. | Concourse Corporate Center Five |18th Floor | Atlanta, GA 30328
T +1 404 302 3846 / M +1 770 851 7250 / F +1 404 224 5001

joyce.carroll@willistowerswatson.com
willistowerswatson.com
Follow Willis Towers Watson on social media

_____

**From:** Carroll, Joyce A.
**Sent:** Tuesday, August 29, 2017 8:18 AM
**To:** Allied World US Property Claim Reporting (awacus.propertyclaims@awac.com); Arch Insurance Claims Reporting (claims@archinsurance.com); Aspen Specialty Insurance Property Claim Reporting (Property.claims@aspen-re.com); Blaine Conant (blaine.conant@willistowerswatson.com); Boris Loncarevic (bloncarevic@vericlaiminc.com); HDI Global Property Claim Reporting (newclaims@us.hdi.global); Hiscox Property Claim Reporting (inquiryusa@hiscox.com); SwissRe Property Claim Reporting (property_newloss@swissre.com); tarroyo@vericlaiminc.com; XL Catlin Property Claim Reporting (napropcasclaimnewnotices@xlcatlin.com)
**Subject:** NEW LOSS: ACON Investments--Various Locations (DOL: 26 Aug 2017/CAT 1743)
**Importance:** High

Please find attached a loss notice for the above.  The nominated adjuster, Boris Loncarevic of VeriClaim, Inc., is also being copied on this message.

We ask that you acknowledge receipt of this notice along with the name of your claim examiner and claim number at your earliest convenience.

Kind regards,


**Joyce A. Carroll**
**Assistant Vice President & Senior Consultant**
**National Property Claims - Risk Control and Claim Advocacy Practice**

**WillisTowersWatson** l.l'l'l.l
Willis North America Inc. | Concourse Corporate Center Five |18th Floor | Atlanta, GA 30328
T +1 404 302 3846 / M +1 770 851 7250 / F +1 404 224 5001

CONFIDENTIAL                                                                  WTW_00016557

joyce.carroll@willistowerswatson.com
willistowerswatson.com
Follow Willis Towers Watson on social media

CONFIDENTIAL

WTW_00016558

**Willis Towers Watson** |ı|ıⁱ|ıl

National Property Claims

## COMMERCIAL PROPERTY CLAIMS—NOTICE OF LOSS

| INSURANCE CARRIERS—PARTICIPATION: | POLICY NUMBERS: | POLICY TERM: |
|---|---|---|
| Allied World US-10% <br> Arch-10% <br> Aspen-12% <br> Hiscox-10% <br> HDI Global-8% <br> Swiss Re-20% <br> XL Catlin-20% | Pol.# 0310-7409-1A <br> Pol.# ESP7303053-01 <br> Pol.# PRAGK1017 <br> Pol.# URS 2552391.17 <br> Pol.# CPD1488300 <br> Pol.# NAP 2001214 01 <br> Pol.# PRO0047629-01 | 06/01/2017-- <br> 06/01/2018 |

| INSURED: | INSURED CONTACT: |
|---|---|
| ACON Investments <br> 1133 Connecticut Avenue NW <br> Suite 700 <br> Washington, D.C. 20036 | |

| NAME & NUMBER OF CONTACT PERSON(s) AT THIS LOCATION: | CONTACT PERSON EMAIL: |
|---|---|
| | |

| TYPE OF LOSS: | DATE OF LOSS: | ESTIMATED GROSS LOSS: | DEDUCTIBLE: |
|---|---|---|---|
| Water Damage | 26 Aug 2017 <br> CAT 1743 | PD $ TBD <br> TE $ TBD | PD $ TBD <br> TE $ TBD |

**LOCATION OF LOSS:**

Various locations including:
Borden Dairy in Conroe, Texas;
Igloo in Houston, Texas;
Fiesta Markets in Houston, Texas;
RMH Franchise Holdings, Inc.-Applebee's in Houston, Texas

**DESCRIPTION OF OCCURRENCE:**

Water damage due to Hurricane Harvey.

**REMARKS:**


**NOMINATED/ACCOUNT ADJUSTER:**

Boris Loncarevic, Executive General Adjuster
VeriClaim, Inc.—120 Broadway, Suite 900, New York, NY 10271
212-266-4250 / M: 973-885-4583 / bloncarevic@vericlaiminc.com / tarroyo@vericlaiminc.com

| YOUR WILLIS TOWERS WATSON CLAIM CONSULTANT IS: <br> *Please direct all queries on this loss to the claim consultant.* | *Blaine Conant—Senior Vice President & Senior Consultant* <br> **Willis Towers Watson** - National Property Claims <br> 801 S. Figueroa Street, Suite 700, Los Angeles, CA 90017 <br> 213-607-6358 / M: 909-618-8209 <br> blaine.conant@willistowerswatson.com |
|---|---|
| CLAIM NUMBER: <br><br> 123215 | |

| DATE SUBMITTED:   29 Aug 2017 | SUBMITTED BY:   Joyce Carroll  404-302-3846 |
|---|---|

CONFIDENTIAL

WTW_00016559

# EXHIBIT 12

| Message | |
|---|---|
| **From:** | Conant, Blaine [blaine.conant@willistowerswatson.com] |
| **Sent:** | 9/14/2017 4:18:35 PM |
| **To:** | Galla, Peter [peter.galla@willistowerswatson.com]; Daar, Henry [henry.daar@willistowerswatson.com] |
| **CC:** | Tom Tio [tom.tio@amwins.com]; Nichole Wilson (Nichole.Wilson@amwins.com) [nichole.wilson@amwins.com] |
| **Subject:** | RE: ACON |

Peter,

I can be available on Monday.

I met with the adjuster (Boris) at the Fiesta location in Houston on Tuesday. We discussed the deductible applicability. Neither of us could really agree on what the deductible would be because basically it could be applied in one of four ways depending on the loss.

The Fiesta loss will be sizeable regardless of which deductible applies. Worst case deductible would be 2% per unit of Insurance. Although preliminary discussions have been had with Fiesta, the adjuster and I discussed his thoughts for reserve purposes. He thinks that the loss reserve could be excess of $20M. Obviously way too early to know numbers but that is the range that the adjuster is going to use for posting a reserve.

I called and discussed the above with Milica Aksic of XL Catlin on Tuesday. She flew to Houston Tuesday night and we met with Fiesta at 2:30 pm yesterday (Wed afternoon). We discussed the loss and took her to store #10 to see the damages caused by the flood. Following the inspection we went back to the Fiesta Offices. She agreed to pay an advance of $1,000,000 Dollars! This was done without any documentation or information provided. She will be discussing with the other Insurers today. Needless to say, Wayne (Fiesta) was appreciative of the advance. Based upon the prompt response by XL, I would think that the other Insurers would pony up advance dollars as well.

I will have a write up regarding all of the entities that I have discussed damages with. But, I wanted to get the above to you because of the quick response regarding the advance and the fact that Fiesta will be the largest loss of the entities in Houston.

So far so good. Off and running.

More later.

Thanks

**Blaine D. Conant**
**Senior Vice President / Senior Consultant**
**National Property Claims** – Risk Control & Claim Advocacy Practice

**Willis Towers Watson**
801 South Figueroa Street | Suite 800 | Los Angeles, CA 90017
Tel:  213-607-6358
**Cell:  909-618-8209**

blaine.conant@willistowerswatson.com

---

**From:** Galla, Peter
**Sent:** Thursday, September 14, 2017 3:53 PM

WTW_00017433

**To:** Daar, Henry; Conant, Blaine
**Cc:** Tom Tio; Nichole Wilson (Nichole.Wilson@amwins.com)
**Subject:** FW: ACON

Henry and Blaine –

The ACON Property portfolio claim is progressing and we should discuss the next steps.    Would you be available for a call on Monday to review the claim and deductible?  Please see Tom Tio's email below.

Please let me know your availability.

Thanks,

**Pete Galla**
**Willis Towers Watson**
M&A Group
Direct: 212-915-8185
Mobile: 201-344-1047

---

**From:** Tom Tio [mailto:tom.tio@amwins.com]
**Sent:** Thursday, September 14, 2017 4:45 PM
**To:** Galla, Peter
**Cc:** Nichole Wilson
**Subject:** ACON

Pete,

We had a preliminary discussion with VeriClaim concerning how the deductible will be determined for the Harvey incident.  They will in turn begin a conversation with underwriters.

We suggest that we have a call with your claims folks on this matter.  There are a number of possible deductibles that may apply to this single occurrence depending on which locations are submitted in the claim.

In addition, the single largest deductible will apply to the occurrence which will be based on one of the OPCO's.  This means that the occurrence deductible (not per OPCO) will need to be shared amongst the various parties making a claim under this contract (big advantage to ACON and each OPCO).  We suggest that ACON consider a proportional allocation of deductible against amount of claim.  In other words, if Fiesta accounts for 75% of the total loss payable under the contract, Fiesta would absorb 75% of the applicable deductible for this occurrence.  Whatever methodology is agreed upon internally, such methodology will need to be communicated to VeriClaim so that the Loss Payable by OPCO can be determined when checks need to be written.

Standing by.

Tomas Tio
Executive Vice President  |  AmWINS Brokerage of Georgia, LLC
T  404.920.3670  |  C  770.317.0033  |  tom.tio@amwins.com
3630 Peachtree Road NE, Suite 1700  |  Atlanta, GA 30326  |  amwins.com

An AmWINS Group Company

In California: AmWINS Brokerage of Georgia Insurance Services, LLC  |  License #0F56593

**Loss Runs may be requested at lossruns.abga.teamtio@amwins.com**

CONFIDENTIAL

09/14/17 tom.tio@amwins.com

This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed.  If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same.  If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer.  Thank you

CONFIDENTIAL

WTW_00017435

# EXHIBIT 13

          IN THE DISTRICT COURT OF THE UNITED STATES
            FOR THE SOUTHERN DISTRICT OF TEXAS
                    HOUSTON DIVISION

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

FIESTA MART, LLC,

          Plaintiff,

   -vs-                    Civil Action No. 4:20-CV-03484

WILLIS OF ILLINOIS, INC.,
WILLIS TOWERS WATSON US,
LLC, ALLIED WORLD ASSURANCE
COMPANY (U.S.) INC.,
ARCH SPECIALTY INSURANCE
COMPANY, ASPEN INSURANCE
U.S. SERVICES, INC.,
(D/B/A ASPEN SPECIALTY
INSURANCE COMPANY),
CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON (HISCOX),
HDI GLOBAL INSURANCE COMPANY,
INDIAN HARBOR INSURANCE COMPANY,
and WESTPORT INSURANCE CORPORATION,

          Defendants.

= = = = = = = = = = = = = = = = = = = = = = = = = = = =

          Remote Videoconference Deposition of:

                    HENRY DAAR

                 June 14, 2022

     Reported by:  Taunia Northouse, RDR, CRR, CRC



HENRY DAAR
Fiesta Mart V. Willis of Illinois

June 14, 2022
41—44

Page 41

1    says "team," I think what he was saying was Henry.
2    So I think I was saying, "You're saying team."
3    But I think what you mean is Henry, which is fine.
4    I mean, I'm being humorous.  I'm happy to draft a
5    few sentences.  And I basically said, "I'll get to
6    it as soon as I can."
7  Q  So Mr. Roberts responds to you, and he says,
8    "Someone other than me please draft so I don't say
9    something incorrect"; right?
10        MS. SMERKANICH:  Objection.
11        Document speaks for itself.
12  A  Can you repeat that?
13  Q  Mr. Roberts writes back and he clarifies that he
14    wants someone to draft it apart from Mr. Roberts
15    to make sure it's correct; right?
16        MS. SMERKANICH:  Objection to form.
17        Document speaks for itself.
18  A  Yeah.  I don't know why he was saying what he is
19    saying.  He just asked me to draft the sentences.
20  Q  So moving up to the next email in the chain,
21    Mr. Galla asks you to draft the sentences for
22    Fiesta and ACON; correct?
23  A  In the next email, "Yeah, Henry, please draft the
24    sentences," okay.
25  Q  And then at the top email in Exhibit 131 on the

Page 42

1    first page you'll see that you send back to the
2    team a draft on this issue; correct?
3  A  Yeah.  Let me read it, please.
4  Q  Take your time.
5  A  Okay.
6  Q  So my first -- my first question here is at the
7    end of the paragraph of instructions you instruct
8    your team to quote a policy wording.  Did you
9    review the policy before drafting this language?
10  A  I don't -- I don't know.  I know earlier on I
11    thought in the first email I said, "Please send
12    the policy at some point."  I probably looked at
13    it, probably a bit down the road.  I mean, the
14    loss was in the end of August of 2017.  And I was
15    being asked to do something at the end of
16    January 2018, so I wrote what I wrote.  And I
17    asked them to, you know, fill in the blanks.
18  Q  Is it fair to say that by directing your team to
19    fill in the blanks and to quote policy wording,
20    that you yourself were not quoting policy wording
21    in your language?
22        MS. SMERKANICH:  Objection to form.
23  A  I -- I think -- I think the fact that I put in
24    brackets "quote policy wording," it indicates that
25    I was not putting in the specific policy wording

Page 43

1    in this draft.
2  Q  And you would agree with me that whatever the
3    policy says on who a payable should be made to
4    controls; right?
5        MS. SMERKANICH:  Objection to form.
6  A  Well, yeah.  I agree.  I mean, in this claim I
7    never had any doubt that the policy payable clause
8    was to ACON.  So I think that to me was always the
9    issue; right?  To me the issue was always, you
10    know, ACON, the holding company, was the one that
11    was going to get paid, or per its direction.  And
12    that's why I asked, when I said earlier, about the
13    purchase and sale agreement.  Because I've been
14    involved with these so many times.  Whenever you
15    have a purchase and sale agreement, the lawyer
16    puts into the purchase and sale agreement how
17    insurance proceeds are going to get distributed
18    after the sale.  Otherwise, you get exactly what
19    we have here.
20        So when you asked about the loss payable
21    clause, before the sale, ACON, from my
22    recollection, you know, said pay Fiesta.  Had
23    there not been a sale, ACON still would have been
24    the one to say who got the proceeds.  After the
25    sale, it should have been in the agreement.  Then

Page 44

1    it would have been done and everybody would have
2    had direction.
3  Q  Is it your recollection that Fiesta Mart, LLC, was
4    not insured under the master property policy?
5  A  Not insured?  My view?  My view is that
6    Fiesta Mart, you know, is insured under the
7    policy.  I mean, I think they paid part of the
8    premium.  But that's not the issue.  The issue of
9    whether they're an insured or not is not the issue
10    when it comes to how proceeds are paid.
11  Q  And is it your recollection -- is it your
12    understanding, sitting here today, that the
13    payment of proceeds under the policy is payable
14    only to the named insured or the named insured's
15    direction?
16        MS. SMERKANICH:  Objection to form.
17  A  You know, if you want to --
18        MR. WEISS:  Join.
19  A  If you want to look at the -- you know, if you
20    want to pull up the policy, we can look at the
21    loss payable clause and see exactly what it says.
22    But my recollection is it says that it's payable
23    by the -- either the insured, the named insured --
24    paid to them or at the direction by them; right?
25    So there's a reason -- there's a reason behind the



Page 73

1   Q   So the email at the bottom of Exhibit 135 is the
2       same email that you reviewed to Mr. Hook from
3       Mr. Roberts on Exhibit 102; correct?  I can show
4       you 102.
5   A   Yeah.  We looked at that email.
6   Q   That's the same email; correct?
7   A   The email we talked about whether -- whether they
8       were -- okay.  Yeah.  We looked at that.  That was
9       like two emails before, two exhibits before.
10  Q   Exhibit 102 which -- if you want me to show it to
11      you, I will.
12  A   No.  I've got it there.  Go ahead.
13  Q   So Mr. -- Mr. Roberts forwarded his September 4th
14      email, September 4th, 6:43 from Mr. Hook to
15      you, and then you wrote back and said, "We don't
16      release funds."  Correct?
17  A   That's what I said.
18  Q   And what did you mean by that?
19  A   We're not the insurance company.  We don't -- we
20      don't make the payments.
21  Q   And further up in the email string you asked
22      Mr. Roberts to clarify that point with Mr. Hook;
23      correct?
24          MS. SMERKANICH:  Objection to form.
25          Document speaks for itself.

