IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FIESTA MART, LLC,<br><br>              Plaintiff,<br><br>vs.<br><br>WILLIS OF ILLINOIS, INC, *et. al.*,<br><br>              Defendants. | **Civil Action No. 4:20-CV-03484** |

### DEFENDANTS WILLIS TOWERS WATSON MIDWEST, INC. (F/K/A WILLIS OF ILLINOIS, INC.) AND WILLIS TOWERS WATSON US, LLC'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendants Willis Towers Watson Midwest, Inc. (f/k/a Willis of Illinois) and Willis Towers Watson US, LLC ("Willis") submit this reply brief in support of their Motion for Summary Judgment (Dkt. 73) ("MSJ") and in response to Plaintiff Fiesta Mart, LLC's Response to Defendants Willis Towers Watson Midwest, Inc. (f/k/a Willis of Illinois, Inc.) and Willis Towers Watson, LLC's Motion for Summary Judgment (Dkt. 75) ("Opposition"). In support, Willis states as follows:

Fiesta's Opposition fails to identify any material facts in dispute and fails to provide any legal basis to keep Willis in the case. This case is a pure coverage dispute between Fiesta and its insurers. There is no conduct by Willis, as Fiesta's insurance broker, that is relevant to the resolution of those disputed coverage issues. Based on the evidence and well-established Fifth Circuit law, judgment should enter for Willis.

1

**I.    WILLIS DID NOT CAUSE THE INSURERS TO MAKE PAYMENT TO ACON INSTEAD OF FIESTA.**

The record shows that the Insurers made the decision to make the insurance claim payment to ACON instead of Fiesta. As would be expected, Willis had absolutely no role or decision-making authority regarding that payment. While Fiesta provides the Court with a legal treatise on contributory negligence and superseding causation (neither of which Willis argued), Fiesta ignores the simple and unassailable fact: nothing Willis did or did not do caused the Insurers to make payment to ACON instead of Fiesta, which is the crux of this litigation. Indeed, *the instruction to make the second payment did not come from Willis,* **it came from ACON directly**. On August 31, 2018, Drew Scielzo of ACON wrote to the assigned independent insurance adjuster (Boris Loncarevic), providing wiring instructions for Fiesta Holdings Investments, L.L.C. MSJ, Ex. 23. Mr. Loncarevic sought clarification *from ACON directly* as to what entity payment should be made to. *Id.* **ACON responded directly**, writing:

> Thanks. Fiesta Holding Investments, LLC is still owned by ACON. We sold the operating company to El Super. As such, **the proceeds will still be coming to ACON**…

*Id.* (emphasis added). Mr. Loncarevic, in turn, forwarded this email to the Insurers, who initiated payment based upon this instruction from ACON and the terms of the Property Policy.[1] *See* Ex. A and B (approving payments based following the September 4, 2018 email from B. Loncarevic and attached email correspondence with ACON); *see also* MSJ, Ex. 24; Ex. MSJ, Ex. 53 (Ashton Transcript), at 116:24-117:4; MSJ, Ex. 52 (Evans Transcript), at 119:24-120:2.

Fiesta would have this Court believe that Willis colluded with ACON, hid the fact that payment was being made, and that its conduct "sent a clear signal to the Insurers [that] if even

---

[1] The capitalized terms are those from the MSJ.

Fiesta Mart's own broker was unwilling to stand up for its rights, Fiesta Mart must have no legitimate entitlement to proceeds." Opposition, at 16.² The problem with these arguments is that there is absolutely no evidence cited by Fiesta in support of this outlandish theory. And, Fiesta wants this Court to ignore the fact that on September 4, 2018 – the very same day that ACON confirmed that payment should go to it – Mr. Roberts wrote to Fiesta and informed it that ACON had "instructed the adjuster…to direct payment to ACON" and that Willis, as the broker, had no ability to "control funds or release them." MSJ. Ex. 25.³

