# EXHIBIT 9

Page 1

1                          H. Scielzo

2             THE UNITED STATES DISTRICT COURT

3                SOUTHERN DISTRICT OF TEXAS

4                      HOUSTON DIVISION

5

6  _____

7  FIESTA MART, LLC,                           )
            Plaintiff,                         )Civil Action No.
8                                              )
            V.                                 )4:20-CV-03484
9                                              )
   WILLIS OF ILLINOIS, INC.,                   )
10 WILLIS TOWERS WATSON US, LLC,               )
   ALLIED WORLD ASSURANCE COMPANY              )
11 (U.S.) INC., ARCH SPECIALTY                 )
   INSURANCE COMPANY, CERTAIN                  )
12 UNDERWRITERS AT LLOYD'S OF                  )
   LONDON (HISCOX), HFI GLOBAL                 )
13 INSURANCE COMPANY, INDIAN                   )
   HARBOR INSURANCE COMPANY, and               )
14 WESTPORT INSURANCE                          )
   CORPORATION,                                )
15                                             )
            Defendants.                        )
16                                             )
            v.                                 )
17                                             )
   ACON INVESTMENTS, L.L.C.,                   )
18                                             )
            Additional Counterclaim            )
19          Defendant                          )

20 _____

21           DEPOSITION OF HENRY ANDREW SCIELZO

22                      Held remotely

23                      May 11, 2022

24 REPORTED BY:  Barbara Moore, CRR, RMR

25 JOB NO. 210972

Page 38

H. Scielzo

2  A. Yes.
3  Q. And there's that footnote 4 next to
4  it?
5  A. Yes.
6  Q. And then under footnote 4 it says
7  with respect to Fiesta Holdings Investments, LLC,
8  "Name change preclosing to ACON Fiesta Holdings,
9  LLC."
10 A. Yes.
11 Q. Is that an accurate statement?
12 A. It is.
13 Q. So it was changed -- I'm sorry. It
14 was changed from ACON Fiesta Holdings, LLC, to
15 Fiesta Holdings Investments, LLC; correct?
16 A. Correct.
17 Q. And then do you see there's a box,
18 it says, "Entities proposed by ACON to be
19 transferred to BLC."
20 A. Yes.
21 Q. What does Newco stand for?
22 A. New company.
23 Q. And what does BLC stand for, please?
24 A. Bodega.
25 Q. Would that be Bodega Latina

Page 39

H. Scielzo

2  Corporation?
3  A. It would be.
4  Q. And then is this -- can you tell if
5  this is what happened with the proposed transfer?
6        MS. CONSOLINO: Object to the
7     form.
8        THE WITNESS: Were these the
9     entities that were sold to bodega?
10 BY MR. KALINER:
11 Q. Yes.
12 A. I believe so, but I would need to
13 verify that, but I believe so.
14 Q. When you say "those entities," would
15 it be the three boxes below Fiesta Mart
16 Investments, LLC, Fiesta Mart Holdings, LLC and
17 Fiesta Mart, LLC?
18 A. It would be, yes. Fiesta Holding
19 Investments was not sold to Bodega.
20 Q. Thank you for that clarification.
21 So the company in the middle that's circled
22 is not?
23 A. Right.
24 Q. Fiesta Holdings LLC with the
25 footnote 4 was not sold?

Page 40

H. Scielzo

2  A. Correct.
3  Q. When you say "not sold," not sold to
4  Bodega Latina Corporation?
5  A. Correct.
6  Q. And this entity on the bottom,
7  Fiesta Mart, LLC, is that the entity that runs the
8  Fiesta Mart stores?
9        MS. CONSOLINO: Objection, form,
10    time frame.
11       MR. KALINER: At the time of the
12    hurricane.
13       THE WITNESS: Yes, I believe so.
14 BY MR. KALINER:
15 Q. What about after the hurricane?
16 A. Yes, until we sold to Bodega, so
17 yes. After it was sold to Bodega, I don't know.
18 Q. Why do you say you don't know after
19 it was sold?
20 A. I'm not sure what Bodega did.
21 Q. And when you say it was sold, does
22 that relate to a MIPA, a membership interest
23 purchase agreement?
24 A. Yes, sir, it does.
25 Q. What exactly is a MIPA in this