Page 74

1   A   Yeah, I don't know -- I don't know if I had a call
2       with him or what.  I mean I say yes, just wanted
3       to clarify what -- WTW does not control funds or
4       release them; right?  So that's consistent with
5       everything we've been talking about today.
6   Q   I'm showing what's been marked at a previous
7       deposition as Exhibit 122, which is a one-page
8       email, and I'm also sharing it on the screen.  Let
9       me know when you've had a chance to look that
10      over.
11  A   Okay.  Hold on one second.  Yeah.  This one's not
12      opening either.  I can probably just read it here
13      on the computer.
14          MS. SMERKANICH:  Tracy, maybe we
15          can zoom in a little bit more for Mr. Daar.
16          MS. LEROY:  Sure.  Make it bigger.
17          I'm sorry.  Got too many screens open right
18          now.  Okay.
19  A   Okay.
20  Q   My first question for you is who is Mark Rusas?
21  A   He was a Willis employee, I believe, out of
22      New York who -- I don't know if he's like, at this
23      point in time, 2018, he may have been like
24      region -- head of New York region, or might have
25      been the head of a certain class of business.  I

Page 75

1       don't really know.
2   Q   Who is Bruce Batzer?
3   A   I don't know.
4   Q   All right.  So not really knowing who those two
5       gentlemen are, do you know why they were included
6       by Mr. Roberts on this email regarding ACON's and
7       the Fiesta claims?
8   A   I mean, I don't.  I mean, I -- the only thing I
9       know about Mark is he may have some responsibility
10      for -- I don't know.  I mean, I just know him to
11      be a more senior person.
12          Appreciate the fact that I deal with claims
13      and that's my world.  And it's kind of -- I'm on a
14      need-to-know basis.  I deal with clients and the
15      claims and the insurance companies, and there you
16      go.
17  Q   Did you -- do you recall whether a phone call did
18      occur with some or all of the people listed on
19      Exhibit 122 to discuss the phone call that
20      Mr. Roberts had with Fiesta Mart?
21  A   I don't recall if there was or wasn't, no.
22  Q   At some point during 2018, did Mr. Conant suffer
23      from a health condition that left him unable to
24      work?
25  A   Yes.  He did.

Page 76

1   Q   And during that point in time, was there someone
2       else who was assigned to his role on the
3       Fiesta Mart claims?
4   A   I know that I -- I worked some on the claim.  I
5       know I did a little work on at least the part that
6       I did work on.  I think I did some work on the
7       business interruption aspect of it.  I thought
8       that the ACV payment was an issue that we're
9       discussing now, right.  And I'm not certain that
10      it was an issue that was kind of an "ongoing"
11      issue.  It was a "how is it going to get paid
12      issue."
13          I'm not certain that the ACV calculation
14      itself ever changed from where it currently
15      stands.  I just don't recall at this point.
16          So to answer your question, assigned?  I
17      think I kind of fostered it a bit.
18  Q   And did that mean that you were the person who was
19      speaking with the adjuster Boris about the claims
20      during Mr. Conant's absence?
21  A   Yeah.  But my discussions with Boris were limited
22      to the business interruption aspect of the claim.
23  Q   Sir, I am marking and dropping into the chat
24      Exhibit 136.
25



# EXHIBIT 14

Message

| | |
|---|---|
| **From:** | Conant, Blaine [blaine.conant@willistowerswatson.com] |
| **Sent:** | 9/20/2017 4:00:39 PM |
| **To:** | Loncarevic, Boris M (bloncarevic@vericlaim.com) [bloncarevic@vericlaim.com] |
| **Subject:** | Acon Investments - Fiesta |

Boris,

How are you doing my friend? This is getting beyond ridiculous! I am buried as I know you are as well. It was good to finally meet you in person.

My apologies, as this is the first chance that I have had to email you. I talked with Wayne this afternoon and he said that you had requested an advance in the amount of $6.5M in addition to the $1M that XL paid on Monday. Is that correct? If so, that is terrific and well timed! Wayne is very happy.

Please keep me in the loop regarding communications with Fiesta and the other Acon Investments entities. We had an internal call with the Acon Investment folks yesterday and I would have enjoyed sharing the news that Boris has requested a $6.5M advance for Fiesta.

Please make sure that the payment is made out to Fiesta and not ACON Investments. The ACON folks reminded us of that yesterday at the end of the conference call.

On the call yesterday, we discussed the deductible issue. I advised that we (you and I) had discussed the deductible issue last week when we met in Houston. Let me know if you need me to assist with the Markets regarding the deductible. It will be interesting to see what the markets decide is the appropriate deductible.

Thanks much for all that you are doing. I know that you have much on your plate currently. If I can assist you in any way, please give me a call.

Thanks

**Blaine D. Conant**
**Senior Vice President / Senior Consultant**
**National Property Claims** – Risk Control & Claim Advocacy Practice

**Willis Towers Watson**
801 South Figueroa Street | Suite 800 | Los Angeles, CA 90017
Tel:  213-607-6358
**Cell:  909-618-8209**

blaine.conant@willistowerswatson.com

CONFIDENTIAL

# EXHIBIT 15

1          THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF TEXAS

3                 HOUSTON DIVISION

4

FIESTA MART, LLC,                    )
5                                     )
                                      )
6          Plaintiff,                 )
                                      ) Civil Action No.
7      vs.                            )
                                      ) 4:20-CV-03484
8  WILLIS OF ILLINOIS, INC., WILLIS   )
   TOWERS WATSON US, LLC, ALLIED      ) VOLUME I
9  WORLD ASSURANCE COMPANY (U.S.)     )
   INC., ARCH SPECIALTY INSURANCE     )
10 COMPANY, CERTAIN UNDERWRITERS AT   )
   LLOYD'S OF LONDON (HISCOX), HFI    )
11 GLOBAL INSURANCE COMPANY, INDIAN   )
   HARBOR INSURANCE COMPANY, and      )
12 WESTPORT INSURANCE CORPORATION,    )
                                      )
13                                    )
           Defendants.                )
14                                    )
   ACON INVESTMENTS, L.L.C.,          )
15                                    )
           Additional Counterclaim    )
16         Defendant                  )
                                      )
17 _____)

18

19           DEPOSITION OF JACK HOOK

20      APPEARING VIA VIDEOCONFERENCE FROM

21           PARAMOUNT, CALIFORNIA

22          THURSDAY, JUNE 9, 2022

23           9:42 A.M. - 6:53 P.M.

24 STENOGRAPHICALLY REPORTED BY:
   CHERYL ASADA
25 CA CSR NO. 13496
   JOB NO. 212335

Page 38

1   23, and 56 Fiesta Mart stores.  Right?
2        A.    Yeah, those three stores, correct.
3        Q.    So when you're saying, sir, that you're waiting
4   for insurance proceeds, what are you referring to?
5        A.    I -- I don't understand.
6        Q.    Well, I believe it was your --
7        A.    Yeah, so for 56, we're -- we're waiting, like,
8   to receive the value that our policy states, which is
9   replacement value of the assets that were in that store,
10  all three stores, at the time of the loss.  We expect
11  those stores to be replaced per the policy, which is
12  replacement value for those stores.
13       Q.    And do you have a general understanding of how
14  depreciation holdback works?
15       A.    I do.
16       Q.    And is it -- just -- what is, generally, Fiesta
17  Mart's understanding as to when it would be entitled to
18  RCV or --
19       A.    So -- so, you know, we need to --
20             THE COURT REPORTER:  Wait, wait.  I'm sorry.
21       Mr. Kaliner, can you please repeat your
22  question?
23             MR. KALINER:  Sure.
24  BY MR. KALINER:
25       Q.    What is Fiesta Mart LLC's understanding as to

Page 39

1   when it would be RCV -- or what we refer to as
2   depreciation holdback?
3             THE WITNESS:  Are you good, Cheryl?
4             Okay.  So we would have -- Fiesta Mart, LLC,
5   would have to spend those funds in order to receive them
6   from the insurers.
7   BY MR. KALINER:
8        Q.    And that hasn't taken place yet by Fiesta Mart,
9   it has not expended funds for Store 56 to receive RCV.
10  Correct?
11       A.    So that -- that is correct.  We're not --
12  again, we're not going to spend those funds until we know
13  we have insurance to -- monies to be reimbursed.
14       Q.    And the same holds true for Fiesta Mart
15  Store 10, Fiesta Mart, LLC has not expended the funds yet
16  to make permanent repairs in order to get RCV?
17       A.    Right.  So -- that is correct.  So we are
18  waiting -- again, that's correct.  We have not spent
19  money on those stores other than the -- to get -- to get
20  those amounts back, that's correct.
21       Q.    And do you understand that there is a policy
22  provision that deals with mechanics of an insured such as
23  Fiesta Mart, LLC, being paid actual cash value versus
24  replacement cost value?
25       A.    Yes.

Page 40

1        Q.    And you understand the insurance policies to be
2   insurance contracts?
3        A.    The policy, I guess, is, in a sense, a
4   contract.
5        Q.    And it has terms and conditions that, at
6   times -- well, strike that.
7             Can we turn to Paragraph 36 of the second
8   amended complaint, please?
9        A.    Which exhibit is that?  Sorry.
10       Q.    This is Exhibit 67.
11       A.    Tell me again the page, please.  Sorry.
12       Q.    Sure.  It's Page 7, Paragraph 36.
13       A.    Yes.
14             "Fiesta Mart paid to repair
15       damages"...
16       Q.    So -- great.
17             So for the part that says, "Fiesta Mart paid to
18  repair damage in the Harvey loss, including damage to
19  Store Numbers 10, 23, and 56," do you see where I'm
20  reading from?
21       A.    I do.
22       Q.    Okay.  Could you identify what was paid for
23  each of these stores as represented in this Paragraph 36?
24       A.    I can tell you $7.5 million was paid to Fiesta
25  Mart, LLC, so -- to date.

Page 41

1        Q.    And I'm asking a little bit of a different
2   question.
3        A.    Uh-huh.
4        Q.    This allegation in Paragraph 36 said Fiesta
5   paid to repair damage.
6        A.    Uh-huh.
7             MS. LEROY:  Bruce, I'm just going to interrupt
8   and note that I think you're getting into a topic that
9   someone else has been designated to address.  I mean,
10  this witness can answer to the best of his ability, but I
11  think that you're in Topic 13 and 10, which we've
12  designated Mr. Olson for.
13             MR. KALINER:  So, Ms. LeRoy, I'm more than
14  happy for you to -- to just tell me that Mr. Olson can
15  answer those questions and I'll move on.  Like, either of
16  you can make that representation.  If you want, I can ask
17  the question or you can just say that's falling under 10
18  and 13 and that will be addressed by Mr. Olson.
19             MS. LEROY:  Well, I -- we've told you which
20  topics Mr. Olson will address.  You can certainly ask
21  this witness about them.
22             MR. KALINER:  Okay.  I will.  But just to cut
23  through this, if you -- if you see me going down a path,
24  just say, "Bruce, Mr. Olson is going to be covering that
25  issue."

Page 46

1    A.    Okay.  Yes, I see it.  "In addition to property
2   damage, Fiesta Mart also suffered business interruption,"
3   yeah.
4    Q.    As part of this litigation, is Fiesta Mart
5   seeking a business interruption loss?
6    A.    So my understand -- understanding is that
7   through the MIPA, we -- that that business interruption
8   was specifically carved out with those proceeds going to
9   ACON.
10   Q.    So just to clarify, answer my question, in this
11  litigation by Fiesta Mart, LLC, is it seeking business
12  interruption, loss or damage from insurers?
13   A.    No.
14   Q.    Thank you.
15         Let's turn to Paragraph 103, please.
16   A.    103?
17   Q.    Correct.  Page 18.
18   A.    Okay.  Yeah.
19   Q.    Do you see it states the depreciation holdback
20  amount total, 4.5 million?
21   A.    I do.
22   Q.    And that would be for all three stores?
23   A.    Correct.
24   Q.    And could you break out that number per store?
25   A.    I don't know that it is broken out by store.

Page 47

1    Q.    Is that something Mr. Olson will testify to?
2    A.    Yes.  I don't know what it is offhand.
3    Q.    With regard to this 4.5 million, is this the
4   sum that's being sought by Fiesta Mart, LLC against
5   insurers or is this just a -- a figure of some type?
6         MS. LEROY:  Objection.  Form.
7   BY MR. KALINER:
8    Q.    Let me rephrase the question.
9         In Fiesta Mart, LLC's action --
10   A.    Uh-huh.
11   Q.    -- what is the amount the depreciation holdback
12  it is seeking from insurers?
13         MS. LEROY:  Objection.  Form.
14         THE WITNESS:  Yeah, let me -- let's take a
15  break here for a minute, please.
16  BY MR. KALINER:
17   Q.    Okay.  There's -- there's a question pending,
18  so you can't --
19   A.    Understand.  I -- I -- so I just need to think
20  about -- so this amount, we -- so of the -- let's see.
21  We -- so of the 4.78, right, we received through
22  negotiations with ACON, 3.1 million, and my understanding
23  is the suit is for the delta between those two amounts
24  plus 6.6 million in amounts, so I think we are -- 6.6 is
25  the number that I have in -- in my mind for that amount.

Page 48

1    Q.    And what documents support this 6.6 million
2   amount?
3         MS. LEROY:  Objection.  Form, and calls for
4   legal conclusion.
5         THE WITNESS:  There is a document that -- that
6   showed us -- I don't recall exactly which one -- that
7   talks about the 6.6.  I recall seeing a schedule of
8   this -- of this amount.
9   BY MR. KALINER:
10   Q.    And for Paragraph 103, what document or
11  documents support the 4.5 million figure?
12         MS. LEROY:  Same objection.
13         THE WITNESS:  I'd have to -- again, I -- I --
14  there's a document, I just don't recall which one it is.
15  BY MR. KALINER:
16   Q.    If I were to suggest to you a settlement
17  agreement that contains an assignment agreement, would
18  that assist you in any way for the document you're
19  referring to?
20   A.    Right.  So during the course of the
21  negotiations with ACON, they did, in fact, assign their
22  rights to Fiesta Mart, LLC.
23   Q.    And is that the document you've been referring
24  to, the figures in it?
25   A.    Honestly, I don't -- I don't recall if that was

Page 49

1   the document or not.
2         MR. KALINER:  I think this is a good time --
3   we've been going for about an hour.  Why don't we take a
4   10-minute break to organize a little bit --
5         THE WITNESS:  Yeah, thank you.
6         MR. KALINER:  Okay.
7         THE WITNESS:  Thank you.  All right.
8         MR. WEISS:  Off the record.
9         (Recess.)
10         MS. SMERKANICH:  Let me take over for Bruce and
11  ask if we can get back on the record, please.
12         And, Tracy, what I want to put on the record
13  is, as you know, there were two deposition notices served
14  here, one by the insurers and one by the Willis
15  Defendants.  Obviously, it's our expectation that we
16  are -- "we" being Willis -- are going to be able to ask
17  questions, regardless of how long Mr. Kaliner takes with
18  his; although, I will make it very clear that we have no
19  intention of wasting everybody's time and reasking
20  questions.
21         To the extent that that is not able to be
22  completed today, we would also, though, expect that you
23  and Mr. Hook would work with us to find a time within our
24  scheduling order to make that happen.
25         MS. LEROY:  Right.  And the last time we talked

Page 162

1  Wayne Peterson I believe you said was responsible for
2  Fiesta Mart's insurance program?
3      A.   That's my understanding.
4      Q.   Anyone else assist Wayne with Fiesta Mart's
5  insurance program?
6      A.   I don't know.
7      Q.   In around the time period of April 2016, did
8  Fiesta Mart have a -- have a risk manager?
9      A.   I do not believe they did.
10     Q.   Do you know for certain whether or not they
11 did?
12     A.   I'm not for certain, but I do know that at
13 acquisition there was not such a position at Fiesta Mart.
14     Q.   Would Wayne Peterson, in the course of his
15 responsibilities for Fiesta Mart's insurance program --
16 and, again, we're in -- in or around April 2016, was
17 Wayne Peterson responsible for selecting Fiesta Mart's
18 insurance broker?
19     A.   I doubt it.  It was likely crammed down by
20 ACON, but I don't know for sure.
21     Q.   You mentioned that Mr. Peterson left at or
22 around the time of the acquisition.  Is that correct?
23     A.   After the acquisition he did stay around.  I do
24 not recall how long he remained after the acquisition
25 date in April of 2018.

Page 163

1      Q.   And I believe you said you assumed the CFO
2  duties after the acquisition.
3      A.   That is correct.
4      Q.   Did responsibility for Fiesta Mart's insurance
5  program fall under your responsibilities then?
6      A.   Yes.  Everything post-acquisition would've --
7  would've fallen under my umbrella.  That's correct.
8      Q.   So now you're -- you're the one -- would --
9  would -- strike that.
10          Would it be fair to say you're now responsible
11 for selecting the insurance broker for Fiesta Mart?
12     A.   That is fair to say, yes.
13     Q.   Does Fiesta Mart currently have a risk manager?
14     A.   Well, we have a risk manager for Chedraui USA.,
15 but there does not sit specifically for Fiesta a risk
16 manager, no.
17     Q.   What is the name of that risk manager?
18     A.   Currently, today?
19     Q.   Yes.
20     A.   His name is Gene Smith, but he was not engaged
21 until the summer of 2021.
22     Q.   Prior to Mr. Smith's engagement, did -- you're
23 going to make me pronounce it so, all right -- prior to
24 Mr. Smith's engagement --
25     A.   I'll make it easy on you.  It was me.