Deposition testimony confirms that Willis, as Fiesta's broker, had no role in deciding that the insurance payment would be made to ACON and not Fiesta. The Insurers testified that decisions about where to direct proceeds are made by them, in accordance with the terms and conditions of the Property Policy, and that Willis, as the broker, had no "ability to…direct [them] one way or the other in making a payment." MSJ, at Ex. 52 (Evans Transcript), 97:8-10; *id.*, at Ex. 53 (Ashton Transcript), at 172:2-9. This position was echoed by the adjuster:

> Q: Would you agree with me that insurance brokers do not independently direct or control the payment of insurance proceeds?
>
> ***
>
> A: From my experience, typically that's accurate. They would follow the direction from the insured, as far as I know.
>
> Q: Any payments that are ultimately issued, that's determined by the insurers in your experience, correct?

---

[2] The alleged collusion is based on the notion that Willis "decided to help its larger client ACON at Fiesta Mart's expense." Opposition, at 5. In support of this, Fiesta blatantly misconstrues the testimony of Jeff Roberts, one of Willis's corporate representatives. What Mr. Roberts *actually* said was that while "[c]umlatively across all portfolio companies" ACON was larger than Fiesta, this was "not by a lot." Mr. Roberts went on to note that Fiesta was "a huge part" – a "good chunk" – of ACON's revenue, and that "Fiesta was very important, as was ACON." Opposition, at Ex. 1 (Roberts Transcript), 98:4-17.

[3] Tellingly, after receiving Fiesta's September 11, 2018 letter claiming that it, not ACON, was entitled to payment of the $4.78 million, more than half of the Insurers went ahead and made payment to ACON anyway. *See* MSJ, at Ex. 28.

                                      \*\*\*

       A:      That's correct.

       Q:      And those determinations in your experience are made in accordance with the terms and conditions in the policy, correct?

                                      \*\*\*

       A:      Correct.

Ex. C (Loncarevic Transcript), at 170:13 - 171:7. In sum, there is no evidence that Willis, which is not a party to the Property Policy between Fiesta and the Insurers, in its capacity as insurance broker, had any ability to direct or control where insurance proceeds are paid. In other words, there is no proof that Willis proximately caused Fiesta's damages. Summary judgment should therefore enter for Willis on all counts.

**II.    TEXAS LAW DOES NOT RECOGNIZE A DUTY FOR BROKERS TO KEEP CLIENTS INFORMED OF MATERIAL FACTS RELATING TO THEIR CLAIMS, AND THERE IS NO EVIDENCE THAT WILLIS BREACHED ITS DUTY IN CONNECTION WITH THE AGGREGATE PROPERTY PROGRAM.**

Fiesta accuses Willis of "misstat[ing] the scope of its duties as an insurance broker," citing to *Gulf-Tex Brokerage v. McDade & Assocs.*, 433 F. Supp. 1015 (S.D. Tex. 1997) for the proposition that brokers also owe a duty "to keep the client informed of material facts relating to the client's insurance claim." Opposition, at 20. That case has no bearing on the disputes in this action because Fiesta misstates the *Gulf-Tex* court's holding.[4] In *Gulf-Tex*, the insured (Gulf-Tex) asked its broker (McDade) to extend its existing coverage for a vessel that had left port. *Id.*, at 1016. Despite knowing that there was a "good chance that the extension would not be granted

---

[4] Since it was decided in 1977, just three published decisions have cited to *Gulf-Tex*. It has not been cited by any Texas court (state or federal). If this case truly articulated an additional duty, as Fiesta claims, one would expect that it would be widely cited. It is not.

under the circumstances," McDade told Gulf-Tex they would "take care of it." *Id.*, at 1017. When the vessel was damaged in an accident, Gulf-Tex sued McDade, claiming that McDade failed "to keep the plaintiff informed as to the progress of" "***plaintiff's request for coverage***." *Id.*, at 1018-19 (emphasis added). Fiesta ignores the fact that this duty to keep the insured informed was in the context of whether or not the requested coverage could be procured. If anything, *Gulf-Tex* supports Willis's position that a broker's duties are limited to: (1) using reasonable diligence in attempting place the coverage requested; and (2) promptly informing the client if it is unable to do so. *See W. Houston Airport, Inc. v. Millennium Ins. Agency, Inc.*, 349 S.W.3d 748, 751 (Tex. App. 2011).