Page 41

H. Scielzo

2  instance, when ACON sold certain entities to
3  Bodega?
4  A. Correct. It sold our interest in
5  those entities to Bodega.
6  Q. Is it correct that ACON had no
7  involvement post-MIPA with regard to the Fiesta
8  Mart stores?
9        MS. CONSOLINO: Object to the
10    form.
11       THE WITNESS: In operating our
12    stores, we had no interest, economic or
13    otherwise.
14 BY MR. KALINER:
15 Q. What about with respect to any
16 repairs to those stores after the sale?
17 A. We were not involved in them.
18 Q. And that would include stores 10, 23
19 and 56 in Houston, the Fiesta Mart stores?
20 A. That is correct. We weren't
21 involved in the repairs.
22 BY MR. KALINER:
23 Q. We're going to go ahead and mark the
24 next exhibit. This is the MIPA, and this is under
25 the Bates stamp numbers WTW867 through -1479. It's

```
                                                   Page 82
 1                  H. Scielzo
 2  in the wrong place.
 3        Q.    On the exhibit it's page 18 of 30.
 4        A.    Got it.
 5        Q.    So this is page 2 of the assignment.
 6        A.    I got it, I see it.
 7        Q.    Can you please tell me where these
 8  numbers came from.
 9        A.    Those were the latest estimates
10  provided by Willis.
11        Q.    And what's your basis for saying
12  that?
13        A.    I believe I was the person who asked
14  Willis for the latest numbers.
15        Q.    And how, if you know, did Willis
16  generate these figures that are in this chart on
17  page 2?
18        A.    You would have to ask Willis that.
19        Q.    Is it correct that with respect to
20  this assignment agreement that the insurers on the
21  part of the property program at the time of
22  Hurricane Harvey were not part of this agreement?
23        A.    I'm sorry, can you repeat your
24  question.
25        Q.    Sure.  With regard to the property
```

```
                                                   Page 83
 1                  H. Scielzo
 2  insurers that covered the period of Hurricane
 3  Harvey, is it correct that they are not parties to
 4  this assignment agreement?
 5        A.    That is correct.
 6              MR. KALINER:  Do you guys want to
 7        take a quick five-minute break?
 8              MS. CONSOLINO:  I was wondering
 9        when you were thinking of taking a lunch
10        break.  We can take a five-minute break
11        now.
12              MR. KALINER:  I'm just asking so I
13        can regroup.
14              MS. CONSOLINO:  Sure.
15              MR. KALINER:  Thank you.
16              (Recess)
17  BY MR. KALINER:
18        Q.    Mr. Scielzo, welcome back from
19  lunch.  We went ahead and marked the next document
20  as Exhibit 13.
21              (Exhibit 13, Objections to
22        Defendants' Interrogatories, was
23        marked for identification.)
24        Q.    These are ACON Investments' LLC
25  objections to Defendants' Interrogatories dated
```

```
                                                   Page 84
 1                  H. Scielzo
 2  December 30, 2001.
 3        Do you see that?
 4        A.    Yes.
 5        Q.    Do you see that on the second to
 6  last page of the document on December 20, 2020, you
 7  provided a verification to the interrogatory
 8  responses?
 9        A.    I did.
10        Q.    And at the time you verified the
11  interrogatory responses that you believed the
12  information to be in there to be true and accurate?
13        A.    I did.
14        Q.    The question on Interrogatory 1,
15  this is on page 2 of Exhibit 13, states separately
16  the costs actually paid and/or incurred by you
17  including by identifying each entity involved in
18  performing the work and/or services and the date
19  such amounts were incurred to repair the alleged
20  Hurricane Harvey damage to each of any or all of
21  Fiesta Mart's store numbers 10, 23 and 56,
22  buildings, structures and/or contents.
23        Do you see where I'm reading from?
24        A.    I do.
25        Q.    And then you provided a response on
```

```
                                                   Page 85
 1                  H. Scielzo
 2  behalf of ACON Investments, LLC?
 3        A.    Yes.
 4        Q.    And after putting forth an
 5  objection, you stated page 2, "ACON states it has
 6  not paid or incurred any costs to repair the
 7  alleged Hurricane Harvey damage to each of any or
 8  all the Fiesta Mart store numbers, 10, 23 and 56
 9  building structures and contents."
10        Did I read that correctly?
11        A.    You did.
12        Q.    In terms of your response, it covers
13  what time period?
14        A.    Going back pre- and post sale.  ACON
15  did not pay for any repairs and wouldn't have.
16        Q.    So would it go back to the time of
17  Hurricane Harvey in 2017?
18        A.    That is correct.
19        Q.    And I understand that this response
20  was on behalf of ACON Investments, LLC, but would
21  your answer be the same thing on behalf of ACON
22  Fiesta Holdings, LLC, the entity that's identified
23  in endorsement A-1?
24              MS. CONSOLINO:  Object to the
25        form.
```