Page 164

1      Q.   Okay.  All right.  So you were the risk manager
2  prior to Mr. Gene's -- excuse me, you were the risk
3  manager prior to Mr. Smith's engagement.
4      A.   That's correct.
5      Q.   Okay.  And is -- I understand that Mr. Smith is
6  the risk manager for -- for Chedraui.  I couldn't escape
7  it, so...
8          I understand that Mr. Smith is the risk manager
9  for Chedraui.  Does he have any responsibilities for
10 Fiesta Mart, LLC?
11     A.   He does.
12     Q.   And what are those responsibilities?
13     A.   So he -- we have three companies in Chedraui
14 USA: Smart & Final, El Super, Fiesta.  He is the head
15 risk manager for all three banners.  And, again, that
16 started just about a year ago.
17     Q.   What was the reason for switching that function
18 from under your umbrella to having a separate position?
19     A.   The company is getting a little bit too large
20 for me to manage.
21     Q.   And in terms of the insurance responsibilities,
22 can you explain to me what's on your plate versus what's
23 on Mr. Smith's plate?
24     A.   With respect to insurance?
25     Q.   Correct.

Page 165

1      A.   Right, so he takes the lead on providing
2  brokers with various information they need to place
3  policies, whether that be sales information, payroll
4  information, statements of values and the like.
5      Q.   Anything else?
6      A.   No, other than he and I are particularly on
7  large policy engagements and decisions, work very
8  closely.  For example, all three banners' property just
9  renewed, you know, last week, actually, 10 days ago, so
10 given the size of that, given that we have close to 400
11 stores in five states, it's -- it's a big deal, so I'm
12 personally involved.
13     Q.   How about claims, is that something that you
14 handle or is that something Mr. Smith handles?
15     A.   He's the lead on claims.
16     Q.   Okay.  Has he had any involvement in this
17 litigation, to your knowledge?
18     A.   None.
19     Q.   Okay.  In or around 2016, April of 2016, when
20 Fiesta Mart was making the decision to switch brokers and
21 use Willis' services, who at Willis did Fiesta Mart speak
22 with?
23     A.   I don't know.
24     Q.   And do you know who at Fiesta Mart was having
25 those conversations with Willis?

Page 166

1    A.    Wayne Peterson, again, was leading the charge
2  on insurance renewals; however, I do not know the
3  interaction between him and representatives of ACON on
4  such a decision.
5    Q.    So I take it you don't know how many
6  conversations Fiesta Mart and Willis had in the course of
7  deciding whether or not to use Willis' brokerage
8  services?
9    A.    I do not.
10   Q.    Can you describe for me the representations
11 that Willis made to Fiesta Mart in or around April 2016
12 concerning its property insurance?
13   A.    I would -- I don't know.  I'm assuming there's
14 a contract in place that outlined those -- those
15 agreements.  But I was not privy to the conversations.
16   Q.    I'm going to have us refer back to one of the
17 previously marked exhibits.  It is the -- it is the
18 second amended complaint -- hold on, let me find the
19 exhibit number for you.
20         THE WITNESS:  Sam, we need you again.
21         MR. WEISS:  Sixty-seven.
22         THE WITNESS:  There you go.
23         MS. SMERKANICH:  Thank you, Sam and Jack.
24 BY MS. SMERKANICH:
25   Q.    I'm going to attempt to share the screen on

Page 167

1  this.  If it fails spectacularly, I'll apologize in
2  advance.
3         And I'm going to scroll down, just go to
4  Paragraph 105.
5         Do you see Paragraph 105, Mr. Hook?
6    A.    I do.
7    Q.    And Paragraph 105 reads:
8         "Willis knowingly made statements
9         misrepresenting the terms of the policies
10        it secured for Fiesta Mart."
11        Do you see that?
12   A.    I do.
13   Q.    What statements representing the benefits or
14 advantages promised by the policies secured for Fiesta
15 Mart did Willis make?
16   A.    Willis told us we had insurance.  Willis
17 didn't -- Willis didn't tell us that we didn't have
18 insurance.
19   Q.    And it is your position that you did not have
20 insurance?
21   A.    I think that's your position.  My position is
22 that we have insurance.  Willis' position is that we
23 didn't have insurance.
24   Q.    And what is -- what is your understanding that
25 Willis' position is you didn't have insurance based upon?

Page 168

1    A.    Well, discussions, e-mails, the fact that I was
2  told we were insured, the fact that I would receive
3  $4.78 million in 30 days and never happened, and finding
4  out the money went to ACON and not us.
5    Q.    Let's break that down.
6         You mentioned discussions.  What discussions
7  are you referring to?
8    A.    Well, I think there's, in part of the
9  documents, there's an April 2nd letter.  I don't know if
10 you can find that and bring that up.
11   Q.    What do you recall about the April 2nd letter?
12   A.    So -- so that was an acknowledgement by Blaine
13 to a discussion we had in August 2nd of 2018 in which
14 Blaine and myself and the CEO of our company were on a
15 call because we were frustrated with what was going on.
16 So we get on the call, the three of us; Blaine in that
17 call said that he was working very hard to get us the
18 money and that we would have it in 30 days.
19   Q.    You mentioned there was an April 2nd letter --
20   A.    I'm sorry, I'm sorry, August 2nd.  It would've
21 been helpful if we had the document.
22   Q.    So an August 2nd letter.
23         And who -- who was -- so let me break that
24 down.  You said there's a letter and then you also
25 referenced a call.

Page 169

1    A.    Correct.  He references the call in the letter.
2    Q.    When did the call take place?
3    A.    The same day, I believe.
4    Q.    That being August 2nd?
5    A.    Correct.
6    Q.    And what do you recall Blaine telling you?
7    A.    He told me that we should expect the money
8  within 30 days, 4.78 million.
9    Q.    Anything else you recall about the call?
10   A.    In fact, I -- I challenged him on that call.  I
11 said, "Blaine, you know, that's great, I don't believe
12 you."  And he assured me that it would.
13   Q.    And why did you say that to him?
14   A.    Because of the -- just the claim is messy and
15 there was a lot of people involved and I just -- I -- was
16 becoming frustrated with the lack of movement.
17   Q.    Anything else you remember about that call?
18   A.    That was the -- that was the gist of the call.
19   Q.    So you referred to that call and the August 2nd
20 letter when I was asking you about discussions that
21 you're aware of that support -- I guess that inform your
22 position as to Willis' -- Willis' position in this case.
23         Any -- what other discussions inform your
24 belief that Willis' position is that Fiesta Mart does not
25 have insurance?

1    A.    Because they sent the money to ACON when, in
2  fact, the -- you know, the fact that Willis helped
3  prepare the proof of losses.  The fact that from
4  acquisition through September when we found out the money
5  went elsewhere, they were not acting as a fiduciary,
6  they're acting like we have insurance, we're getting on
7  calls, there's e-mails, they're not telling me we don't
8  have insurance and, in fact, actually, they, you know,
9  the -- the -- so we're -- any reasonable person and
10 someone in my position who has been placing property
11 policies for 15 years knows what a broker's job is and
12 what they do.
13         It would've been nice for Willis to tell me,
14 "Hey, you don't have insurance."
15    Q.    Any other discussions, though, or calls?  I
16 know you were referring to Willis' actions, but any other
17 discussions or calls?
18    A.    There were several over the -- the summer
19 period in which there were e-mails about what's the
20 update, what's going on.  And then at some point, I don't
21 recall the date, then for about a three- to four-week
22 period, no one was responding.
23    Q.    And is that when you referred to, I think
24 earlier you said Willis went dark?
25    A.    Correct.

1    Q.    Did you later learn that Blaine Conant was
2  having some health issues?
3    A.    I know that Wayne was -- Blaine was having
4  health issues, but he was not the only point of contact.
5  Jackie [sic] Collins was, in fact, our account executive
6  and there were others that I included on communications.
7    Q.    And by Jackie Collins, do you mean Nancy
8  Collins?
9    A.    I'm sorry, that's correct.
10   Q.    Are you aware whether or not Nancy Collins
11 works on claims?
12   A.    Well, she was our account executive, so it
13 would've been nice if she would've told me she wasn't.
14   Q.    Going back to Paragraph 105 for a moment.
15         Any other statements misrepresenting the terms
16 of the policies it secured for Fiesta Mart, that you can
17 think of?
18   A.    Again, there -- your -- Willis is issuing
19 certificates of insurance on our behalf.  Willis is
20 acting like our broker.  Willis is helping us with the
21 proof of loss.  Willis is representing us, you know, and
22 then Willis says we don't have insurance.  So, yes, there
23 were multiple -- multiple ways that they're telling us
24 that they misrepresented us.
25   Q.    And let me just clarify.  Did anybody at Willis

1  specifically tell you, you don't have insurance?
2    A.    Well, it was hard to get anyone to tell me
3  anything.  It went dark and then the next thing I know,
4  September -- late September of 2018 I get an e-mail from
5  Willis, basically saying we don't have insurance because
6  the money went to another party.  That, to me, is --
7  means we don't have insurance.
8    Q.    Are you referring to the September 15th e-mail
9  from Mr. Roberts?
10   A.    I'd have to see it.
11   Q.    Okay.  Did anybody, though, other than this
12 e-mail at Willis, tell you that you don't have insurance?
13   A.    Well, again, no one from Willis would contact
14 me for several weeks.  And actions speak louder than
15 words, clearly.
16   Q.    So nobody -- nobody orally during a discussion
17 or phone call said you don't have insurance?  I
18 understand your position, I just want to make sure --
19   A.    No, no one called me.  They -- they had -- they
20 had to send a letter.
21   Q.    And, Mr. Hook, I understand your position, I'm
22 just trying to make sure that we have the universe --
23 that you and I are understanding the same universe of
24 what Paragraph 105 of the second amended complaint is
25 referring to.

1         I took us on a bit of a tangent.  I wanted to
2  go back to April -- April of 2016 and Fiesta Mart's
3  decision to join the -- what's sometimes referred to as
4  the aggregate property program and sometimes referred to
5  as the master property policy.  If I use those two terms
6  interchangeably to describe the policies that are at
7  issue in this case, do you understand what I'm referring
8  to?
9    A.    Yes, so that -- yes, I do.
10   Q.    Okay.  If I have this correct, after Willis
11 became Fiesta Mart's broker, it bound a stand-alone
12 property policy with AIG.  Correct?
13   A.    I don't know exactly, but if that happened, it
14 wouldn't surprise me, but I don't know the -- that -- if
15 they bound with who the carrier was.
16   Q.    Ultimately, though, Fiesta made the decision to
17 join the aggregate property program that Willis had
18 assisted in putting into place.  Correct?
19   A.    I would say that was ACON's decision, not
20 Fiesta's decision.
21   Q.    But we can agree that eventually Fiesta Mart
22 came under the aggregate property program?
23   A.    Certainly.
24   Q.    To your knowledge, could Fiesta Mart have
25 stayed under the AIG program?

Page 182

1   the family office?
2       A.    It was it was called Fiesta, ironically enough,
3   Fiesta Mexicana.  It was, I think, in 2010 or 2012.  And
4   the Smart & Final deal from Apollo was last year.
5       Q.    I want to turn your attention to the
6   certificates of insurance that we discussed earlier, and,
7   again, I'll try to keep my questions to new ground.
8            Who at Fiesta Mart would request certificates
9   of insurance from Willis?
10      A.    So typically the majority of these certificates
11  go out to landlords, and so the broker knows, as part of
12  the normal course.  They have the list of properties and
13  landlords and so once we buy, they kind of automatically
14  click that off to all the different landlords.  So
15  that's -- that's kind of one big large batch issuance of
16  the certificates that happens upon renewal.
17           Subsequent to that, it's -- it's -- it happens,
18  it doesn't happen every day, but presumably it would've
19  been Wayne that would request a certificate to a party
20  that would acquire them.
21      Q.    And I don't want to put words in your mouth,
22  but would you agree with me that certificates of
23  insurance are demonstrate -- that the purpose of
24  certificates of insurance is to demonstrate to third
25  parties that -- that there's insurance?

Page 183

1       MR. KALINER:  Objection to form.
2       THE WITNESS:  Absolutely.  Which is why having
3   Fiesta Mart, LLC on there is meaningful, despite all the
4   legalese surrounding everything else.  Those things have
5   meaning, that's why they're required.
6   BY MS. SMERKANICH:
7       Q.    Did Willis ever represent to Fiesta Mart that
8   by issuing a certificate of insurance, that it was adding
9   Fiesta Mart, LLC to the master property policy as a named
10  insured?
11      MR. KALINER:  Objection.
12      THE WITNESS:  Can you say that again, Kyra?
13  BY MS. SMERKANICH:
14      Q.    Did Willis ever represent to Fiesta Mart that
15  by issuing the certificates of insurance, that it was
16  adding Fiesta Mart, LLC to the master property policy as
17  a named insured?
18      MS. LEROY:  Objection.
19      THE WITNESS:  Absolutely.  This is an action.
20  Right?  By issuing it with Fiesta Mart, LLC on the
21  certificate, yes.  They are telling us that -- that we
22  are insured.
23  BY MS. SMERKANICH:
24      Q.    You mentioned it was an action.  Any e-mails or
25  letters stating that?

Page 184

1       A.    There -- there -- makes no sense to do that,
2   right, it's inherent in the document.  This document is
3   saying that Fiesta has insurance.
4       Q.    Any oral --
5       A.    You don't need --
6       Q.    I'm sorry, go ahead.
7       A.    Yeah, so in my opinion, I've never had to
8   say -- call my broker and say, "You just issued this, it
9   says Fiesta Mart, LLC is the insured.  Are you sure we're
10  insured?"  That's nonsensical.
11      Q.    When you say your -- "in your opinion," is that
12  testimony you're providing in a personal capacity?
13      A.    No, in my professional capacity as CFO.
14      Q.    Okay.  Were there any oral discussions, in
15  person or phone, where Willis represented that it was
16  adding Fiesta Mart, LLC to the master property policy by
17  way of certificate of insurance?
18      MR. KALINER:  Objection to form.
19      THE WITNESS:  Not that I am aware of.
20  BY MS. SMERKANICH:
21      Q.    I'm going to pull up, just briefly, the
22  certificate of insurance on -- this one I have is 26, I
23  believe.
24           Mr. Hook, we looked at this document earlier.
25  If you need to take a minute to -- to -- to remind

Page 185

1   yourself through the document, let me know.
2       A.    You know what, because it's kind of small, can
3   you give me an exhibit number and I'll -- oh, okay.  That
4   helps.
5       Q.    It's 26.  And I can scroll down for you.
6       A.    Okay.  I can see that, yeah.
7       Q.    And I should clarify for you.  I was mistakenly
8   referring to this as a certificate of insurance.
9            You would agree with me that this says
10  "evidence of property insurance."  Correct?
11      A.    To me, it's the same thing.
12      Q.    Okay.
13      A.    I'm referring to this as evidence of property
14  insurance.
15      Q.    Okay.  But this doesn't say -- and, again, that
16  was a mistake on my part.  That doesn't say "certificate
17  of insurance," it says "evidence of property insurance."
18  Right?
19      A.    That's correct.  I think I said "certificate"
20  and you followed my lead on there.  But, yes, it says
21  "evidence of property insurance."
22      Q.    And having reviewed this document, Mr. Hook,
23  anything on the certificate of insurance that you believe
24  to be inaccurate?
25      A.    No.  I mean, we have the -- we have the

1  insured, which is Fiesta Mart; we have the broker, which
2  is Willis; and we have the insurance company and -- and a
3  date, so I -- I -- you know, if you want to scroll to the
4  bottom so I can take a quick look, but this seems proper
5  and bona fide to me.
6      Q.   Tell me if I'm scrolling too fast.
7      A.   It looks fine to me.  I don't -- I don't see
8  any mistakes on this document.
9      Q.   And, again, I understand you're not making the
10 distinction, but it says "insured," not "named insured."
11 Correct?
12     A.   It does say "insured."  That is correct.
13     Q.   I'm going to switch gears, talk a little bit --
14 maybe more than a little bit -- about the sale of Fiesta
15 Mart to El Super or Bodega Latina Corporation.  I will
16 warn you in advance I'm probably likely to use both
17 iterations --
18     A.   That's okay.  I understand.
19     Q.   Who approached who about that -- that
20 acquisition?
21     A.   Oh, boy.  That's a good question.  I believe it
22 was our investment banker with RBC.
23     Q.   And by "our investment banker," you're
24 referring to El Super's investment banker?
25     A.   Correct, correct, who specializes in the retail

1  grocery space.
2      Q.   And do you recall why they -- why they
3  suggested the acquisition to you?
4      A.   Well, we had been inquisitive over the years.
5  We've bought seven companies, seven retail groceries.
6  We -- six of the seven had been focused in the Hispanic
7  trade, and the opportunity to buy a company in Texas,
8  with significant presence in Dallas and Houston, was
9  attractive to us.
10     Q.   You mentioned that you -- and by "you," it's
11 Bodega/El Super bought seven retail groceries previously.
12 Correct?
13     A.   Including Fiesta Mart.
14     Q.   Okay.
15     A.   Correct.
16     Q.   Just trying to square that with the -- with
17 the -- with the, I guess, the acquisition that you
18 personally have been through.  Can you -- can you walk me
19 through the -- the -- these -- well, let's call it six
20 and we'll say the seventh is Fiesta Mart.  Is that fair?
21     A.   Sixth is Fiesta, seventh is Smart & Final.
22     Q.   Okay.
23     A.   So I started in -- in 2008, when we had seven
24 stores, and then that same year we bought a company.
25     Q.   What company?