Because there is no legal duty underpinning Fiesta's theory that Willis was negligent by somehow failing to keep Fiesta "informed of material facts throughout the claims process," as a matter of law, Willis is entitled to summary judgment on this theory. Opposition, at 21.[5]

Fiesta's alternative theory of liability is that Willis failed to use reasonable diligence in attempting to place the insurance coverage Fiesta requested. *See, e.g.*, Opposition at 11 (accusing

---

[5] Although there is no legal duty, Willis did not withhold any material facts relating to the claim. Assuming that Mr. Hook's recollection of the August 2, 2018 call is correct, there is no evidence to suggest that Willis believed this statement (*i.e.,* that Fiesta would receive payment withing 30 days) to be untrue. As addressed *infra* at fn. 10, the fact that Willis was asked to draft language in January 2018 – prior to, and in connection with, the sale to El Super – shows that Willis reasonably believed that the parties would account for the open Harvey claims as part of their transaction. For whatever reason, they did not do so. Beyond this discrete request, Willis had not involvement in the sale and was not provided with the MIPA (which it is not a party to) until many months later. This argument is a red herring. In reality, when Willis learned that ACON had instructed the Insurers to make payment to it, not Fiesta, Willis promptly informed Fiesta—***the very next business day***. *Compare* MSJ, at Ex. 23 (Email sent on Friday, August 31, 2018 from ACON to B. Loncarevic directing that payment be wired to an account for "Fiesta Holdings, L.L.C." ) with Ex. 25 (Email sent on Tuesday, September 4 from Jeff Roberts to Jack Hook, advising Fiesta that ACON had "instructed the adjuster…to direct payment to ACON"; Monday, September 3, 2018 was Labor Day). And, as of the date that Willis informed Fiesta that ACON had directed payment to itself (September 4), the Insurers had not yet acted upon ACON's instruction. *See* MSJ, Ex. 24; Exs. A and B.

In any event, all of this is immaterial as the undisputed evidence shows that it was up to the Insurers to determine where payment would be made, based upon the terms of the Property Policy and the direction from the Named Insured. Nothing Willis did prevented Fiesta from objecting to the payment going to ACON instead of it. Fiesta alerted Willis and the Insurers as to their claim to the proceeds on September 11, 2018. MSJ, at Ex. 27. Despite learning of the dispute between ACON and Fiesta, the Insurers chose to pay ACON anyway. *Id.*, at Ex. 28 (as of September 18, 2018 – a week after Fiesta's letter putting the Insurers on notice of its claim for the proceeds – more than half of the Insurers had not yet made payment to ACON).

Willis of failing to "secure[] true coverage"). This theory fares little better for the simple reason that **Fiesta has put forth no evidence showing that it received anything other than what it agreed to in 2016**. Throughout its Opposition, Fiesta claims that Willis placed a "defective" insurance policy. *See, e.g.*, Opposition, at 10.[6] To be clear, the ***only*** evidence in the record is from Willis's corporate representative who was personally involved in the placement[7] and who testified that Willis explained the program design to Fiesta, including the terms and conditions of the Property Policy; that Fiesta carefully considered whether joining the Aggregate Property Program would be in its best interest; and that, after careful study, it voluntarily elected to join. MSJ, Ex. 1 (Roberts Transcript), at 37:15-16, 40:11-16. **These facts are undisputed**.