Page 86

H. Scielzo

1  Q. So did ACON Fiesta Holdings spend
2  any money repairing?
3  A. It would not have either. It would
4  have been the operating company, if there was any
5  money spent.
6  Q. Just so the record is clear, ACON
7  Fiesta Holdings, LLC, is now known as Fiesta
8  Holdings Investments, LLC?
9  A. Correct.
10 Q. As of today, is the information
11 provided in the interrogatory answers still true
12 and accurate?
13 A. It is.
14 Q. Let's go ahead and mark the next
15 document. This is going to be Exhibit 14.
16         (Exhibit 14, Document
17          Bates-stamped ACON 11425 through
18          -11460, was marked for
19          identification.)
20 Q. This is under ACON 11425 through
21 ACON 11460. It's a cover email from a Singh Harman
22 dated September 15, 2007, to certain individuals
23 including Mr. Scielzo, and the attachments, the
24 board call September 15 of 2017.

Page 87

H. Scielzo

1  A. I have it.
2         MR. WEISS: Just for the record,
3     this was produced as two separate
4     documents by ACON, but because the
5     information provided in the load files or
6     whatever indicated this was an attachment,
7     we just combined it into a single PDF.
8         THE WITNESS: I understand.
9  BY MR. KALINER:
10 Q. Why is Fiesta providing this
11 information to ACON, this Fiesta board call?
12        MS. CONSOLINO: Objection, form.
13        THE WITNESS: Yes. This was an
14    update from the Fiesta management team to
15    the board on a variety of topics.
16 BY MR. KALINER:
17 Q. In your individual capacity, do you
18 see that your email is in this on the first page?
19 A. Yes.
20 Q. Why were you copied in this? Why
21 was it being addressed to you?
22 A. Even though I wasn't on the board, I
23 participated in observing board meetings.
24 Q. When you say the board meetings, it

Page 88

H. Scielzo

1  was the Fiesta Mart board?
2  A. It would have been, yeah. Fiesta
3  Mart board, correct.
4  Q. On the first page, this is ACON
5  11425, it states in part, "Furthermore, the store
6  56 remodel, which was part of the year 1 remodel
7  plan without recovering the insurance costs plan
8  related to Hurricane Harvey."
9  Do you see where I'm reading from?
10 A. I do.
11 Q. Can you expand on that at all?
12 A. The management team had a program to
13 remodel certain stores. This is prior to Hurricane
14 Harvey. And in here they're indicating store 56
15 was one of those stores, but obviously it would no
16 longer be in the remodel program since it was
17 damaged and instead would have to be handled
18 through the insurance recovery.
19 Q. Was that referred to as the Capex
20 for remodeling the stores?
21 A. Yes.
22 Q. What does Capex stand for?
23 A. Capital expenditures.
24 Q. Let's turn to ACON 11431, I'm

Page 89

H. Scielzo

1  actually on the Fiesta Mart LLC board call dated
2  September 15, 2017. And this is slide 4.
3         MR. WEISS: Page 7 of 36.
4         THE WITNESS: Okay.
5  BY MR. KALINER:
6  Q. It states in part, "23 out of 34
7  stores were open in Houston the day after the
8  hurricane. Thirty-one stores out of 34 were open
9  within 48 hours."
10 Do you see where I'm reading from?
11 A. I do.
12 Q. Do you know where that information
13 came from?
14 A. This was a presentation from the
15 Fiesta management team, so it came from them.
16 Q. Is everything -- was all information
17 on this page from the Fiesta management team?
18 A. It was, yes.
19 Q. Do you have any reason to believe
20 that the information on this page from the Fiesta
21 management team is not accurate?
22 A. I do not.
23 Q. Can you expand at all with regard to
24 store 10 relocation options?