1      A.   Called Gigante, G-i-g-a-n-t-e.
2      Q.   Okay.
3      A.   And then in 2010 we bought Fiesta Mexicana.
4      Q.   Good thing there aren't any trademark attorneys
5  on this call.
6      A.   I hope not.
7           2012, we bought a company called Value Plus;
8  then we bought three stores from a -- our competitors had
9  created joint venture and they sold off three of their
10 stores and we bought that.
11     Q.   What stores were those?
12     A.   There were two in El Paso, Texas, and one in
13 Albuquerque, New Mexico.
14     Q.   And I guess what type of stores were they?
15     A.   Oh, these are all retail grocery stores.
16     Q.   Do you recall what the name of the stores were?
17     A.   Yes.  They were called -- I believe they were
18 called Ranch Market.
19     Q.   And when was that?
20     A.   2014 or 2015.
21           And then we bought a small chain called
22 El Tapatio, and that was in the 2015, '16 range.  I don't
23 recall exactly when.  And 2018 was Fiesta, and 2021 was
24 Smart & Final.  I think that's seven.
25     Q.   Earlier Mr. Kaliner asked you about the outside

1  counsel that repre- -- that represented you in connection
2  with the acquisition of Fiesta Mart.
3           Do you remember that?
4      A.   Yeah, I think -- well, I don't recall exactly.
5  We used Sidley Austin.  I think he asked me who was
6  helping me draft some letters and that was Sidley Austin,
7  and we also used Sidley Austin for our M&A work.
8      Q.   Sidley Austin represented you in connection
9  with the acquisition of Fiesta Mart?
10     A.   That's correct.
11     Q.   How about in the acquisition of Gigante?
12     A.   We just did that ourselves.
13     Q.   How about in the acquisition of Fiesta
14 Mexicana, did Sidley Austin represent you in that?
15     A.   You know, I don't remember who that was, it was
16 12 years ago.  I don't recall who was our attorneys at
17 that point.
18     Q.   Did you -- let me put it this way:  Was that
19 one that you used outside counsel or you did in-house?
20     A.   That one we used outside counsel, I just don't
21 recall the firm that we used.
22     Q.   How about Value Plus, did you use outside
23 counsel?
24     A.   We did.  I don't recall who it was.  At some
25 point we became kind of a Sidley shop, and I don't know

Page 190

1  if that was in '14 or '15.  We certainly used them for
2  Fiesta, and we used Sidley for Smart & Final.
3      Q.    Had you used Sidley before the acquisition of
4  Fiesta Mart?
5      A.    Yeah.  Yes.  Some of those -- you know, of
6  course there's deals you do and there's deals that you
7  don't do, right, and so sometimes they happen, sometimes
8  they don't, so we used Sidley starting, I think, in a
9  couple of deals that didn't come to fruition.
10     Q.    And I will caveat -- and Tracy will also jump
11 in -- please, without revealing anything that is
12 privileged, how did El Super come to begin its
13 relationship with Sidley Austin?
14           MS. LEROY:  Look, I am going to object.  Why --
15 what is the relevance of this line of questioning, how
16 they picked their lawyers years ago?
17           MS. SMERKANICH:  I'm building up to what I'm
18 getting at.  This is a bit of context.
19           MS. LEROY:  Okay.  Well, if he knows, he can
20 try to answer that without -- without impinging on
21 discussions either with inside or outside counsel.
22           If you can answer that question, do your best.
23           THE WITNESS:  I -- I don't -- I don't really
24 recall how that relationship began six or eight years
25 ago.

Page 191

1  BY MS. SMERKANICH:
2      Q.    Can you name for me all of the individuals at
3  Fiesta Mart or El Super that were involved in any way
4  with the due diligence for the acquisition of Fiesta
5  Mart?
6      A.    Yeah, so we -- we used a third party, a CPA
7  firm, Pricewaterhouse, to do financial diligence at the
8  time.  Myself, and there were others on my team, who had
9  a role in diligence efforts.
10     Q.    Who else was it on your team who had a role in
11 diligence efforts?
12     A.    Names?
13     Q.    Yes.
14     A.    Yeah, so Miranda Kassis, K-a-s-s-i-s; Victor
15 Chavez; let's see, Nieves, N-i-e-v-e-s, Kelley,
16 K-e-l-l-e-y.  They all helped us -- helped me.  Those
17 were the primary people helping us.
18     Q.    And what are their positions?  Ms. Kassis?
19     A.    She -- her job is director of decision support.
20     Q.    Could you just describe generally to me what
21 that entails?
22     A.    She does a little bit of everything.  She's
23 kind of our project person, financial statement modeling
24 systems integration, I would say she's kind of our
25 project -- a project manager for various company-wide

Page 192

1  initiatives.
2      Q.    And how about Mr. Chavez, what was his
3  position?
4      A.    Controller.
5      Q.    And Ms. Kelley?
6      A.    Director of financial planning and analysis.
7      Q.    How about individuals at Fiesta Mart or
8  El Super that were involved with negotiating the MIPA,
9  would that be yourself and the three team members that
10 you told me about earlier?
11     A.    No.  The -- the general business terms would've
12 been worked out between myself and our CEO, but, of
13 course, using the investment banker whose primary job was
14 really to negotiate and broker the deal and then, of
15 course, once the major business terms were agreed to,
16 then it moved to the legal teams.
17     Q.    In drafting the MIPA, that would've been when
18 it had moved to the legal teams?
19     A.    That is correct.
20     Q.    And you said it was -- Sidley Austin was
21 representing Fiesta Mart.  Correct?
22     A.    That is correct.
23     Q.    I'm sorry, Sidley Austin was representing
24 El Super.
25     A.    That's right, that's right.

Page 193

1      Q.    And do you recall the attorneys that were
2  representing ACON?
3      A.    Yes.  It was -- is it Hogan Lowell [sic] --
4  global -- Hogan Lowell, I believe is their name.  I'm not
5  clear on the second word, I can't really remember.
6      Q.    That's all right.
7            Was anyone in Willis involved with conducting
8  due diligence?
9      A.    Not on the -- not from the -- from our side,
10 from the buyer side, no, to my knowledge.
11     Q.    Do you know whether or not anyone from Willis
12 was involved on the ACON side, I guess the seller side,
13 to use -- to use more appropriate terms?
14     A.    Yeah, so I'm not sure what diligence they
15 would've performed as the seller.
16     Q.    To your knowledge, no one from Willis was
17 involved in negotiating the MIPA.  Correct?
18     A.    To my knowledge, they were not involved in the
19 MIPA.
20     Q.    And so, to your knowledge, no one from Willis
21 was involved in drafting the MIPA.
22     A.    Correct, no one from Willis, to my knowledge,
23 was involved in diligence, drafting the MIPA, no.
24     Q.    Did the due diligence that was done on the
25 acquisition of Fiesta Mart extend to Fiesta Mart's

1  insurance program and the insurance claim Fiesta Mart had
2  at the time of acquisition?
3       A.    We did a review internally of the policies.
4       Q.    Did you request copies of the insurance
5  policies as part of due diligence?
6       A.    Yes.  Yes.
7       Q.    And you received and reviewed those policies?
8       A.    Yes.
9       Q.    What documentation did you request regarding
10 the -- Fiesta Mart's Hurricane Harvey claims?
11      A.    There was some communications in, I believe,
12 the spring of 2018 in which we made some inquiries about
13 those stores.
14      Q.    My question was a little different.  What
15 documents were -- did El Super request about the
16 Hurricane Harvey claims?
17      A.    It may have been -- it may have been inquiries
18 into -- to Fiesta itself, now that I think about it.  I
19 believe there was some inquiries by the company to
20 Fiesta, or potentially ACON, about the status of those --
21 of those stores.  I believe there's some documents, I
22 don't recall which one, off the top of my head.
23           MS. SMERKANICH:  I'm going to pull up what was
24 previously marked as Exhibit 7A and 7B, and I admit that
25 I was not present at the deposition where these were

1  marked, so somebody who was, feel free to correct me.  My
2  understanding is that 7A is a spreadsheet where it --
3  part of the text is cut off so that 7B is where that text
4  was copy and pasted so it could be viewed in full.
5           MS. LEROY:  Kyra, can you drop that in the
6  chat, too, so that he can open it separately, if it's
7  hard for him to see?
8           MS. SMERKANICH:  Yeah, absolutely.  And did I
9  not drop -- I apologize, I thought we were looking at
10 ones that had been previously marked.  I've been trying
11 to drop the new ones in.  I can do my best, going
12 forward, to also drop the previously marked ones as well.
13          MS. LEROY:  No, I think you have been, but just
14 with the spreadsheet, it's extra important, in my view.
15          MS. SMERKANICH:  Heard.
16          (Exhibit 7A was previously marked.)
17          (Exhibit 7B was previously marked.)
18 BY MS. SMERKANICH:
19      Q.    So those should both now be in the chat,
20 Mr. Hook.
21           Why don't we pull up 7A first.
22      A.    Okay.  Give me a second.
23      Q.    Let me know when you have the document open.
24      A.    I do have it open.
25      Q.    What is Project Parrot?

1       A.    I mean, it's not obvious from the parrot from
2  Fiesta?  Yeah, it's the little parrot, Project Parrot.
3       Q.    So was that the code name that was used for
4  this deal?
5       A.    It was.
6       Q.    And are you familiar with this document that
7  is -- has been marked as Exhibit 7A?
8       A.    I don't recall seeing this specific -- this
9  particular document.
10      Q.    Okay.  Do you recall seeing a Q&A tracker that
11 was exchanged between the parties as part of the due
12 diligence process?
13      A.    Yes.  We had a very extensive amount of
14 documents that we were passing back and forth in keeping
15 track of when they were received or not.
16      Q.    And this one, you'll agree with me, that it
17 says project -- "Project Parrot Q&A tracker insurance."
18 Correct?
19      A.    I do see that.
20      Q.    And if you can scroll down, it looks like there
21 were four different requests made, 8.001 through 8.004.
22 Is that correct?
23      A.    I see that.
24      Q.    Other than these four requests, did El Super
25 request any other additional information or documents

1  about Fiesta Mart's insurance program?
2       A.    Give me a minute to read the questions here.
3            Yeah.  I don't recall if this is the totality
4  of the requests, no, but certainly we would've requested
5  all policies, whether property or casualty or benefits or
6  what have you, as part of diligence.
7       Q.    Other than these four questions listed here, to
8  your knowledge, did El Super request any additional
9  information concerning outstanding insurance claims
10 Fiesta Mart had?
11      A.    Can you say that one more time?  I -- I it
12 sounded like the previous question to me.
13           Sorry, go ahead.
14      Q.    So the previous question was asking about any
15 other requests other than those four about Fiesta Mart's
16 insurance program.
17      A.    Uh-huh.
18      Q.    And my second question was asking about any
19 other requests, other than those four listed there, about
20 outstanding claims.
21      A.    When -- when you talk about outstanding claims,
22 are you specifically referring to property?
23      Q.    Of any type.
24      A.    You know, I don't recall there being -- I don't
25 I don't recall.

1    Q.    So if you look at Question 8.004.
2    A.    Uh-huh.
3    Q.    If you scroll over to about the middle of the
4  page, there's a column that says "Priority."
5         Do you see that?
6    A.    I do.
7    Q.    And it says, "Hi there."  Right?
8    A.    It does.
9    Q.    And Question 8.04 [sic], for the record, says:
10             "Please provide summary of Hurricane
11             Harvey-related claims."
12         Did I read that correctly?
13    A.    Yes, you did.
14    Q.    Why was Question 8.004 a high priority for
15  El Super?
16    A.    Well, because clearly Hurricane Harvey was --
17  was a major natural disaster that impacted the stores in
18  Houston.
19    Q.    And, Mr. Hook, let me ask you about that
20  request date.  It says September 12th, 2017.  Is that
21  correct or is that -- is that an error there?
22    A.    It seems a little early, but I don't have any
23  reason to believe that that's an incorrect date.
24    Q.    Maybe a better question would be:  When did
25  El Super first explore an acquisition of Fiesta Mart?

1    A.    Yeah, so I believe it was that summer of 2017.
2    Q.    Was it before or after Hurricane Harvey?
3    A.    That's a good question.  I think it was before
4  Hurricane Harvey, but I don't -- I actually don't recall
5  the exact date where we -- you know, I don't -- you know,
6  clearly there's a time where you're kind of back and
7  forth and you're kind of figuring things out and then
8  things kind of get more serious and you start putting
9  together letters of intent and stuff, so I don't really
10  recall, but I do believe it was before Hurricane Harvey.
11    Q.    So do you recall, either specifically or
12  generally, when you first started conducting due
13  diligence in connection with the acquisition?
14    A.    So it was -- I don't know when we started, but
15  certainly the fall was when we were in kind of major
16  diligence.  And the reason it's -- it -- it was a little
17  bit -- it was kind of a longer negotiation than most, I
18  would say, given the structure of the deal, so it did
19  take a while to -- to get this done.
20    Q.    Can you explain to me why it was a longer
21  negotiation given the structure?
22    A.    Sure.  There was a question as to whether, you
23  know, ACON was going to take a equity position or not and
24  so we had to kind of work through those issues.
25    Q.    So that September 12, 2017, request date, that

1  could, in fact, be the date that 8.04 was requested.
2  Correct?
3    A.    Yeah, I'm not -- I -- I -- I have no reason to
4  believe that that's not correct.
5    Q.    If I can have you switch to -- oh, and geez,
6  I -- sorry, looked like a 78 here, I need to go see my
7  eye doctor.  I did, in fact, put 7B up in the chat.  So
8  if I could direct your attention away from 7A and to 7B.
9    A.    Okay.  Give me one second.
10    Q.    And I will represent to you that it is my
11  understanding that 7B is the text that appears in the
12  response that was given for Question 8.004 that we were
13  previously discussing.  For whatever reason, on the
14  spreadsheet, it just appears cut off.
15         Let me know when you have 7B in front of you,
16  sir.
17    A.    Okay.  Okay.  I have it in front of me.
18    Q.    Was this summary provided to you by ACON?
19    A.    This has no -- this has no context where
20  there's -- it's not, like, attached to an e-mail or
21  anything or -- I don't --
22    Q.    So if we -- I told you to close 7A and I'll
23  have you open it back up.  So you'll see -- if you can
24  open 7A just back up, the spread there.
25    A.    Yeah.

1    Q.    You'll see there's a response to
2  Question 8.004, and it starts off with, "The company is
3  continuing to work with insurance adjusters."
4         Do you see that?
5    A.    Yes, I do.
6    Q.    And if you scroll down to the bottom, you can
7  see it stops mid sentence that it says, "There will
8  also" -- "there will also be a claim for business," and
9  then it just stops.
10         Do you see that?
11    A.    It says "interruption" on mine.
12    Q.    It says "business interruption"?
13    A.    It does.
14    Q.    Does it keep going on after that?
15    A.    It does not -- interrupted after
16  "interruption," there's a period.  I can -- I can show
17  you -- I can show you this, if you want me to, I guess.
18         MR. KALINER:  It's Bruce.  Can I interrupt both
19  you guys?
20         MS. SMERKANICH:  Yes.  Thank you, Bruce.
21         MR. KALINER:  So I was the one who introduced
22  this.  So we had a hard copy and then we had the native
23  file which had the complete text, and what we did is we
24  took the complete text in that column from the native
25  file and put it into a Word document so it was easy for

Page 202

1  everybody to see.  So this document that you're saying is
2  7B, I thought it was 7C, but this is the text from the
3  response row for Project Parrot from --
4          MR. WEISS:  I12.
5          MR. KALINER:  You can say that.
6          MR. WEISS:  From I12.
7          MR. KALINER:  Does that make sense to you guys?
8  It's just, we just pulled the text from the Excel and put
9  it into a Word document, that's all.
10         MR. WEISS:  If you were to copy and paste the
11 document -- if you were to copy and paste the cell I-12
12 into a new Word document, you would get what is listed in
13 7B.  It's just because the -- the cell isn't big enough
14 to handle the entire text.
15         THE WITNESS:  To be clear, the last sentence on
16 the Excel file 7A says, "There will be a claim for
17 business interruption."
18         MR. WEISS:  That's only what you can see in the
19 cell.  Right?  If you click on the cell, Control C, open
20 up a new e-mail and you hit Control V, you'll see more,
21 which is what's in 7B.
22         THE WITNESS:  Okay.
23 BY MS. SMERKANICH:
24    Q.   So let's go to 7B there with, again, the
25 representation that the text from that cell that we were

Page 203

1  discussing that some of us can read more than others,
2  apparently, in their view, that that text was copied and
3  pasted in it's entirety into 7B.
4    A.   Okay.
5    Q.   If you just take a look at 7B.
6    A.   Yep.
7    Q.   And I think -- the response that you would have
8  received in this Q&A tracker, would that have come from
9  ACON and/or ACON's attorneys?
10   A.   Yeah, so the process was is that Fiesta would
11 provide documents to ACON, ACON would kind of review them
12 and they were taking the lead on posting data to the data
13 site.
14   Q.   If you could look at 7B and if you could look
15 at what's the second paragraph, it begins with "1)."
16        Do you see that?
17   A.   Yes.
18   Q.   And the second-to-last sentence reads:
19            "The estimated claim is 6,100,000 and
20            includes 1.1 million for inventory," and
21            the sentence goes on.
22        Do you see that?
23   A.   I do.
24   Q.   So the reference there is to an estimated
25 claim.  Right?