Fiesta's corporate representative (Jack Hook) was not personally involved with Fiesta's decision to join the Aggregate Property Program. In preparation for his deposition, he made no effort to speak to anyone who actually was. Ex. D (Hook Transcript, Vol. I), at 157:15-17. Not surprisingly, when asked about what representations Willis made in connection with procuring coverage, **Mr. Hook could not identify a single one**:

> Q. Okay. In or around 2016, April of 2016, when Fiesta Mart was making the decision to switch brokers and use Willis' services, who at Willis did Fiesta Mart speak with?
>
> A. I don't know.

---

[6] Fiesta also ignores the fact that within months following Hurricane Harvey, it received payments from the Insurers totaling $7.5 million for damage to the Stores. Given this, it is unclear how the Property Policy could possibly be considered "defective" or offer only "illusory" coverage. Opposition, at 10. Fiesta's argument – that it would never have decided to join the Aggregate Property Program had they known that their recovery would be contingent on ACON's decision-making – is unsupported by *any* evidence, and appears to conflate the T&Cs and the Property Policy, to which Willis is not a party. And, but for the sale of Fiesta to El Super (and failure of Fiesta and its attorneys to document what would happen to proceeds from the open insurance claims), there would have continued to be unity of ownership and likely no issue as to where ACON opted to direct payment.

[7] In the Opposition, Fiesta claims that the "Willis representatives who negotiated the placing of the Property Policies in April 2016 were unavailable for deposition[.]" Opposition, at 22. This is untrue. Mr. Roberts was personally involved in the 2016 placement and testified about this in his capacity as one of the Willis corporate representatives. Fiesta never asked to depose the other Willis individuals who were involved with the placement, many of whom still work at Willis.

> Q. And do you know who at Fiesta Mart was having those conversations with Willis?
>
> A. Wayne Peterson, again, was leading the charge on insurance renewals; however, I do not know the interaction between him and the representatives of ACON on such a decision.
>
> Q. So I take it you don't know how many conversations Fiesta Mart and Willis had in the course of deciding whether or not to use Willis' brokerage services?
>
> A. I do not.
>
> Q. Can you describe for me the representations that Willis made to Fiesta Mart in or around April 2016 concerning its property insurance?
>
> A. I would – I don't know. I'm assuming there's a contract in place that outlined those – those agreements. But I was not privy to the conversations.

MSJ, Ex. 15 at 165:19-166:15; Ex. D, at 174:9-11 ("Q. Do you know why Fiesta Mart decided to join the aggregate property program? A. Again, I don't know exactly…"); *id*., at 22:14-20. Simply put, not only are there no material facts in dispute to support Plaintiff's theory that Willis did not place the requested coverage, *there are no facts full stop*.[8]

### III. FIESTA FAILED TO PRESENT EVIDENCE OF ANY REPRESENTATIONS MADE BY WILLIS IN CONNECTION WITH ITS JOINING THE AGGREGATE PROPERTY POLICY IN 2016.

Given Fiesta's inability to identify *any* specific representations by Willis in connection with the 2016 decision to join the Aggregate Property Program, Fiesta's negligent misrepresentation claim must also fail as a matter of law. *See Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (to recover for negligent misrepresentation, the plaintiff must show "a representation is made by a defendant"). Nor has Fiesta demonstrated that the

---

[8] For this reason, the Court should also dismiss Fiesta's breach of contract claim to the extent that it is premised upon statements allegedly made by Willis "in choosing whether to bind the Property Policies." Opposition, at 23.

7

statements Willis made were false. *Id*. It is undisputed that, as compared to its standalone policy, the Property Policy offered Fiesta savings of $450,000 in annual premium and other coverage enhancements. See MSJ, at Exs. 4 – 5. Willis provided an accurate coverage comparison and left it to Fiesta to decide whether it wanted to join. MSJ, Ex. 1 (Roberts Transcript), at 37:6-7 ("It's not a mandate for the portfolio companies to participate in the program"). Fiesta's opposition identifies no evidence to the contrary and rests on pure speculation as to what a jury "*could* find." Opposition, at 23 (emphasis added).