Page 126

H. Scielzo

1
2    Q.    Did you agree that Mr. Peterson and the
3  Fiesta team were diligent in their work?
4    A.    I know they were working on the
5  claim, yes.
6    Q.    Did you think that they were being
7  less than diligent as they worked on the insurance
8  claim?
9    A.    I did not, no.
10   Q.    You can put that exhibit aside.
11  Sir, I want to turn back to the first proof
12 of loss and the first payments issued in the wake
13 of Hurricane Harvey under the insurance policies.
14 You testified earlier today that in response to the
15 first proof of loss you directed payment to Fiesta.
16 Do you remember that testimony?
17   A.    I do, yes.
18   Q.    Do you recall which Fiesta entity
19 you directed payments to?
20   A.    I do not. I don't remember. What I
21 did is I verbally told Jeff Roberts from Willis
22 that the payments could be directed to Fiesta and
23 let Wayne -- and to Wayne Peterson. Figure out
24 where it goes.
25   Q.    And were you directing the payments

Page 127

H. Scielzo

1
2  to the operating company?
3           MS. CONSOLINO:  Objection to form.
4           THE WITNESS:  Yes.  I believe --
5      and I directed it to that Wayne could
6      direct the funds to where he wanted.  And
7      I assume as operating company they would
8      give specific directions on exactly which
9      entity to give it to.
10 BY MS. LeROY:
11   Q.    Sitting here today, are you aware of
12 which specific Fiesta company the checks were made
13 out to by carriers in payment on those, on the
14 first proof of loss?
15   A.    I do not.
16           MS. LeROY:  I'm going to try to
17      upload an exhibit.  So if everyone can
18      bear with me while I try to do this
19      mechanically I will, hopefully, be able to
20      do this quickly.
21           MR. WEISS:  If it becomes an
22      issue, just email it to me.
23           MS. LeROY:  I'm going to rename
24      it.  We're on Exhibit 18 now, aren't we?
25           MR. WEISS:  No, we've gone through

Page 128

H. Scielzo

1
2    21.  So you can do 22.
3           MS. LeROY:  You said Exhibit 22?
4           MR. WEISS:  Yes.
5           MS. CONSOLINO:  Thank you.
6           MS. LeROY:  I just uploaded it so
7      you all should see it in a minute.  When
8      it comes it's an email Bates stamped
9      Fiesta Mart 3095 through -97.  Let me know
10     when you all --
11          (Exhibit 22, Document
12          Bates-stamped Fiesta Mart 3095
13          through -97, was marked for
14          identification.)
15 BY MS. LeROY:
16   Q.    Feel free to read the whole string,
17 but I'm going to direct your attention to the last
18 string that shows up at the top of page 1 of
19 Exhibit 22.  Is this email as shown on Exhibit 22
20 an email that you received on or around
21 September 27, 2018?
22   A.    It is.
23   Q.    And is this something that you
24 received in the course of your ordinary work for
25 ACON?

Page 129

H. Scielzo

1
2    A.    It is.
3    Q.    Does this appear to be an exact copy
4  of the email string?
5    A.    It is.
6    Q.    So at the top of the first page,
7  Mr. Roberts is writing to you and copying two
8  gentlemen from Willis.  And he says, "Drew, because
9  Fiesta Mart is an insured under the policy and
10 received the prior proceeds on this claim, WTW is
11 obligated to provide pertinent information to
12 Fiesta Mart/El Super."
13 Do you see that?
14   A.    I do.
15   Q.    Do you disagree that Fiesta was an
16 insured under the policy?
17   A.    Yes.
18           MS. CONSOLINO:  Objection.
19   Q.    Do you think Willis was wrong about
20 that?
21   A.    I do, yes.
22   Q.    Do you disagree that Fiesta Mart
23 received the prior proceeds on the claim?
24   A.    I'm not sure who received that.  I
25 don't know where exactly they went.