Page 204

1    A.   Yes.  It says estimated claim.  This was -- I
2  mean, this was provided, you know, essentially weeks
3  after the hurricane, so this was really fresh, so to
4  speak.
5    Q.   And if you go to the second-to-last paragraph
6  that begins, "The company will make smaller claims."
7        Do you see that too?
8    A.   "The company will make smaller claims related
9  to product loss, power failures, business interruption,
10 crime losses, looting, other incremental expenses," yes.
11   Q.   And you see that next sentence where it says,
12 "The amounts are still under review"?
13   A.   I do.
14   Q.   Is it fair to say that receiving this
15 information, that El Super knew that there were open
16 insurance claims prior to the close of the acquisition?
17   A.   No doubt about it.  It was clear that we knew
18 that, you know, Fiesta had suffered a major loss, that
19 several -- well, quite a few stores were impacted, it
20 was, you know, a terrible event, and we knew that there
21 were, you know, insurance claims that were to be had.
22   Q.   After receiving the summary that was in
23 response to Question 8.004, did El Super ask for any
24 follow-up information of ACON regarding the Hurricane
25 Harvey claims?

Page 205

1    A.   I don't recall exactly if we did, but I -- I --
2  I -- well, let me take that back.
3        I do believe we made inquiries to the company
4  in the spring of 2018 before the deal did close.
5    Q.   And when you say "to the company," which
6  company are you referring to?
7    A.   I can't recall if it was Fiesta or ACON.
8    Q.   Would that be documented?  Would those
9  inquiries have been via e-mail or letter?
10   A.   I believe so.  I just can't recall exactly
11 which one, as we're sitting here.
12   Q.   Would those inquiries have been included in
13 this Q -- in a later iteration of this Q&A tracker we
14 just looked at?
15   A.   I don't know if -- I don't know if that
16 would've been part of the tracker, if we were asking for
17 another update.  Presumably, yes, but I don't recall.
18        MS. SMERKANICH:  I'm going to mark as
19 exhibit -- Exhibit 85.  Bear with me for one second here.
20        (Exhibit 85 was marked for
21        identification.)
22 BY MS. SMERKANICH:
23   Q.   If you could pull up 85 when you have a moment.
24   A.   Yep.
25        THE COURT REPORTER:  And before you move on,

Page 214

```
 1              "ACON team:  Per David's conversation
 2        with Suma last night, attached please
 3        find the supporting documents for our
 4        current proposal."
 5        Do you see that?
 6   A.   Yes.
 7   Q.   And that would be referring to the supporting
 8  documents that are in the attachments?
 9   A.   I would say so, yes.
10   Q.   And so I'll represent for you, if you want to
11  open up 88, that 88 is the attachment that we just looked
12  at and I just read in the attachments on the e-mail.  You
13  can see that at the top of 88 it reads, "Sidley draft
14  2-14-2018."
15        Do you see that on 88?
16   A.   I see that, yes, in the upper right-hand
17  corner.  Yes.
18        MS. SMERKANICH:  And for our record, Exhibit 88
19  begins with the Bates number Fiesta Mart 0032386.
20  BY MS. SMERKANICH:
21   Q.   Do you see that?
22   A.   I see that in the lower right-hand corner, yes.
23   Q.   And so on this page you can see the
24  contribution is crossed out and membership interest
25  purchase is inserted?
```

Page 215

```
 1   A.   Yes.
 2   Q.   So earlier we talked about sort of the -- the
 3  change in name.  So is it fair to say that eventually the
 4  contribution -- let me strike that.
 5        Is it fair to say that the MIPA was, at one
 6  point, referred to as a contribution agreement?
 7   A.   Yes.
 8   Q.   And, again, this is a -- this document is
 9  labeled "Sidley draft," so, again, without the benefit of
10  color, if, you know, showing the track changes, this is
11  showing changes that Sidley made to the document.
12  Correct?
13   A.   That makes sense.
14   Q.   Hold on one sec so I can get the PDF page to
15  direct you to.
16   A.   Okay.
17   Q.   All right.  So if you could go to Page 105 of
18  the PDF.  This is the page that's labeled
19  Fiesta Mart 0032490.
20   A.   Yes.
21   Q.   You can see this is the same provision that we
22  were looking at earlier in Documents 85 and 86.  Right?
23  Except now --
24   A.   That is correct.
25   Q.   I was going to clarify, except now it looks
```

Page 216

```
 1  like it has some additional changes made there.
 2   A.   Right.  For example, "business interruption" is
 3  now included in there.  Right.
 4   Q.   And so these would've been changes, then, that
 5  the -- the attorneys at Sidley Austin made to this
 6  document.  Right?
 7   A.   Yes.  I recall a -- a conversation surrounding
 8  the business interruption, insurance payments and, you
 9  know, agreeing that these would be separated from the
10  pending property payments and that these were
11  specifically called out to go to ACON with the
12  understanding that all other insurance proceeds would go
13  to Fiesta Mart.
14   Q.   Who were these conversations with?
15   A.   This was a negotiation made between the
16  parties.
17   Q.   So who were on those -- who were -- who were a
18  party to those negotiations?
19   A.   Internal and external -- external counsel,
20  internal folks, internal counsel as well.
21   Q.   And so if I have this correctly, your
22  understanding -- if I have this correctly, your position
23  is that you understood that the business interruption
24  claims were going to go to ACON.  Correct?
25   A.   That's correct, because by the very nature of
```

Page 217

```
 1  those business interruption, right, you know, ACON would
 2  have experienced the losses.  Right?  They didn't
 3  experience the losses of -- of Fiesta Mart post-close, so
 4  obviously this was called out specifically to them with
 5  the remainder going to Fiesta Mart, LLC.  That's why it
 6  was carved out.
 7   Q.   And if we could jump to --
 8        MS. SMERKANICH:  What was -- and, Sam, if you
 9  don't know, I'll figure out -- the MIPA, I believe we
10  have that one, is six?  Sorry to take advantage of your
11  expertise here.  I'll drop this into the chat too so --
12        THE WITNESS:  I have it here.
13  BY MS. SMERKANICH:
14   Q.   Okay.
15   A.   Exhibit 6, I have it in my folder here.  I can
16  bring it up.
17   Q.   I was going to say, I can drop it in, but then
18  we'll spend the next 10 minutes waiting for it to load.
19   A.   Yeah, this is a big one.
20        Okay.  I have the MIPA agreement, the execution
21  version -- version.
22   Q.   And let me just clarify something.  The MIPA,
23  it's -- it's -- it's dated as of March 23rd, 2018.
24  Correct?
25   A.   It is dated as of March 23rd, 2018.  Correct.
```

Page 218

1    Q.    But that's not when the deal closed.  Right?
2    A.    The deal closed 4/28/2018, I believe.
3    Q.    Any -- what was the reason for -- for the --
4  the -- the difference -- the delay -- if that's an
5  accurate term for it -- between March 23 and April 20?
6    A.    Well, there was the agreement that it has to be
7  executed.  Right?  I don't think that the -- the -- the
8  agreement necessarily has to be on the transfer date.
9    Q.    Okay.  And if you -- let's go to that same
10  provision that we are -- were looking at earlier,
11  although I will represent for you that in the final MIPA,
12  it is 7.14, not 7.15.
13    A.    Okay.
14    Q.    And I'll get you a PDF page.  That is on
15  Page 76 of the document.
16    A.    Okay.
17    Q.    And do you see that there?
18    A.    Yes, I see on Page 76, 7.14, Westport business
19  interruption insurance payments.
20    Q.    And that's the final language of what we were
21  looking at earlier in 85, 86, 87, and 88.  Right?
22    A.    Yes, this being the final executed version,
23  this is -- yes, this is final.
24    Q.    Where does it say that the other proceeds, the
25  insurance proceeds other than business interruption, were

Page 219

1  going to Fiesta Mart?
2    A.    It certainly -- it's assumed, right, the
3  assumption is that everything goes to the buyer and you
4  only deal with exceptions.  Business interruption being
5  a -- a -- an exception, right, we -- we bought the
6  balance sheet, you know, the -- we bought all the
7  policies that were in place at the time.  To the extent
8  there would be an exception, it would be called out,
9  which this one was or is.
10    Q.    You didn't think it was important to document
11  this assumption?
12    MS. LEROY:  Objection.
13    THE WITNESS:  Well, we didn't -- we didn't have
14  to document all other policies whether they be, you know,
15  benefits policies or any other policies.  It would've
16  been -- it's -- it was already represented in the MIPA
17  that ACON was selling a business with appropriate and
18  adequate and enforceable insurance.  To the extent any of
19  that would've been changed, it would've been called out,
20  which this one was here.  So no, I don't.  Otherwise you
21  would have a contract instead of 600 pages, it was a
22  thousand pages.
23  BY MS. SMERKANICH:
24    Q.    Even though this was, as we had discussed
25  earlier, in due diligence, you knew that there was an

Page 220

1  open claim from Hurricane Harvey?
2    MS. LEROY:  Objection.
3    THE WITNESS:  You know, again, it doesn't --
4  whether it was Harvey and, you know, three hurricanes, we
5  certainly believed that there was appropriate insurance
6  for Fiesta Mart because ACON told us so in the agreement,
7  and certainly the expectation of someone like myself who
8  has been doing this for many years in an M&A environment,
9  this is, you know, normal course.  You don't call out
10  what's assumed, you only deal with items that are unusual
11  or different.
12  BY MS. SMERKANICH:
13    Q.    And you don't consider proceeds from an open
14  insurance claim to be unusual or different?
15    A.    Certainly not.  There's always open claims with
16  companies of this size.  Of course there are.
17    Q.    Would you agree with me that if the MIPA had
18  addressed the outstanding ACV payments and depreciation
19  holdback, that we wouldn't be in this lawsuit right now?
20    A.    No, I do not.
21    Q.    And why is that?
22    A.    As I just explained, the -- ACON is telling us
23  in this agreement that they have adequate insurance, and
24  we took that to be the case, that they had insurance for
25  these things.  We don't -- you don't call out every, you

Page 221

1  know, possible item.  So a hundred percent, everyone
2  assumed, including Willis, by their post -- by their
3  post-acquisition actions was believing the same thing.
4    THE COURT REPORTER:  And, I'm sorry, was there
5  an objection?
6    MS. LEROY:  Yes, thank you.
7    Just one objection, form.
8    MR. KALINER:  Yeah.
9  BY MS. SMERKANICH:
10    Q.    You mentioned it was assumed that ACON would
11  have adequate insurance.  How is that the same as
12  entitlement to claims proceeds?
13    MR. KALINER:  Objection.
14    THE WITNESS:  Clearly if you have insurance in
15  place, insurance means that you potentially could have
16  claims and those claims could be paid out under those
17  policies.  There's no difference, in my mind, or any
18  business person minds that you would separate insurance
19  from coverage.  That's nonsensical.
20  BY MS. SMERKANICH:
21    Q.    We're talking about claims here that were
22  already open.
23    A.    Yeah, there's -- that's okay, we bought the
24  balance sheet and everything that went with it, right.
25  We bought accounts payable, those were still due after

Page 226

1  WTW_00 -- lots of zeros -- 914.
2            MR. KALINER:  Thank you.
3            MS. SMERKANICH:  Forty-eight of 613 of the PDF.
4            MS. LEROY:  And if that's not what you meant,
5  Jack, let me know and I can --
6            THE WITNESS:  No, I think this is it, I'm just
7  reading it real quick here.
8            Yeah, this is what I'm referring to so -- let's
9  see.
10 BY MS. SMERKANICH:
11    Q.    You testified earlier that ACON no longer had
12 the policy.  So point me to where -- where 4.20 says
13 that.
14    A.    Well, again, we bought all the policies.
15 Right?
16    Q.    Did you?
17    A.    All -- all -- of course.  And if we didn't, it
18 would've been nice for Willis to tell us that, "Oh, by
19 the way, we've been talking to you for months and you
20 don't have any policies."  It's ridiculous --
21    Q.    How --
22    A.    -- because all -- all such pol- -- because
23 they're our broker.
24    Q.    You just testified earlier, sir, that Willis
25 wasn't involved in the negotiation drafting of the MIPA

Page 227

1  or the due diligence.
2    A.    No, we're not talking about that, we're talking
3  about the insurance policy.
4            "All such policies are in full force
5            and effect.  All premiums with respect to
6            thereto covering all periods up to
7            including the closing date have been
8            paid, no notice of cancellation of
9            termination has been received with
10           respect to any such policy, such policies
11           are sufficient for compliance with all
12           requirements of law, and of all
13           agreements to which Fiesta Group company
14           is a party, valid and enforceable."
15    Q.    And I think --
16    A.    And they are adeq- -- adequate concerns.  And
17 if this is not the case, then we would need to know and
18 Willis would be in a position to know if we were covered
19 or not because they're our broker.
20    Q.    But, again, they weren't involved in drafting
21 the MIPA.  Right?
22    A.    Doesn't matter.
23    Q.    Well, how are they supposed to know what --
24    A.    Because it's Willis' job to make sure we have
25 appropriate insurance.

Page 228

1            MS. LEROY:  Jack, make sure you don't interrupt
2  her, okay?  Let her --
3            THE WITNESS:  I'm sorry.  I'm sorry.  I'm
4  sorry.
5  BY MS. SMERKANICH:
6    Q.    How was Willis supposed to know what Bodega
7  Latina Corporation was purchasing?
8    A.    Well, again, Willis was a broker
9  post-acquisition.
10    Q.    And was the broker post-acquisition for Fiesta
11 Mart.  Right?
12    A.    Correct.
13    Q.    Did Bodega Latina have its own separate broker?
14    A.    I'm not sure why that's relevant.
15    Q.    Did Bodega Latina Corporation have its own
16 insurance broker?
17    A.    Yes.
18    Q.    Who was that?
19    A.    USI at the time.
20    Q.    Is USI still its broker?
21    A.    No.
22    Q.    When did that change?
23    A.    It's been several years.  Two or three years
24 ago.
25    Q.    And who is it now?

Page 229

1    A.    Gallagher.
2    Q.    In connection with the acquisition of Fiesta
3  Mart, did Bodega Latina Corporation ever consult with
4  USI?
5    A.    I don't recall.
6    Q.    They may have, you just don't recall?
7    A.    Correct.
8    Q.    Okay.  And you said earlier that you requested
9  and reviewed the insurance policies in connection with
10 the acquisition of Fiesta Mart.  Right?
11    A.    Yes.  I recall receiving policies of -- from
12 doing diligence, yes.
13    Q.    And you saw in the policies that the named
14 insured was ACON Investments, L.L.C.?
15           MS. LEROY:  Objection.
16           THE WITNESS:  I -- yes, I believe so.
17 BY MS. SMERKANICH:
18    Q.    And you saw that there was an endorsement
19 adding ACON Fiesta Holdings, L.L.C. as a named insured?
20    A.    I don't recall that.
21    Q.    You weren't acquiring ACON Investments, L.L.C.,
22 were you?
23    A.    We were -- we were acquiring Fiesta Mart from
24 ACON who owned Fiesta.
25    Q.    You weren't acquiring ACON Investments, L.L.C.,

1  were you?

2      A.   I think we already reviewed exactly who we

3  bought, and ACON Investments, L.L.C. was not one them.

4      Q.   And you weren't acquiring ACON Fiesta Holdings,

5  L.L.C.

6      A.   We were not acquiring anything with the word

7  "ACON" in it.

8      Q.   And that distinction between the named insureds

9  and the policy and what you're requiring, that didn't

10  make you want to add a provision to the MIPA addressing

11  insurance proceeds?

12      A.   Correct.  Given all the things we've discussed.

13      Q.   So I take it if you didn't think there was a

14  need to include anything in the MIPA about insurance

15  proceeds, that you never directed your attorneys to

16  include any provisions addressing insurance proceeds?

17  And I should clarify, insurance proceeds other than

18  business interruption.

19          MS. LEROY:  No.  Objection.  I'm instructing

20  the witness not to answer that question as to what he

21  directed his attorneys to do and not to do.

22  BY MS. SMERKANICH:

23      Q.   Has Fiesta ever considered bringing a legal

24  malpractice suit against Sidley Austin?