And, having put forward no evidence as to what representations were made or what false information was provided, Fiesta has not – and cannot – demonstrate detrimental reliance. *See Moody Nat. Bank of Galveston v. GE Life & Annuity Assur. Co*., 270 F. Supp. 2d 875, 882 (S.D. Tex. 2003). Fiesta's sole argument is that "a jury could find that [it] justifiably relied on" certain alleged nebulous statements Willis made about the Aggregate Property offering a better value as opposed to its current standalone policy. Opposition at 22-23. Once again, Fiesta offers no testimony or documentary evidence showing that Fiesta did, in fact, rely upon statements made by Willis. The only evidence in the record is that Willis "explain[ed] all the terms and conditions to join the program" and that Fiesta "was extremely inquisitive" because it "wanted to make sure….that it was in [its] best interest to join." MSJ, Ex. 1 (Roberts Transcript), at 40:9-16.

Tellingly, Fiesta completely ignores Willis's argument that, because it is undisputed that Fiesta had a copy of the Property Policy, Fiesta was on notice of the terms and conditions and therefore precluded from bringing a claim for negligent misrepresentation. *Roland v. Transamerica Life Ins. C*o., 570 F. Supp. 2d 871, 881 (N.D. Tex. 2008), *aff'd*, 337 F. App'x 389 (5th Cir. 2009). Texas law is clear: "[a] claim for misrepresentation cannot stand when the party

asserting the claims is legally charged with knowledge of the true facts." *Manion v. Sec. Nat. Ins. Co.*, No. 13-01-248-CV, 2002 WL 34230861, at *3 (Tex. App. Aug. 15, 2002).

Fiesta concedes that the only other basis for its negligent misrepresentation claim is the August 2, 2018 phone call between Mr. Hook and Mr. Conant, in which Mr. Conant allegedly told Fiesta that it would receive payment within thirty days.[9] While Fiesta tries to portray this conversation as "more…than a mere future guess," it was not until August 22, 2018 that the Insurers informed Willis that a second payment of $4,780,347 had been authorized and would issue. *See* MSJ, Ex. 18. Even accepting Mr. Hook's recollection of the conversation as true, his statement is a quintessential "promise of future action" that, as a matter of law, "cannot form the basis of a negligent-misrepresentation tort as a matter of law." *Stolts v. Wells Fargo Bank, NA*, 31 F. Supp. 3d 876, 882, fn. 5 (S.D. Tex. 2014); *see also McNamara v. EnCana Energy Servs., Inc.*, No. CIV.A. H-03-226, 2005 WL 2106088, at *2 (S.D. Tex. Aug. 30, 2005) ("Representations must be about present facts rather than predictions or even promises of future performance.").[10] Moreover, and in any event, the alleged representation is not material because Fiesta objected on

---

[9] In connection with its Insurance Code claim, Fiesta argues that Willis represented that all future payments would go to Fiesta. This takes out of context a September 28, 2017 email from Blaine Conant. At that point in time, one of the Insurers – XL Catlin – had made a payment of $1 million to Fiesta, and the remaining Insurers had agreed to make "additional payments" totaling $6.5 million, which is what the email refers to. The email was not – as Fiesta would have this Court believe – a blanket promise by Willis that all future payments would be made to Fiesta. Indeed, the email contains no reference to "future payments." This would also be a promise of a future action, which cannot, as a matter of law, form the basis for a negligent misrepresentation claim.

[10] According to Fiesta, it is "immaterial" that Willis had not seen the MIPA at the time Mr. Conant allegedly made this statement. No so. Fiesta has pointed to a series of emails in January 2018 wherein Willis was enlisted by ACON to draft language indicating how future insurance proceeds might be paid. Opposition, at Exs. 14-16. As Willis's corporate representative explained, in the typical due diligence process, the parties will negotiate how open claims will be treated and that it was his understanding that this is why Willis was asked to provide this language. Ex. E (Roberts Transcript), at 88:2-89:14. Of course, Willis was not involved in the due diligence or in the drafting of the MIPA, and was not provided a copy until November 2018. Thus, Willis had no idea if this language was ultimately made part of the deal. In light of this background – which Fiesta's Opposition deliberately ignores – Mr. Conant's lack of knowledge regarding Fiesta and ACON's deal establishes that there is no basis for Fiesta's claim that Willis failed to exercise reasonable care.