25          MS. LEROY:  I am going to object to that too,

1  that -- that -- well, let me say this:  If the witness

2  can answer that question without -- without referencing

3  discussions with internal counsel or external counsel, go

4  ahead.

5          As inappropriate as that question is, go ahead

6  and do your best.

7          THE WITNESS:  Your question is:  Have we ever

8  considered suing Sidley for malpractice?

9  BY MS. SMERKANICH:

10      Q.   Bringing a claim for a legal malpractice.  And

11  I'll clarify, in connection with the -- in connection

12  with the acquisition of Fiesta Mart.

13          MS. LEROY:  Same objection, same instruction to

14  the witness.

15          THE WITNESS:  No.

16  BY MS. SMERKANICH:

17      Q.   Ever threatened to bring a claim for legal

18  malpractice against Sidley Austin in connection with the

19  acquisition of Fiesta Mart?

20          MS. LEROY:  Same objection, same instruction.

21          THE WITNESS:  No.

22  BY MS. SMERKANICH:

23      Q.   Have you entered into any tolling agreement or

24  settlement agreement relating with -- with Sidley Austin

25  relating to their representation of Fiesta Mart in

1  connection with the acquisition of Fiesta Mart?

2          MS. LEROY:  Same objection and same

3  instruction.

4          THE WITNESS:  No.

5  BY MS. SMERKANICH:

6      Q.   How about if Fiesta Mart has ever received

7  anything of value, such as discounted rates, written off

8  time in connection with its representation -- actually,

9  strike that.  That is -- that's not a good question.  I

10  will strike that and Tracy can save her objection for

11  another line of questioning.

12          MS. SMERKANICH:  I think now would be a good

13  time to take a break.

14          Tracy, I've got quite a bit left.

15          MS. LEROY:  Okay.  Well, let me talk to the

16  witness.  It's not as late where he is and -- what is

17  your -- do you want to keep it going for a few more

18  hours?  What's your preference?

19          MS. SMERKANICH:  I mean, I've already missed

20  bedtime by quite a bit, so if this witness wants to go,

21  I'm fine with -- you know, assuming our court reporter is

22  and co-counsel is.

23          THE COURT REPORTER:  I'm sorry, are we off the

24  record?

25          MS. SMERKANICH:  Let's stay on the record for

1  this.

2          MS. LEROY:  Let me -- let me talk to the -- to

3  my client about whether he wants to keep going, but I

4  think it's going to be more difficult on those of you on

5  the East Coast, so if those of you on the East Coast are

6  willing to continue, let me talk to the witness to see if

7  he's willing to continue.

8          And by "a few more hours," do you mean, like,

9  two to three or do you mean, like, seven?

10          MS. SMERKANICH:  Closer to -- on the two to

11  three end, not seven.

12          MS. LEROY:  Okay.  Sam, Bruce, would that work

13  for you if that works for Jack and the court reporter?

14          MR. WEISS:  I'm here.

15          MS. LEROY:  Yeah?

16          MR. WEISS:  Sure.

17          MS. LEROY:  Okay.  Can we take 10 minutes just

18  to -- let's stretch our legs and let me talk to Jack and

19  confirm, but I think -- I think we should just finish

20  this up today, if we can.

21          MS. SMERKANICH:  All right.  Let's go off the

22  record.

23          (Recess.)

24          MS. SMERKANICH:  Let's go back on the record

25  then.

1     A.     Yes, I see that.
2     Q.     And why were you requesting copies of these
3  policies?
4     A.     I believe we -- I believe we were having
5  trouble locating those policies or they were missing.  I
6  can't recall, but for some reason, the stack of
7  carriers, we had a few that were missing.
8     Q.     And at some point, did you learn that
9  Travelers, Lloyd's, Liberty Mutual, and Sompo Japan, that
10  these requests were not for the property insurers for the
11  policies that are at issue?
12     A.     You know, honestly, I don't recall that.
13  Again, I just recollect that we were asking for policies
14  that may have potentially been missing from the, you
15  know, stack of carriers involved with coverage.
16     Q.     And you didn't have copies of these as part of
17  the due diligence process?
18     A.     I don't -- I don't remember, but we didn't have
19  them at -- in -- in -- in September of 2018, I know that.
20  I don't know if they were missing all the way back from
21  acquisition date or not.
22     Q.     In your September 11, 2018, letter, that
23  actually -- you cited to the master property policy.
24  Right?
25     A.     Can you show me -- sorry.  In that same e-mail

1  thread?
2     Q.     I'll actually just share my screen so that we
3  can --
4     A.     Okay, thanks.
5     Q.     So I have up on the screen as -- this is --
6  this is the September 11th letter that we looked at
7  earlier, this is Exhibit 57.  And you can see you
8  actually cite to the master property policy in this
9  letter.  Correct?
10     A.     Yes.
11     Q.     So then going back to -- going back to
12  Exhibit 93 where you're requesting some additional
13  policies, is it fair to say that at this time you did
14  have the master property policies in your possession?
15     A.     The carriers that were listed in -- in my
16  e-mail?
17     Q.     Sorry, I probably didn't do a good job with
18  this.  Since the September 11th letter quoted from the
19  master policy --
20     A.     Yes.
21     Q.     -- at the time you made this request for
22  additional policies, I just want to confirm that you did
23  have the master property policy.
24     A.     Yes, I must have because we quoted from it, so
25  yes.

1     Q.     Bear with me one second, sir.
2     MS. LEROY:  Kyra, I just want to note that I
3  did promise the court reporter a meal break at some
4  point, so maybe the next few minutes or whatever would be
5  a good stopping point.  It doesn't have to be right now,
6  but I don't want her to starve.
7     MS. SMERKANICH:  I do not want that either.  I
8  also, Tracy, if you didn't notice, this is where we're
9  starting to get a little more document heavy.  So why
10  don't take that break now.  I can mark some documents so
11  we can kind of keep clipping along, if that works for
12  folks.
13     MS. LEROY:  How long do you all want to take?
14  And I'm really asking the court reporter and Jack.
15     THE COURT REPORTER:  I'm sorry, are we off the
16  record?
17     MS. SMERKANICH:  Yeah, we can go off the
18  record.
19     MS. LEROY:  Yeah.
20     (Recess.)
21     THE WITNESS:  So my clarification is, is that I
22  said that Fiesta signed the second proofs, when, in fact,
23  it was ACON.  That's a mistake I made.
24     MS. SMERKANICH:  Okay.  Thank you, Mr. Hook.
25     THE WITNESS:  Thank you.

1     MS. SMERKANICH:  And, Tracy, my proposal to you
2  that I made when we were off the record and on break is
3  that I have a bit more of questioning, part of it a
4  document-heavy questioning for Mr. Hook.  I anticipate
5  that it should take -- I think I can get it done in three
6  hours.  So given that it is 9:52 here on the East Coast,
7  and even dinnertime on the West Coast, my suggestion
8  would be that we adjourn for the evening, excuse the
9  witness, and find another date that we can reconvene for
10  those three hours, plus whatever reasonable follow-up the
11  folks at Mound Cotton has.
12     MS. LEROY:  We agree to that stipulation that
13  we'll work around everyone's schedules, but get it done
14  in the next few weeks, and that all of the -- all counsel
15  agree that if a different counsel needs to do the
16  questioning or defend the deposition, that no one will
17  object if we have to substitute in.
18     MR. KALINER:  We're agreeable to that.
19     MS. SMERKANICH:  We are as well.
20     MR. KALINER:  And in terms of substitution of
21  counsel, that would -- that's the same for our firm.
22     MS. LEROY:  Agreed.
23     MS. SMERKANICH:  Also, agreed.
24     MS. LEROY:  All right.  We can go off, then.
25     MR. KALINER:  All right, Mr. Hook, thank you

# EXHIBIT 16

*Submitted In Camera*

# EXHIBIT 17

*Submitted In Camera*

# EXHIBIT 18

Message

| | |
|---|---|
| **From:** | Daar, Henry [henry.daar@willistowerswatson.com] |
| **Sent:** | 8/23/2018 9:56:23 AM |
| **To:** | Conant, Blaine [blaine.conant@willistowerswatson.com] |
| **Subject:** | Fwd: ACON Investments LLC (Acon Fiesta Holdings) Hurricane Harvey (CAT #1743) DOL 8/26/17 VCI File NYC17648090 |
| **Attachments:** | image001.png; ATT00001.htm; NYC17648090 Indian Harbor POL - 2nd Partial - Fiesta.pdf; ATT00006.htm; NYC17648090 Westport POL - 2nd Partial - Fiesta.pdf; ATT00007.htm; NYC17648090 Aspen POL - 2nd Partial - Fiesta.pdf; ATT00008.htm; Acon - Harvey - Fiesta Loss Analysis - current.xlsx; ATT00009.htm; NYC17648090 Arch POL - 2nd Partial - Fiesta.pdf; ATT00002.htm; NYC17648090 AWAC POL - 2nd Partial - Fiesta.pdf; ATT00003.htm; NYC17648090 HDI POL - 2nd Partial - Fiesta.pdf; ATT00004.htm; NYC17648090 Hiscox POL - 2nd Partial - Fiesta.pdf; ATT00005.htm |

How are you feeling?

Did you forward these on?

Sent from my iPhone

Begin forwarded message:

> **EXHIBIT**
>
> **Ex 52   HG 6.2.22**
>
> exhibitsticker.com

**From:** "Loncarevic, Boris M" <Boris.Loncarevic@sedgwick.com>
**Date:** August 22, 2018 at 3:32:24 PM CDT
**To:** "Conant, Blaine" <Blaine.Conant@WillisTowersWatson.com>
**Cc:** "Daar, Henry" <Henry.Daar@WillisTowersWatson.com>
**Subject: ACON Investments LLC (Acon Fiesta Holdings)      Hurricane Harvey (CAT #1743)      DOL 8/26/17      VCI File NYC17648090**

Blaine,

While we await for Fiesta to provide the requested proposals for the repairs of the flooded stores (as well as documentation concerning any other stores damaged from Hurricane Harvey), the carriers have authorized another partial adjustment in connection with Fiesta's claim.  Please see attached schedule for details.  The amount of the 2nd partial totals $4,780,347.

Kindly forward to an officer of the Insured to sign, notarize, and return the duly executed proofs to my attention so that I could forward them onto the carriers for payment.

**Please confirm the payment instructions (not sure whether anything changed re: payments since the ownership change of Fiesta).**

If you have any questions, please do not hesitate to contact me.

Thanks and regards,

**Boris Loncarevic** | Executive General Adjuster
**Vericlaim, Inc.**
**A Sedgwick company**
OFFICE 212.267.2700 | DIRECT 212.266.4250
CELL 973.885.4583 | FAX 212.406.3932
120 Broadway, Suite 900 | New York, NY 10271
EMAIL bloncarevic@vericlaiminc.com | www.vericlaiminc.com

CONFIDENTIAL

# EXHIBIT 19

Message
_____

**From:**        Conant, Blaine [blaine.conant@willistowerswatson.com]
**Sent:**        8/27/2018 3:21:59 PM
**To:**          Drew Scielzo (dscielzo@aconinvestments.com) [dscielzo@aconinvestments.com]
**CC:**          Roberts, Jeffrey [jeffrey.roberts@willistowerswatson.com]
**Subject:**     ACON Investments LLC (Acon Fiesta Holdings) Hurricane Harvey (CAT #1743) DOL 8/26/17 VCI File NYC17648090
**Attachments:** NYC17648090 Arch POL - 2nd Partial - Fiesta.pdf; NYC17648090 AWAC POL - 2nd Partial - Fiesta.pdf; NYC17648090
                 HDI POL - 2nd Partial - Fiesta.pdf; NYC17648090 Hiscox POL - 2nd Partial - Fiesta.pdf; NYC17648090 Indian Harbor
                 POL - 2nd Partial - Fiesta.pdf; NYC17648090 Westport POL - 2nd Partial - Fiesta.pdf; NYC17648090 Aspen POL - 2nd
                 Partial - Fiesta.pdf

Drew,

Hope that you are having a good Monday.

The Markets have agreed to issue a second advance payment in the amount of **$4,780,347**. The attached Proofs of Loss
represents the Insurers proportionate share of the payment.

The payment is regarding the Building Actual Cash Value as estimated by JS Held and Inventory Costs. The current
Building Replacement Quotes have forwarded to the Insurers. The adjuster and JS Held (building Consultant for Insurers)
are currently reviewing the quotes provided by Dave Olson – Fiesta.

I did not forward the attached to Jack Hook. If you would like me to do so, the Markets will need a letter from you
directing them to make any future PD/Inventory payments to El Sempo.

The BI portion of the loss is ongoing. Will advise further per our discussion this week with the adjuster and accountant.

Let me know if you have any questions.

Thanks


**Blaine D. Conant**
**Senior Vice President / Senior Consultant**
**National Property Claims** – Risk Control & Claim Advocacy Practice

**Willis Towers Watson**
801 South Figueroa Street | Suite 800 | Los Angeles, CA 90017
Tel:  213-607-6358
**Cell:  909-618-8209**


blaine.conant@willistowerswatson.com

CONFIDENTIAL

# EXHIBIT 20

Message

| | |
|---|---|
| **From:** | Drew Scielzo [dscielzo@aconinvestments.com] |
| **Sent:** | 11/28/2018 4:17:09 PM |
| **To:** | henry.daar@willistowerswatson.com; Jeffrey Roberts [jeffrey.roberts@willistowerswatson.com] |
| **Subject:** | Fwd: Fiesta Purchase Agreement |
| **Attachments:** | BLC-Fiesta - MIPA - Executed - 3-23-2018 - Fully Compiled.pdf; ATT00001.htm |

Henry,

Attached is MIPA for the Fiesta sale.

Thanks,

Drew


Begin forwarded message:

> **From:** "Stefan Leon" <sleon@aconinvestments.com>
> **To:** "Drew Scielzo" <dscielzo@aconinvestments.com>
> **Cc:** "Suma Kulkarni" <skulkarni@aconinvestments.com>
> **Subject: Fiesta Purchase Agreement**
>
> Drew – See attached the MIPA for Fiesta. Wasn't exactly sure what you needed but pages 48 and 76 (in the PDF, don't exactly correspond with the page numbers in the document) have relevant information.
>
> Thanks,
> Stefan
>
> **Stefan Leon**
> **ACON Investments, L.L.C.**
> 1133 Connecticut Avenue NW, Suite 700
> Washington, DC 20036
> Office: (202) 386-9785
> Mobile: (973) 634-6739
> sleon@aconinvestments.com

**Daar**

**Exhibit 143**

CONFIDENTIAL

# EXHIBIT 21

Message

| | |
|---|---|
| **From:** | Conant, Blaine [blaine.conant@willistowerswatson.com] |
| **Sent:** | 8/28/2018 4:21:29 PM |
| **To:** | Roberts, Jeffrey [jeffrey.roberts@willistowerswatson.com] |
| **Subject:** | Urgent - ACON Investments - Fiesta |
| **Attachments:** | image001.png |

Jeff,

Yesterday, I forwarded the Proofs of Loss **$4.78M** (second advance payment in the amount of **$4,780,347)** to Drew. I did not include Jack Hook (ElSempo). In discussions with the adjuster and the Insurers, they will not recognize any other interested party unless they receive a letter directing them to do so. The letter needs to come from ACON Investments on their letterhead. Until said letter is received, all communications, payments, etc. regarding Fiesta will continue thru ACON Investments.

The above letter also should include a directive providing WTW permission to discuss the Fiesta PD adjustment with Jack Hook. Going forward we cannot do so until ACON directs us in writing to do so.

I have not heard back from Drew regarding my email below. I received an email from Jack (see below) today Aug 28th asking for a status. Because the payment is sizeable, we need to address this issue as soon as possible.

Please let me know something regarding the above as soon as possible.

Thanks


The adjuster (Boris) mailing address is as follows:

**Boris Loncarevic |Executive General Adjuster**
**120 Broadway, Suite 900 | New York, NY 10271**
**DIRECT 212.266.4250| FAX 212.406.3932**
**CELL 973.885.4583 | bloncarevic@vericlaim.com**
**www.vericlaim.com | Caring counts®**

 sedgwick.




**Blaine D. Conant**
**Senior Vice President / Senior Consultant**
**National Property Claims** – Risk Control & Claim Advocacy Practice

**Willis Towers Watson**
801 South Figueroa Street | Suite 800 | Los Angeles, CA 90017
Tel:  213-607-6358
**Cell:  909-618-8209**

blaine.conant@willistowerswatson.com


**From:** Conant, Blaine
**Sent:** Monday, August 27, 2018 3:22 PM

CONFIDENTIAL

**To:** Drew Scielzo (dscielzo@aconinvestments.com)
**Cc:** Roberts, Jeffrey
**Subject:** ACON Investments LLC (Acon Fiesta Holdings) Hurricane Harvey (CAT #1743) DOL 8/26/17 VCI File NYC17648090
**Importance:** High

Drew,

Hope that you are having a good Monday.

The Markets have agreed to issue a second advance payment in the amount of **$4,780,347**. The attached Proofs of Loss represents the Insurers proportionate share of the payment.