September 11, 2018 to the second payment being made to ACON, but the Insurers ignored the objections and paid ACON.

If this Court agrees with Willis that it is entitled to judgment on Fiesta's negligent misrepresentation claims, it should also dismiss the Insurance Code claims, which are premised on the same conduct (see Opposition at 43-45, 47). This also means that Fiesta's request for treble damages and attorneys' fees must be dismissed, as Fiesta has identified no other basis for either.

## IV. FIESTA HAS ADDUCED NO EVIDENCE TO SUPPORT ITS BREACH OF CONTRACT CLAIMS WHICH IGNORES THE PLAIN LANGUAGE OF THE T&CS.

Fiesta argues that there is no reason to look to Illinois law, on the grounds that it is in accord with Texas law. Opposition, at 34. Fiesta further argues that the reference to "the state in which our office is located" is somehow ambiguous and could be interpreted to mean *any* state in which Willis has an office. *Id*., at 34-35. Fiesta's legal gymnastics ignore the fact that it retained Willis of Illinois, Inc. as its broker, which is based (as the name suggests) in Illinois and which only has offices in Illinois. Illinois law applies.

Fiesta argues that whether Willis had a conflict of interest and whether it provided inaccurate and/or untimely information are issues of fact not appropriate for summary judgment. But a careful read of the Opposition shows that Fiesta has not actually adduced any evidence supporting its claims. For example, Fiesta cites to testimony from Willis witnesses claiming that Willis "recognized the conflict…and discussed it internally." Opposition, at 37. However, the conflict discussed was not a conflict between Fiesta and Willis, it was the conflict between Fiesta and ACON, its former owner, exacerbated by El Super's failure to adequately protect its understanding as to what it believed would happen to insurance proceeds.[11]

---

[11]Fiesta would have this Court believe that because ACON carved out that it would receive business interruption proceeds, that meant that any other proceeds must go to El Super. Opposition, at 18-19. Of course, the MIPA says

Fiesta goes on to cite to "at least seven ways" in which Willis breached its duty to provide accurate and timely facts and to promptly respond to requests for coverage information. Opposition, at 41-43. Each of these alleged breaches are without basis and without evidence, and many of which are discussed above. For example, Fiesta alleges that Willis falsely claimed that it had no power to direct payment of the insurance proceeds because it actually directed for the first payment to go to Fiesta. *Id*. This is incorrect as it is undisputed that ACON, as the Named Insured under the Property Policy, made the decision to have the first payment go to Fiesta. ACON relayed that decision to Willis, who then relayed that decision to Insurers. Willis had absolutely no role in that decision. *See* MSJ, at Ex. 14.[12]

Fiesta's remaining argument – that Willis ignored its requests in the summer of 2020 – is based on a non-sensical interpretation of the T&C's "Termination" provision.[13] As an initial matter, Plaintiff argues that it is entitled to the benefit of the doubt if there are any ambiguities because "under Texas law, ambiguities in insurance contracts are construed in favor of the insured against the drafter." Opposition, at 40. Fiesta is mixing apples and oranges. The T&Cs are not an insurance contract. Thus, this body of case law is completely inapplicable.

In any event, this is moot. **There is no ambiguity**. The T&Cs clearly state that Willis's "obligation to render services under the agreement ceases on the effective date of termination of

---

no such thing, and if this was as clear as Fiesta suggests, then why did Fiesta agree to settle its litigation with ACON for less than the full amount of the second payment? At the end of the day, as Mr. Daar pointed out, this entire litigation could have been prevented had El Super's attorneys simply "just drop[ped] two sentences in there to say how these proceeds were going to be dealt with." Ex. F (Daar Transcript), at 58:24-59:1.