The payment is regarding the Building Actual Cash Value as estimated by JS Held and Inventory Costs. The current Building Replacement Quotes have forwarded to the Insurers. The adjuster and JS Held (building Consultant for Insurers) are currently reviewing the quotes provided by Dave Olson – Fiesta.

I did not forward the attached to Jack Hook. If you would like me to do so, the Markets will need a letter from you directing them to make any future PD/Inventory payments to El Sempo.

The BI portion of the loss is ongoing. Will advise further per our discussion this week with the adjuster and accountant.

Let me know if you have any questions.

Thanks

---

**From:** Jack Hook [mailto:jack.hook@blcmarkets.com]
**Sent:** Tuesday, August 28, 2018 3:19 PM
**To:** Conant, Blaine
**Cc:** Roberts, Jeffrey
**Subject:** RE: Hurricane Harvey

Hello Blaine, any updates or requests for additional information from any party?
Thanks, Jack

---

**From:** Conant, Blaine [mailto:Blaine.Conant@WillisTowersWatson.com]
**Sent:** Wednesday, August 22, 2018 2:57 PM
**To:** Jack Hook <jack.hook@blcmarkets.com>
**Cc:** Roberts, Jeffrey <Jeffrey.Roberts@WillisTowersWatson.com>
**Subject:** RE: Hurricane Harvey

Jack,

Absolutely, be happy to do so.

In the following example, say the Agreed Replacement Cost (ARC) for the Property Damage is $7.5M. The ARC in this example represents the total cost of the Property Damage that is agreed to by us and the Insurers. At that point the Insurers would owe the Actual Cash Value (ACV) until the actual repairs have been completed and the ARC has been incurred by the Insured.

The ACV is calculated by taking a percentage of the ARC and holding back a percentage (usually industry standard is 25%). The amount held back is called the Depreciation Holdback Amount. It simply means that when you incur the cost of the holdback amount, the Insurers will issue payment for said holdback amount. In this example, the Depreciation

WTW_00012420

Holdback amount would be $1,875,000 or 25% of the ARC ($7.5M). The holdback amount would be paid the insured incurs that cost not to exceed the ARC. If the Depreciation Holdback amount is not incurred, only the ACV is owed by the Insurers. Should a portion of the holdback amount be incurred and not the entire amount, the insurers would only owe that which is actually incurred.

The breakdown in this example is:

| | |
|---|---|
| Agreed Replacement Cost | $7,500,000 |
| Less Depreciation Holdback | $1,875,000 |
| Actual Cash Value Owed | $5,625,000 |
| | |
| **ACV Amount payable** | **$5,625,000** |

The Depreciation Holdback amount would need to be incurred by the Insured to be reimbursed when the actual repairs have been completed.

Let me know if you want to discuss the above further. I am available most of the day tomorrow.

Thanks

**Blaine D. Conant**
**Senior Vice President / Senior Consultant**
**National Property Claims** – Risk Control & Claim Advocacy Practice

**Willis Towers Watson**
801 South Figueroa Street | Suite 800 | Los Angeles, CA 90017
Tel:  213-607-6358
**Cell: 909-618-8209**

blaine.conant@willistowerswatson.com

---

**From:** Jack Hook [mailto:jack.hook@blcmarkets.com]
**Sent:** Wednesday, August 22, 2018 4:07 PM
**To:** Conant, Blaine
**Cc:** Roberts, Jeffrey
**Subject:** Re: Hurricane Harvey

Hello Blaine, please provide a numerical example of the depreciation holdback concept. Sorry, but I'm not following. Thanks, Jack

Sent from my iPhone

On Aug 22, 2018, at 2:57 PM, Conant, Blaine <Blaine.Conant@WillisTowersWatson.com> wrote:

Jack,

The Property Damage information submitted is currently being reviewed by the adjuster and Insurers Building Consultants. The Markets have not provided a date regarding payment until the review is completed and a recommendation has been provided by the adjuster. Obviously, the adjuster will need to discuss his findings and recommendations with us before any requests or recommendations are provided to the markets. To expedite the process, I requested that the Insurers Building Consultant provide us with the undisputed items that they are in agreement with.  Said undisputed costs should be submitted for payment. The costs that are disputed (either still being reviewed or further discussion needed) will continue to be cleared as undisputed as their review continues.

CONFIDENTIAL

The Insurers per the policy owe Actual Cash Value (ACV) which is the Agreed Replacement Cost (RC) less depreciation hold back. When the depreciation holdback amount has been incurred and the repairs have been completed, the holdback amount is paid.

I will continue to follow up with adjusters for updates. Thus far the building consultant has not requested additional information which is a good thing.

Thanks

**Blaine D. Conant**
**Senior Vice President / Senior Consultant**
**National Property Claims** – Risk Control & Claim Advocacy Practice

**Willis Towers Watson**
801 South Figueroa Street | Suite 800 | Los Angeles, CA 90017
Tel:  213-607-6358
**Cell:  909-618-8209**

blaine.conant@willistowerswatson.com

For information pertaining to Willis Towers Watson's email confidentiality and monitoring policy, usage restrictions, or for specific company registration and regulatory status information, please visit http://www.willis.com/email_trailer.aspx

You may receive direct marketing communications from Willis Towers Watson. If so, you have the right to opt out of these communications. You can opt out of these communications or request a copy of Willis Towers Watson's privacy notice by emailing unsubscribe@willistowerswatson.com.

For information pertaining to Willis Towers Watson's email confidentiality and monitoring policy, usage restrictions, or for specific company registration and regulatory status information, please visit http://www.willis.com/email_trailer.aspx

You may receive direct marketing communications from Willis Towers Watson. If so, you have the right to opt out of these communications. You can opt out of these communications or request a copy of Willis Towers Watson's privacy notice by emailing unsubscribe@willistowerswatson.com.

# EXHIBIT 22

Message

| | |
|---|---|
| **From:** | Roberts, Jeffrey [jeffrey.roberts@willistowerswatson.com] |
| **Sent:** | 8/31/2018 10:47:12 AM |
| **To:** | Drew Scielzo [dscielzo@aconinvestments.com] |
| **Subject:** | RE: ACON Proof of Losses |

Drew- did the other side agree that that ACON is entitled to the funds?

Jeffrey Roberts
Willis Towers Watson
M&A Practice
312-339-2953

---

**From:** Drew Scielzo [mailto:dscielzo@aconinvestments.com]
**Sent:** Friday, August 31, 2018 10:44 AM
**To:** bloncarevic@vericlaim.com
**Cc:** Conant, Blaine; Roberts, Jeffrey
**Subject:** Fwd: ACON Proof of Losses

Boris,

Hope all is well. Please find the proof of losses attached for the partial payment. Please have the money wired to the account below.

Thanks,

Drew


| | |
|---|---|
| Bank: | Wells Fargo Bank NA |
| | 420 Montgomery Street |
| | San Francisco, CA94104 |
| ABA: | 121000248 |
| SWIFT: | WFBIUS6S |
| Acct Name: | Fiesta Holdings Investments, L.L.C. |
| Acct Number: | ███████ |

CONFIDENTIAL

# EXHIBIT 23

Message

| | |
|---|---|
| **From:** | Drew Scielzo [dscielzo@aconinvestments.com] |
| **Sent:** | 9/4/2018 3:43:14 PM |
| **To:** | Loncarevic, Boris M [boris.loncarevic@sedgwick.com] |
| **CC:** | blaine.conant@willistowerswatson.com; Jeffrey Roberts [jeffrey.roberts@willistowerswatson.com] |
| **Subject:** | RE: ACON Proof of Losses |
| **Attachments:** | image001.png |

Boris,

Thanks. Fiesta Holdings Investments, LLC is still owned by ACON. We sold the operating company to El Super. As such, the proceeds will still be coming to ACON. If the insurance carrier is mailing a check, please have it sent to

ACON Investments LLC
C/O Teresa Bernstein
1133 Connecticut Avenue NW,
Suite 700
Washington DC
20036

Regards,

Drew

---

**From:** Loncarevic, Boris M <Boris.Loncarevic@sedgwick.com>
**Sent:** Tuesday, September 4, 2018 4:23 PM
**To:** Drew Scielzo <dscielzo@aconinvestments.com>
**Cc:** Blaine.Conant@WillisTowersWatson.com; Jeffrey Roberts <Jeffrey.Roberts@WillisTowersWatson.com>
**Subject:** RE: ACON Proof of Losses

Thanks Drew.

Just need a bit of clarification. The Named Insured in the policy is ACON Fiesta Holdings, LLC. The proofs of loss appear to have been executed by ACON Investments, LLC representative not Fiesta. I understand Fiesta was sold to El Super several months ago. I am not aware of what the arrangement was between ACON and Fiesta (and/or their new owner El Super) in connection with the proceeds and resolution of this claim. Kindly provide some insight into this and whether anyone else has an interest that should be addressed with any future payments. Also, for those carriers that will be issuing a check payment vs wire transfer, please advise who should be named on the check and where to send the check. Thanks.

Regards,

**Boris Loncarevic** | Executive General Adjuster
120 Broadway, Suite 900 | New York, NY 10271
DIRECT 212.266.4250 | FAX 212.406.3932
CELL 973.885.4583 | bloncarevic@vericlaim.com
www.vericlaim.com | Caring counts®

 sedgwick.

**Exhibit 11**

**From:** Drew Scielzo <dscielzo@aconinvestments.com>
**Sent:** Friday, August 31, 2018 11:44 AM
**To:** Loncarevic, Boris M <Boris.Loncarevic@sedgwick.com>
**Cc:** Blaine.Conant@WillisTowersWatson.com; Jeffrey Roberts <Jeffrey.Roberts@WillisTowersWatson.com>
**Subject:** Fwd: ACON Proof of Losses

Boris,

Hope all is well. Please find the proof of losses attached for the partial payment. Please have the money wired to the account below.

Thanks,

Drew


| Bank: | Wells Fargo Bank NA |
| | 420 Montgomery Street |
| | San Francisco, CA94104 |
| ABA: | 121000248 |
| SWIFT: | WFBIUS6S |
| Acct Name: | Fiesta Holdings Investments, L.L.C. |
| Acct Number: | ▮▮▮▮▮▮▮ |

CONFIDENTIAL

EXHIBIT 24

| | |
|---|---|
| **From:** | Todd Richards |
| **Sent:** | 07.09.2018 16:44 CET |
| **To:** | Suhail Pervez Ansari |
| **Cc:** | IS FinancialBalancing;Abhinav Sonu;CSProperty Claims |
| **Subject:** | RE: Payee Name Confirmation - Activity id : 3182291 , Claim# 020171126227 |

Suhail,

Please make the check payable to: ACON Fiesta Holdings, LLC. This was confirmed through Mark Simpson, as William Ashton is out of the office.

Regards,

Todd Richards | Claims Analyst | **ASSISTANT VICE PRESIDENT** | Operations Corporate Solutions
Westport Insurance Corporation | 5200 Metcalf Ave, OVERLAND PARK, KS 66202-1265, UNITED STATES (USA)
Direct: +1 913 676 3825 Email: Todd_Richards@swissre.com

This message contains information which may be confidential and/or legally privileged.  Unless you are the addressee (or authorized to receive e-mail for the addressee), you may not use, copy or disclose to anyone the message or any other information contained in the message or any attachment.  If you have received this message in error, please advise the sender by reply e-mail and delete the message and any attachments and destroy all hard copies of same.  Thank you.

**From:** Suhail Pervez Ansari
**Sent:** Thursday, September 06, 2018 2:07 PM
**To:** Todd Richards <Todd_Richards@swissre.com>
**Cc:** IS FinancialBalancing <IS_FinancialBalancing@swissre.com>; Abhinav Sonu <Abhinav_Sonu@rcomext.com>; CSProperty Claims <CSProperty_Claims@swissre.com>
**Subject:** Payee Name Confirmation - Activity id : 3182291 , Claim# 020171126227
**Importance:** High

HI Todd,

We have received payment request under activity id  : 3182291 , Claim# 020171126227 , As per instruction payment in the amount of **USD 956,069.00 payable to "ACON Investments LLC"** , However on supporting document payee name is **"ACON Fiesta Holdings, LLC"** . See below screen shot of document . Kindly confirm the correct payee name.

**ASHTON**

**EXHIBIT 158**

Westport_000995

| From: | William Ashton |
|---|---|
| Sent: | 06.09.2018 19:00 CET |
| To: | CSProperty Claims |
| Cc: | Michael Nolan;William Ashton |
| Subject: | Payment Request // ACON Investments LLC (Acon Fiesta Holdings) // claim # 020171126227 // Hurricane Harvey (CAT #1743) DOL 8/26/17 |
| Attachments: | 0597_001.pdf, ATT00001.htm, RE: ACON Proof of Losses |
| Importance: | High |

LOB: NA Property
Claim No: 020171126227
Comments: Payment Request – Advance Payment to Insured
Document Type: Settlement
Activity Type: Financial
Rush Case (Y/N) No

Payment Information
Amount: **USD 956,069.00**
Payee: **ACON Investments LLC**

Please mail payment to:     ACON Investments LLC
                            C/O Teresa Bernstein
                            1133 Connecticut Avenue NW,
                            Suite 700
                            Washington DC 20036

**Dear Primary Layer Market Members,**

Attached, please find the executed 2nd partial POL for ACON Fiesta Holdings as received from ACON Investments LLC representative.  The payment instructions are as follows:

| Bank: | Wells Fargo Bank NA |
|---|---|
| | 420 Montgomery Street |
| | San Francisco, CA94104 |

| ABA: | 121000248 |
|---|---|
| SWIFT: | WFBIUS6S |
| Acct Name: | Fiesta Holdings Investments, L.L.C. |
| Acct Number: | ▉▉▉▉▉▉ |

For those carriers paying via checks, please make the checks payable to ACON Fiesta Holdings, LLC and send to:

ACON Investments LLC
C/O Teresa Bernstein
1133 Connecticut Avenue NW,
Suite 700

**Thanks & Regards**

Suhail Pervez Ansari | External Staff | **Contractor** | Operations Corporate Solutions

Westport Insurance Corporation | GENPACT , BUILDING NO. A-1, DLF LTD, SEZ, SILOKHERA, GURGAON, 122002 Gurgaon, India

Email: SuhailPervez_Ansari@rcomext.com

LOB: NA
Claim No: 020171126227
Comments: Payee Name Confirmation
Document Type: Indemnity & Defence Payment
Activity Type: Put In File
Rush Case:
Policy No:
Claims Team

Confidential

# EXHIBIT 25

Message
| | |
|---|---|
| **From:** | Roberts, Jeffrey [jeffrey.roberts@willistowerswatson.com] |
| **Sent:** | 9/4/2018 6:49:50 PM |
| **To:** | Jack Hook [jack.hook@blcmarkets.com] |
| **CC:** | Collins, Nancy [nancy.c.collins@willistowerswatson.com]; Conant, Blaine [blaine.conant@willistowerswatson.com] |
| **Subject:** | RE: Hurricane Harvey |

Jack- I just want to clarify that Willis does not control funds or release them...

Jeffrey Roberts

Willis Towers Watson

M&A Practice

312-339-2953

**Exhibit 90**

**From:** Roberts, Jeffrey
**Sent:** Tuesday, September 04, 2018 6:43 PM
**To:** 'Jack Hook'
**Cc:** Collins, Nancy; Conant, Blaine
**Subject:** RE: Hurricane Harvey

Jack,

As I stated last week when we were corresponding, we are truly appreciative for the opportunity to be working with you on the Fiesta Insurance policies and we hope for further opportunities to partner in the future. You are an important client!

As you know the ACON Fiesta/El Super transaction is complicated from a property insurance perspective given that ACON is the actual named insured on the Property policy in question at the time of the Harvey claims. Because they are the named insured they have the right to payment under the policy and as such has instructed the adjuster and Willis to direct payment to ACON. Unless we have some documentation that proves Fiesta/El Super is entitled to the funds we are not permitted to release information or funds to El Super. I hope you understand that my team is in a very difficult position and need to ask that if El Super is indeed owed the funds you take this up with ACON since there is clearly a difference of opinion. I am sorry but Willis cannot be in the middle of this potential dispute.