[12] Throughout the Opposition, Fiesta takes deposition testimony wildly out of context. For example, Fiesta claims that Mr. Roberts "admit[ted] that Willis 'told the adjuster to whom the checks should be paid.'" Opposition, at 43. But, in that same answer, Mr. Roberts went on to explain that it is "ultimately[] the carriers [that] make the payment." Ex. E (Roberts Transcript), at 158:10.

[13] Fiesta's breach of contract claims are at odds with one another. On the one hand, Fiesta claims that Willis had a conflict of interest and had to withdraw from the relationship. On the other hand, Fiesta argues that Willis was on the hook to assist with any claim that arose during its representation, regardless of whether or not its services had been terminated. This further demonstrates the speciousness of Fiesta's claim.

the agreement." MSJ. At Ex. 2. Fiesta is trying to create a distinction that does not exist. Fiesta terminated Willis as its broker on February 13, 2019. MSJ, Ex. 48. Thus, as of February 13, 2019, Willis had no obligation to provide any further services to Fiesta. Accordingly, Willis's failure to respond to Fiesta's emails in June and July of 2020 – nearly 1.5 years after Willis was terminated as Fiesta's broker – cannot form the basis for a breach of contract claim.

V. **TEXAS DOES NOT RECOGNIZE A BROKER PROFESSIONAL NEGLIGENCE EXCEPTION TO THE ECONOMIC LOSS DOCTRINE, AND IS INTENDED TO PREVENT WHAT FIESTA IS DOING HERE: PLEADING A BREACH OF CONTRACT CLAIM IN TORT.**

In an effort to try and salvage its negligence claim – which is almost entirely duplicative of its breach of contract claim – Fiesta argues that the economic loss doctrine does not apply because Texas courts recognize an exception for cases involving professional negligence and negligent misrepresentations. The case Fiesta relies upon – *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234 (Tex. 2014) – involved an architect, not an insurance broker, and nowhere in this case did the Texas Supreme Court hold that under Texas law, where professional negligence is alleged against an insurance broker, the economic loss doctrine does not apply. Fiesta cites to no cases for this proposition because none exist.

The economic loss doctrine is intended to prevent exactly what Fiesta seeks to do in this litigation: "using artful pleading to recast contract claims as tort claims." *BlackHawk Paving, Inc. v. CPCM, LLC*, No. 4:20-CV-48-SDJ, 2021 WL 1152836, at *1 (E.D. Tex. Mar. 26, 2021). The Court should not permit Fiesta to recover in tort for a claim that sounds in contract.

VI. **CONCLUSION**

For these reasons, and for the reasons set forth in the MSJ, Willis respectfully requests that the Court grant its motion, enter judgment in its favor, dismiss Fiesta's claims with prejudice, and award any such other relief as the Court deems just.

12

Respectfully submitted,

*/s/ Christopher W. Martin*_____
Christopher W. Martin
SBOT No. 13057620
Federal ID No. xxx
MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.
808 Travis, Suite 1100
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101
E-mail: martin@mdjwlaw.com

and

Edward J. Baines (*admitted pro hac vice*)
ted.baines@saul.com
Saul Ewing Arnstein & Lehr LLP
500 E. Pratt Street, 8th Floor
Baltimore, MD 21202
(410) 303-8831
(410) 332-8862 (fax)

and

Kyra A. Smerkanich (*admitted pro hac vice*)
kyra.smerkanich@saul.com
Saul Ewing Arnstein & Lehr LLP
1919 Pennsylvania Avenue, Suite 550
Washington, DC 20006
(202) 295-6632
(202) 337-6065 (fax)

*Counsel for Defendants Willis Towers Watson Midwest, Inc. and Willis Towers Watson US, LLC*

13

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served upon all counsel of record via electronic mail delivery on November 15, 2022.

/s/ *Christopher W. Martin*
CHRISTOPHER W. MARTIN