Thanks,
Jeff

Jeffrey Roberts

Willis Towers Watson

M&A Practice

312-339-2953

**From:** Jack Hook [mailto:jack.hook@blcmarkets.com]
**Sent:** Tuesday, September 04, 2018 2:08 PM
**To:** Roberts, Jeffrey
**Cc:** Collins, Nancy
**Subject:** Re: Hurricane Harvey

Hello Jeffrey
Do you have any updates?
Thanks
Jack

CONFIDENTIAL

WTW_00012486

Sent from my iPhone

On Aug 29, 2018, at 10:19 AM, Roberts, Jeffrey <Jeffrey.Roberts@WillisTowersWatson.com> wrote:

Thanks Jack, I didn't interpret your comment that way at all, just trying to b efficient as possible in getting this resolved and introducing a new claims person may be even slower

Jeffrey Roberts
Willis Towers Watson
M&A Practice
312-339-2953

On Aug 29, 2018, at 10:04 AM, Jack Hook <jack.hook@blcmarkets.com> wrote:

Thanks for the reply Jeff. I didn't mean to imply that you aren't able to keep me apprised – I just want to make sure we're all efficient when reaching out for information/updates.
Appreciate your and everyone's support on our account and specifically this large claim.
Regards, Jack

**From:** Roberts, Jeffrey [mailto:Jeffrey.Roberts@WillisTowersWatson.com]
**Sent:** Wednesday, August 29, 2018 7:41 AM
**To:** Jack Hook <jack.hook@blcmarkets.com>
**Cc:** Collins, Nancy <Nancy.C.Collins@WillisTowersWatson.com>
**Subject:** Re: Hurricane Harvey

Jack,

Although I am on the M&A team, I am very close to the fiesta account overall as I work closely with Nancy Collins and the rest of team. However, you are right I thinking that if Blaine is unable to keep pace with demands of the account we will need to identify a back up contact. Having said all that, I did speak with Blaine last night and we think we will have answer for you on the claim by weeks end. Jack, with the acquisition by El Super, Fiesta is a client and a priority for us all here at WTW, so please know we are pushing for claim resolution. Truly sorry for the delay, just a challenging claim situation overall. I will keep you posted in real-time on progress over next 48 hours.

Best,
Jeff

Best,
Jeff

Jeffrey Roberts
Willis Towers Watson
M&A Practice
312-339-2953

On Aug 29, 2018, at 9:24 AM, Jack Hook <jack.hook@blcmarkets.com> wrote:

Hello Jeff

CONFIDENTIAL

In Blaine's absence, is there someone else I should be contacting to get updates? I'm relatively new to this and don't know all the players so I want to make sure to connect with the right person. I note that you are on the M&A team.

Thanks, Jack

Sent from my iPhone

On Aug 28, 2018, at 5:37 PM, Roberts, Jeffrey <Jeffrey.Roberts@WillisTowersWatson.com> wrote:

> Thanks Jack- I believe he is on the mend, but still dealing with Dr.'s and full
> recovery. I don't want to paint a totally negative picture, but just respecting what we can expect in terms of responsiveness...
>
>
> Jeffrey Roberts
> Willis Towers Watson
> M&A Practice
> 312-339-2953

On Aug 28, 2018, at 6:37 PM, Jack Hook <jack.hook@blcmarkets.com> wrote:

> Thanks for the update Jeff – so very sorry to hear about Blaine.
> Yes, please provide us an update on the claim when possible. Regards, Jack
>
> ---
>
> **From:** Roberts, Jeffrey [mailto:Jeffrey.Roberts@WillisTowersWatson.com]
> **Sent:** Tuesday, August 28, 2018 1:36 PM
> **To:** Jack Hook <jack.hook@blcmarkets.com>
> **Subject:** RE: Hurricane Harvey
>
> Jack,
>
> Blaine is still struggling with Health issues I am sorry to report. However, I am in the process of getting you an update and also back up for Blaine as his ongoing health situation is in question. Very sorry for the inconvenience.
>
> Best,

WTW_00012488

jeff

Jeffrey Roberts
Willis Towers Watson
M&A Practice
312-339-2953

---

**From:** Jack Hook
[mailto:jack.hook@blcmarkets.com]
**Sent:** Tuesday, August 28, 2018 3:19
PM
**To:** Conant, Blaine
**Cc:** Roberts, Jeffrey
**Subject:** RE: Hurricane Harvey

Hello Blaine, any updates or requests
for additional information from any
party?
Thanks, Jack

---

**From:** Conant, Blaine
[mailto:Blaine.Conant@WillisTowersWa
tson.com]
**Sent:** Wednesday, August 22, 2018 2:57
PM
**To:** Jack Hook
<jack.hook@blcmarkets.com>
**Cc:** Roberts, Jeffrey
<Jeffrey.Roberts@WillisTowersWatson.
com>
**Subject:** RE: Hurricane Harvey

Jack,

Absolutely, be happy to do so.

In the following example, say the
Agreed Replacement Cost (ARC) for the
Property Damage is $7.5M. The ARC in
this example represents the total cost
of the Property Damage that is agreed
to by us and the Insurers. At that point
the Insurers would owe the Actual Cash
Value (ACV) until the actual repairs
have been completed and the ARC has
been incurred by the Insured.

The ACV is calculated by taking a
percentage of the ARC and holding back
a percentage (usually industry standard
is 25%). The amount held back is called
the Depreciation Holdback Amount. It
simply means that when you incur the

WTW_00012489

cost of the holdback amount, the Insurers will issue payment for said holdback amount. In this example, the Depreciation Holdback amount would be $1,875,000 or 25% of the ARC ($7.5M). The holdback amount would be paid when the insured incurs that cost not to exceed the ARC. If the Depreciation Holdback amount is not incurred, only the ACV is owed by the Insurers. Should a portion of the holdback amount be incurred and not the entire amount, the insurers would only owe that which is actually incurred.

The breakdown in this example is:

| | |
|---|---|
| Agreed Replacement Cost | $7,500,000 |
| Less Depreciation Holdback | $1,875,000 |
| Actual Cash Value Owed | $5,625,000 |
| | |
| **ACV Amount payable** | **$5,625,000** |

The Depreciation Holdback amount would need to be incurred by the Insured to be reimbursed when the actual repairs have been completed.

Let me know if you want to discuss the above further. I am available most of the day tomorrow.

Thanks

**Blaine D. Conant**
**Senior Vice President / Senior Consultant**
**National Property Claims** – Risk Control & Claim Advocacy Practice

**Willis Towers Watson**
801 South Figueroa Street | Suite 800 | Los Angeles, CA 90017
Tel:  213-607-6358
**Cell:  909-618-8209**

blaine.conant@willistowerswatson.com

CONFIDENTIAL

WTW_00012490

**From:** Jack Hook
[mailto:jack.hook@blcmarkets.com]
**Sent:** Wednesday, August 22, 2018
4:07 PM
**To:** Conant, Blaine
**Cc:** Roberts, Jeffrey
**Subject:** Re: Hurricane Harvey

Hello Blaine, please provide a numerical
example of the depreciation holdback
concept. Sorry, but I'm not following.
Thanks, Jack

Sent from my iPhone

On Aug 22, 2018, at 2:57 PM, Conant,
Blaine
<Blaine.Conant@WillisTowersWatson.c
om> wrote:

> Jack,
>
> The Property Damage
> information submitted
> is currently being
> reviewed by the
> adjuster and Insurers
> Building Consultants.
> The Markets have not
> provided a date
> regarding payment until
> the review is completed
> and a recommendation
> has been provided by
> the adjuster. Obviously,
> the adjuster will need
> to discuss his findings
> and recommendations
> with us before any
> requests or
> recommendations are
> provided to the
> markets. To expedite
> the process, I requested
> that the Insurers
> Building Consultant
> provide us with the
> undisputed items that
> they are in agreement
> with.  Said undisputed
> costs should be
> submitted for payment.
> The costs that are

CONFIDENTIAL

disputed (either still being reviewed or further discussion needed) will continue to be cleared as undisputed as their review continues.

The Insurers per the policy owe Actual Cash Value (ACV) which is the Agreed Replacement Cost (RC) less depreciation hold back. When the depreciation holdback amount has been incurred and the repairs have been completed, the holdback amount is paid.

I will continue to follow up with adjusters for updates. Thus far the building consultant has not requested additional information which is a good thing.

Thanks

**Blaine D. Conant**
**Senior Vice President /**
**Senior Consultant**
**National Property**
**Claims** – Risk Control & Claim Advocacy Practice

**Willis Towers Watson**
801 South Figueroa Street | Suite 800 | Los Angeles, CA 90017
Tel:  213-607-6358
**Cell:  909-618-8209**

blaine.conant@willisto werswatson.com

For information pertaining to Willis Towers Watson's email confidentiality and monitoring policy, usage restrictions, or for

WTW_00012492

specific company registration
and regulatory status
information, please visit
http://www.willis.com/email_trail
er.aspx

You may receive direct
marketing communications from
Willis Towers Watson. If so, you
have the right to opt out of these
communications. You can opt
out of these communications or
request a copy of Willis Towers
Watson's privacy notice by
emailing
unsubscribe@willistowerswatso
n.com.
_____
_____
_____

_____

For information pertaining to Willis Towers Watson's
email confidentiality and monitoring policy, usage
restrictions, or for specific company registration and
regulatory status information, please visit
http://www.willis.com/email_trailer.aspx

You may receive direct marketing communications
from Willis Towers Watson. If so, you have the right to
opt out of these communications. You can opt out of
these communications or request a copy of Willis
Towers Watson's privacy notice by emailing
unsubscribe@willistowerswatson.com.
_____
_____

_____

For information pertaining to Willis Towers Watson's
email confidentiality and monitoring policy, usage
restrictions, or for specific company registration and
regulatory status information, please visit
http://www.willis.com/email_trailer.aspx

You may receive direct marketing communications
from Willis Towers Watson. If so, you have the right to
opt out of these communications. You can opt out of
these communications or request a copy of Willis
Towers Watson's privacy notice by emailing
unsubscribe@willistowerswatson.com.
_____
_____

_____

For information pertaining to Willis Towers Watson's email confidentiality
and monitoring policy, usage restrictions, or for specific company
registration and regulatory status information, please visit
http://www.willis.com/email_trailer.aspx

You may receive direct marketing communications from Willis Towers
Watson. If so, you have the right to opt out of these communications. You
can opt out of these communications or request a copy of Willis Towers
Watson's privacy notice by emailing unsubscribe@willistowerswatson.com.
_____
_____

_____

For information pertaining to Willis Towers Watson's email confidentiality and monitoring policy, usage restrictions, or
for specific company registration and regulatory status information, please visit http://www.willis.com/email_trailer.aspx

You may receive direct marketing communications from Willis Towers Watson. If so, you have the right to opt out of
these communications. You can opt out of these communications or request a copy of Willis Towers Watson's privacy

notice by emailing unsubscribe@willistowerswatson.com.

For information pertaining to Willis Towers Watson's email confidentiality and monitoring policy, usage restrictions, or for specific company registration and regulatory status information, please visit http://www.willis.com/email_trailer.aspx

You may receive direct marketing communications from Willis Towers Watson. If so, you have the right to opt out of these communications. You can opt out of these communications or request a copy of Willis Towers Watson's privacy notice by emailing unsubscribe@willistowerswatson.com.

CONFIDENTIAL

# EXHIBIT 26

**Message**

| | |
|---|---|
| **From:** | Roberts, Jeffrey [jeffrey.roberts@willistowerswatson.com] |
| **Sent:** | 9/11/2018 2:07:05 PM |
| **To:** | Daar, Henry [henry.daar@willistowerswatson.com]; Rusas, Mark [mark.rusas@willistowerswatson.com]; Batzer, Bruce [bruce.batzer@willistowerswatson.com]; Conant, Blaine [blaine.conant@willistowerswatson.com]; Collins, Nancy [nancy.c.collins@willistowerswatson.com]; Galla, Peter [peter.galla@willistowerswatson.com] |
| **Subject:** | ACON Fiesta Claims |

Team,

I just got off the phone with El Super/Fiestamart CFO and General Counsel ( he didn't disclose he was GC until I asked) and it was a very difficult call as they feel like Harvey Claim proceeds should have gone to Fiestamart, not ACON. They were adamant that Willis needs to assist them in obtaining the proceeds as we have a Fiduciary duty to Fiestamart. You can probably understand where the rest of the call went.

Can we all please get on a call to discuss next steps here?

How does wed or Thursday look?

Jeff


Jeffrey Roberts
Willis Towers Watson
M&A Practice
312-339-2953

**Exhibit 91**

CONFIDENTIAL

# EXHIBIT 27



September 11, 2018

**<u>VIA EMAIL AND OVERNIGHT COURIER</u>**

Jeffrey Roberts (Jeffrey.Roberts@WillisTowersWatson.com)
Executive Vice President
Willis Towers Watson
233 S. Wacker Drive, Suite 1800
Chicago, IL 60606

|  |  |  |
|---|---|---|
| Re: | Insured: | Fiesta Mart, LLC (then-subsidiary of ACON Investments, LLC) |
|  | Loss: | Property - Flood/Hurricane Harvey (CAT #1743) |
|  | Location: | Various Fiesta Mart stores – Houston, TX |
|  | Date of Loss: | August 26, 2017 |

| | | | |
|---|---|---|---|
| Insurer: | Allied World Assur. Co. US | Claim No.: | 2017019830 |
| Policy No.: | 0310-7409-1A | Policy Period: | 06/01/17-18 |
| Insurer: | Arch Specialty Ins. Co. | Claim No.: | 000013106710 |
| Policy No.: | ESP7303053-01 | Policy Period: | 06/01/17-18 |
| Insurer: | Aspen Specialty Ins. Co. | Claim No.: | PR1770027432 |
| Policy No.: | PRAGK1017 | Policy Period: | 06/01/17-18 |
| Insurer: | Certain U/w Lloyds (Hiscox) | Claim No.: | Cms165000690 |
| Policy No.: | URS2552391.17 | Policy Period: | 06/01/17-18 |
| Insurer: | HDI Global Ins. Co. | Claim No.: | Please advise |
| Policy No.: | CPD1488300 | Policy Period: | 06/01/17-18 |
| Insurer: | Indian Harbor Ins. Co. | Claim No.: | 3961510 |
| Policy No.: | PRO0047629-01 | Policy Period: | 06/01/17-18 |
| Insurer: | Westport Ins. Co. | Claim No.: | 20171126227 |
| Policy No.: | NAP200121401 | Policy Period: | 06/01/17-18 |

Dear Mr. Roberts:

Per our discussion of today, Fiesta Mart, LLC ("Fiesta Mart") is an Insured under the Master Property Policy placed with the captioned insurers and is a client of Willis Towers Watson ("Willis") in connection with the captioned property loss. As such, we instruct

Fiesta Mart, L.L.C. | 5444 Westheimer Road, Suite 101 | Houston, TX 77056 | 713.869.5060

WTW_00002905



Willis to so advise the relevant insurers and loss adjuster(s), to provide a status update on adjustment of the loss, and to direct the insurers to pay such insurance proceeds to Fiesta Mart.

As we discussed, at the time of the loss Fiesta Mart was a "subsidiary, associated, allied or affiliated ... Limited Liability Company ...wholly or partially owned or controlled by the Insured, where the Insured maintains an interest, or where the Insured is required to provide insurance, as now exist..." of ACON Investments, LLC. As such, it is an "Insured" under the Master Property Policy, which calls for loss to "be adjusted with and payable to the Insured, or as directed by them." Master Property Policy at ¶ 6 (loss payable). Fiesta Mart is also, as I mentioned, the party that suffered the loss, submitted the claim, received the initial partial insurance payments, and has been paying for the underlying property damage.

Given the importance of this matter, we are taking the liberty of copying the insurers and loss adjuster known to us on this communication. If we have omitted anyone, please inform them as well and provide us their contact information. Please confirm once our instructions have been carried out.

Thank you, and please contact me with any questions.

Very truly yours,

Jack Hook
Assistant Treasurer

cc (via email and overnight courier)

Blaine D. Conant
Executive Vice President
Willis Towers Watson
801 South Figueroa Street, Suite 800
Los Angeles, CA 90017
blaine.conant@willistowerswatson.com

Nancy C. Collins
Senior Vice President
Willis Towers Watson
5 Concourse Parkway, 18th Floor
Atlanta, GA 30328
nancy.c.collins@willistowerswatson.com

Aspen Specialty Ins. Mgm't, Inc.
125 Summer Street
Boston, MA 02110
property.claims@aspenspecialty.com

Allied World Assurance Company (U.S.) Inc.
160 Federal Street, 6th Floor
Boston, MA 02110
awacus.propertyclaims@awac.com

Arch Specialty Insurance Co.
2345 Grand Blvd., Suite 900
Kansas City, MO 64108
claims@archinsurance.com

HDI Global Ins. Co.
161 North Clark Street, 48th Floor
Chicago, IL 60601
newclaims@us.hdi.global

Fiesta Mart, L.L.C. │ 5444 Westheimer Road, Suite 101 │ Houston, TX 77056 │ 713.869.5060

CONFIDENTIAL



Indian Harbor Ins. Co., c/o XL Catlin
Attn: Property
4209 Vineland Rd, Suite J-2
Orlando, FL 32811
napropcaseclaims@xlcatlin.com

Certain Underwriters at Lloyds (Hiscox)
Hiscox Claims
5 Concourse Parkway, Suite 2150
Atlanta, GA 30328
reportaclaim@hiscox.com

Westport Ins. Corp.
5200 Metcalf
Overland Park, KS 66202
ClaimsNAProperty_CorporateSolutions@swissre.com

Boris Loncarevic
VeriClaim, Inc.
120 Broadway, Suite 900
New York, NY 10271
bloncarevic@vericlaiminc.com

CONFIDENTIAL                                                                                           WTW_00002907