United States District Court
Southern District of Texas
**ENTERED**
April 01, 2024
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **FIESTA MART, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:20-CV-03484** |
| | § | |
| **WILLIS OF ILLINOIS, INC., WILLIS** | § | |
| **TOWERS WATSON US, LLC, ALLIED** | § | |
| **WORLD ASSURANCE COMPANY** | § | |
| **(U.S.) INC., ARCH SPECIALTY** | § | |
| **INSURANCE COMPANY, ASPEN** | § | |
| **SPECIALTY INSURANCE COMPANY,** | § | |
| **CERTAIN UNDERWRITERS AT** | § | |
| **LLOYD'S OF LONDON (HISCOX), HDI** | § | |
| **GLOBAL INSURANCE COMPANY,** | § | |
| **INDIAN HARBOR INSURANCE** | § | |
| **COMPANY, and WESTPORT** | § | |
| **INSURANCE CORPORATION** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

This is an insurance dispute.  Plaintiff Fiesta Mart, LLC ("Fiesta") is a supermarket

chain with a series of stores across Houston.  In 2015, Fiesta was purchased by a private

equity firm—ACON Investments, LLC ("ACON").  And with the new ownership, Fiesta

switched insurance carriers, opting to join into a property insurance policy that many of

ACON's other portfolio companies also used.  This policy was brokered by Defendant

Willis of Illinois, Inc. ("Willis") and included coverage from a variety of insurance carriers

("the Insurers").  The policy listed ACON as the named insured.

In 2017, three of Fiesta's Houston stores sustained extensive flood damage during

Hurricane Harvey.  Willis, ACON, and Fiesta worked together with the Insurers to

recover Fiesta's losses.  The Insurers quickly came up with an initial $7.5 million payment, and ACON directed them to send the payment to Fiesta.  Then, while the Insurers were gathering a second and final payment of $4.78 million, ACON sold Fiesta.  Because of the sale, when the second payment was ready, the Insurers were faced with a question—who to pay?  The Insurers elected to pay the named insured, ACON, and Fiesta responded with this suit against Willis and each Insurer.

Pending before the Court is the Insurers' Motion for Summary Judgment Against Fiesta Mart, LLC.  (Dkt. No. 87).  After reviewing the Motion, the Response, the Reply, the record, and the applicable law, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

## I.    BACKGROUND[1]

Fiesta is a supermarket chain based in Houston, Texas.  (Dkt. No. 75 at 10).  In 2015, Fiesta was purchased by a private equity firm—ACON.  (Dkt. No. 46 at 5).  Shortly after the acquisition, Fiesta met with Willis, an insurance broker, to discuss using Willis's services to place a property insurance plan for its stores.  (Dkt. No. 93 at 7).

The portfolio policy that Fiesta Mart elected to join ("the Policy") consisted of several layers of coverage provided by various insurers.[2]  (Dkt. No. 73 at 8–9).  As part of

---

[1]    Except where noted, this section contains only undisputed facts which have been construed in the favor of the nonmovant, Fiesta.  *See Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007).

[2]    The primary layer was made up of seven policies issued by Allied World Assurance Company, Arch Specialty Insurance Company, Aspen Specialty Insurance Company, Certain Underwriters at Lloyd's of London entity Hiscox, HDI Global Insurance Company, Indian Harbor Insurance Company, and Westport Insurance Company, each of which insured a percentage of the Policy.  (Dkt. No. 73 at 9).

the discussions, Willis examined the property insurance Fiesta was paying for at the time, and represented to Fiesta that the new Policy would offer better protection for lower premiums.  (Dkt. No. 93 at 7).  Fiesta eventually agreed and purchased the Policy.  (*Id.*).

### A.   THE POLICY

While the Policy's primary layer of coverage was made of seven different policies, each individual policy contained an identical "Master Property Policy" ("the Policy agreement").  (Dkt. No. 73 at 9).  The first clause of the Policy agreement states the named insured:

**MASTER PROPERTY POLICY**

1.   NAMED INSURED - This policy does insure ACON Investments, LLC <u>and as per the attached endorsement schedule,</u> any subsidiary, associated, allied or affiliated company, corporation, firm, organization, partnership, Joint Venture, Limited Liability Company or individual, whether wholly or partially owned or controlled by the Insured, where the Insured maintains an interest, or where the Insured is required to provide insurance, as now exist or are hereafter constituted or acquired, and any other party in interest that is required by contract or other agreement to be named, all hereafter referred to as the "Insured".

(Dkt. No. 73-2 at 61).  And in the endorsement pertaining to Fiesta, the Policy agreement elaborates:

**Endorsement A1**

**With respects to the entity of, Fiesta Mart, the following terms and conditions shall apply:**

**A.   Named Insured –** ACON Fiesta Holdings, LLC

(*Id.* at 94).  When Fiesta joined the Policy, ACON Fiesta Holdings, LLC was owned by ACON.  (Dkt. No. 73-3 at 19).  Earlier in the Policy agreement, a provision titled "LOSS PAYABLE" explains that "[l]oss, if any, shall be adjusted with and payable to the Insured, or as directed by them."  (Dkt. No. 73-2 at 63).

Clause 10 of the Policy agreement governs how property damage loss is calculated.  (*Id.* at 65–66).  The clause states that if the damaged property "is not repaired, rebuilt or replaced with similar property on the same or another site, the [Insurers] shall not be liable for more than the actual cash value of the property damaged or destroyed." (*Id.* at 65).  This language creates two buckets for losses under the Policy—actual cash value ("ACV") and replacement cost value ("RCV").  ACV refers to the depreciated value of the property at the time of damage, and RCV refers to the full cost of replacing or repairing the property to its original state.  (Dkt. No. 87 at 10 n.4).  The term "depreciation holdback" refers to the difference between RCV and ACV.  (*Id.*).

### B.  Hurricane Harvey and the First Payment

On August 25, 2017, Hurricane Harvey made landfall on the Texas coast.  During the storm, three Fiesta stores ("the stores") sustained extensive flood damage.  (Dkt. No. 73 at 10).  Willis promptly submitted a claim that included the damage to the stores.  (*Id.*). Fiesta and Willis worked together to submit partial proofs of Fiesta's losses to the Insurers for recovery of an initial $7.5 million.  (Dkt. No. 75 at 11).  This amount is referred to as the first payment.  (*Id.*).  Throughout the process of collecting the first payment, Willis repeatedly directed the Insurers to address payments to Fiesta, not ACON.  (*Id.*).  The Insurers complied.  (*Id.*).  One insurer submitted a $1 million check to Fiesta before the

proofs were fully submitted, and other insurers later sent Fiesta the remaining $6.5 million.  (*Id.*).  The first payment was then complete.

### C.   ACON SELLS FIESTA

Before Hurricane Harvey hit, Bodega Latina Corporation ("Bodega") expressed interest in purchasing Fiesta to ACON.  (Dkt. No. 73 at 10).  And in the Fall of 2017, Bodega and ACON began a due diligence period, in which Bodega became familiar with Fiesta's insurance policies and existing claims.  (*Id.* at 10–11).  Bodega's CFO, Jack Hook, testified as much.  In his deposition, Hook explained that "it was clear that we knew that, you know, Fiesta had suffered a major loss" and Bodega was aware that "there were, you know, insurance claims that were to be had."  (Dkt. No. 73-3 at 49).

Ultimately, Bodega purchased Fiesta in April 2018.  (Dkt. No. 75 at 13).  While Bodega acquired Fiesta Mart, LLC and other Fiesta subsidiaries, Bodega did not acquire ACON Fiesta Holdings, LLC.  (Dkt. No. 73 at 12).  The sale was memorialized in a Membership Interest Purchase Agreement ("MIPA").  (Dkt. No. 93 at 8).

### D.   THE SECOND PAYMENT

Shortly after Bodega acquired Fiesta, the insurance claims began to progress. Specifically, the Insurers notified Willis that they were ready to make a second payment for the property damage sustained by the stores.  (Dkt. No. 73 at 12).  The second payment consisted of $4,780,347.  (*Id.*).  This time, knowing that ACON no longer owned Fiesta, the Insurers reached out to Willis for instructions as to whom should receive the second payment.  (*Id.*).  Willis informed ACON that the Insurers were ready to release a second payment and explained that if ACON wanted this payment—or any future payments—

5

to be sent to Bodega, the Insurers would require written confirmation from ACON.  (*Id.*).
ACON never sent that confirmation.  (*Id.* at 13).  ACON instead sent the Insurers executed
proofs of loss and requested that the second payment be wired to Fiesta Holdings
Investment, L.L.C., an ACON-owned entity.  (*Id.* at 13).

Once Fiesta realized that ACON had submitted executed proofs and was pursuing
the second payment, it sent a letter to Willis and the Insurers claiming entitlement to the
second payment.  (Dkt. No. 75-21 at 2–4).  In response, Willis explained to Fiesta that it
had "no control over how any insurance funds are distributed — that is a matter decided
solely by the insurers involved."  (Dkt. No. 75-22 at 2).

Now forecasting the growing tension, the Insurers sought additional confirmation
that payment would be going to the right place.  (Dkt. No. 73-3 at 71).  The Insurers
responded to ACON's proofs:

> Just need a bit of clarification. The Named Insured in the
> policy is ACON Fiesta Holdings, LLC. The proofs of loss
> appear to have been executed by ACON Investments, LLC
> representative not Fiesta. I understand Fiesta was sold to
> [Bodega] several months ago. I am not aware of what the
> arrangement was between ACON and Fiesta (and/or their
> new owner [Bodega] in connection with the proceeds and
> resolution of this claim. Kindly provide some insight into this
> and whether anyone else has an interest that should be
> addressed with any future payments. Also, for those carriers
> that will be issuing a check payment vs wire transfer, please
> advise who should be named on the check and where to send
> the check. Thanks.

(*Id.*).  ACON quickly clarified: "the proceeds will still be coming to ACON."  (*Id.*).  And
shortly after this exchange, the Insurers sent the entire second payment to ACON.  (Dkt.
No. 75 at 14).  It is undisputed that after the first and second payment, the Insurers had

fulfilled their obligations to pay the ACV of Fiesta's losses.  (Dkt. No. 87-9 at 4–5).  Because the ACV had been paid in full, Fiesta sought to recover the depreciation holdback—the difference between RCV and ACV.

After learning that the second payment was sent to ACON, Fiesta issued another round of letters to the Insurers.  (Dkt. No. 75-24 at 2–3).  Fiesta informed the Insurers that it had begun repairs on one store and detailed its plans to rebuild the other two stores.  (*Id.*).  More importantly, Fiesta used the letter to ask the Insurers which entity they would be sending future payments to—Fiesta or ACON.  (*Id.*).  The Insurers made clear that ACON would continue receiving any future payments and clarified that under their interpretation of the Policy agreement, Fiesta was essentially never insured at all.  (Dkt. No. 75-25 at 2–3).  The Insurers noted that because both the named insured and endorsed subsidiary listed in the Policy agreement are ACON-owned entities, Fiesta would only ever receive a payment if ACON were to assign its rights.  (*Id.* at 3).

### E.    FIESTA SUES ACON AND TERMINATES WILLIS

In November 2018, Fiesta sued ACON for breach of the MIPA.  (Dkt. No. 75 at 15).  That case settled just over a year later.  (*Id.*).  As part of the parties' settlement agreement, Fiesta received a majority of the ACV that the Insurers sent ACON in the second payment.  (*Id.*).  ACON also agreed to assign "any rights ACON had to the amounts the Insurers had held back in [the first and second payments] for depreciation (the "Depreciation Holdback Amounts")"—then estimated to be $6.6 million.  (Dkt. No. 93 at 9).  Neither Willis nor the Insurers were parties to that suit or the ensuing settlement.  (*Id.*).

In February 2019, Fiesta formally terminated Willis as its insurance broker. (Dkt.

No. 73 at 15). Willis's terms and conditions govern the obligations Willis owes to clients

upon termination. (*Id.*). In the event of a termination, the terms and conditions state that:

> [Willis's] obligation to render services under the agreement
> ceases on the effective date of termination of the agreement
> . . . Claims and premium or other adjustments may arise after
> our relationship ends. Such items are normally handled by
> the insurance broker serving you at the time the claim or
> adjustment arises. However, it may be mutually agreed that
> we will provide services in these areas after the termination
> of our relationship for mutually agreed upon compensation.

(*Id.*). Willis and Fiesta made no agreement to continue working together. (*Id.*). However,

sixteen months after Willis was terminated as broker, Fiesta reached back out to Willis

requesting a call to discuss new restoration and repair efforts as well as pursuing

depreciation holdback amounts. (*Id.* at 16). Willis never responded. (*Id.*). The Insurers

eventually denied Fiesta's claim for the depreciation holdback amounts, stating that

Fiesta was not insured under the Policy and the time to make repairs with due diligence

and dispatch had passed. (Dkt. No. 75 at 15).

### F.  PROCEDURAL HISTORY

In September 2020, Fiesta filed suit against Willis and the Insurers in Harris

County District Court. (Dkt. No. 1-1 at 10). The case was removed to this Court. *(See*

Dkt. No. 1*)*. Fiesta brings four different claims against Willis and one breach of contract

claim against the Insurers.  (*See* Dkt. No. 46 at 19–21).  The Insurers filed the instant Motion, which is now ripe for review.[3]

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the outcome of the suit under governing law.  *E.g.*, *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018).  And, a "fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2253, 91 L.Ed.2d 265 (1986).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504,

---

[3]   Willis also filed a motion for summary judgment asking for judgment as a matter of law on each of the four claims against it.  (*See* Dkt. No. 73).  However, each of Fiesta's claims, in one way or another, alleges wrongdoing by Willis as Fiesta's insurance broker.  (*Id.*).  Therefore, understanding the end-results of Willis's actions—i.e., whether Fiesta was insured at all—is crucial to the analysis of each of Fiesta's claims against Willis.  The Court addresses the Insurers' Motion first, as resolution of this Motion will clarify Fiesta's claims against Willis.

507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

If the movant meets this burden, the nonmovant must then come forward with specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). If evidence is merely colorable, or not significantly probative summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019). The nonmovant's burden "will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075). But the district court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

## III.   DISCUSSION

Fiesta brings one claim against the Insurers—breach of contract. (Dkt. No. 46 at 20–21). To prevail on this claim, Fiesta must show that it was either an insured party under the Policy agreement or has some other contractual claim to proceeds afforded under the Policy. *See generally Kent v. Citizens State Bank*, 99 S.W.3d 870, 871 (Tex. App.— Beaumont 2003, pet. denied) (explaining that a breach of contract claim requires the

existence of a contract).  The Insurers insist that Fiesta's claim fails as a matter of law for two reasons.  First, the Insurers argue that Fiesta is not a named insured under the Policy agreement and therefore was not entitled to any insurance proceeds.  (Dkt. No. 87 at 17–24).  Second, the Insurers argue that ACON's assignment of its rights under the Policy to pursue depreciation holdback was invalid and should be rejected, leaving Fiesta with no rights to any proceeds under the Policy.  (*Id.* at 24–26).

## A.   WHETHER FIESTA WAS INSURED UNDER THE POLICY AGREEMENT

Fiesta, Willis, and the Insurers all disagree as to Fiesta's status under the Policy. Fiesta asserts that (1) it was an insured party and therefore entitled to insurance proceeds when its stores sustained damage, or (2) became insured when Willis issued it a certificate of insurance.  (Dkt. No. 93 at 11–20).  Willis argues that Fiesta was insured under the Policy agreement but would only be entitled to proceeds if ACON instructed the Insurers as much.  (Dkt. No. 73 at 18–19).  And the Insurer's stance is simple: Fiesta was never insured at all.  (Dkt. No. 87 at 17).  The Court must first interpret the Policy agreement to determine whether Fiesta was insured under the Policy.  For the following reasons, it was not.

### 1.   Under the Policy agreement

Under Texas law, "[i]nsurance policy interpretation principles emphasize a policy's plain language in determining its intended coverage." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 131 (Tex. 2010).  If the terms of an insurance policy are unambiguous, courts "must enforce the policy according to its plain meaning." *Travelers Lloyds Ins. Co. v. Pac. Emps. Ins. Co.*, 602 F.3d 677, 681 (5th Cir. 2010)

(applying Texas law) (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984)).

"A contract is not ambiguous simply because the parties to a lawsuit offer conflicting

interpretations of the contract's provisions." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508

S.W.3d 254, 258 (Tex. 2017).  Here, the plain language of the Policy agreement requires a

finding that two entities were insured, neither of which were Fiesta.

As a reminder, the "NAMED INSURED" section of the Policy agreement read:

### MASTER PROPERTY POLICY

1.   NAMED INSURED - This policy does insure ACON Investments, LLC <u>and as
     per the attached endorsement schedule,</u> any subsidiary, associated, allied or
     affiliated company, corporation, firm, organization, partnership, Joint Venture,
     Limited Liability Company or individual, whether wholly or partially owned or
     controlled by the Insured, where the Insured maintains an interest, or where the
     Insured is required to provide insurance, as now exist or are hereafter
     constituted or acquired, and any other party in interest that is required by
     contract or other agreement to be named, all hereafter referred to as the
     "Insured".

(Dkt. No. 73-2 at 61).  There is no dispute that the Policy agreements refers to ACON

Investments, LLC as the "Insured."  (*Id.*).  However, this clause makes clear that per the

Policy agreement's attached endorsement schedule, various other entities *may* be insured

as well.  The Parties disagree about the meaning of this language.  Fiesta argues that as

an ACON "subsidiary," this clause designates Fiesta as an insured party.  (Dkt. No. 93 at

12–13).  This interpretation would consider every single ACON "subsidiary, associated,

allied or affiliated company" (Dkt. No. 73-2 at 61), and much more as insured under the

Policy, and would read the endorsement schedule as simply modifying the coverage of a

few, specifically named subsidiaries.  The Insurers propose a much more limited

interpretation.   (Dkt. No. 87 at 17).   Under the Insurers' interpretation, this clause considers subsidiaries insured *only* if they are specifically designated as an insured party in the endorsement schedule.   (*Id.*).   Upon review, the Policy agreement unambiguously omits Fiesta as an insured party.

Fiesta's status under the Policy is best determined by reading the endorsement schedule as a whole.  *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998) ("[Courts] must read all parts of the [policy] together, [] striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative." (internal citation omitted)).  The Court starts with Endorsement D1:

**Endorsement D1**

**With respects to the entity of, IWP Holdings, LLC, the following terms and conditions shall apply:**

**A.      Named Insured – IWP Holdings, LLC**

**B.      All Other Perils Deductible**

DEDUCTIBLE CLAUSE - All losses, damages, or expenses arising out of any one occurrence shall be adjusted as one loss and from the amount of such adjusted loss shall be deducted **$25,000**.

**C.      Allocated Premium –** $3,073

**D.      Special Terms & Conditions**

(Dkt. No. 73-2 at 97).  Endorsement D1 names a subsidiary, IWP Holdings, LLC, and then goes on to describe several aspects of the Policy that are unique to that entity.   The endorsement designates the named insured, the deductible, the allocated premium, and

also lays out any special terms or conditions. (*Id.*). Each endorsement works the same

way. Consider E1:

**Endorsement E1**

**With respects to the entity of Refac Holdings, Inc, the following terms and conditions shall apply:**

A.    **Named Insured – Refac Holdings, Inc,**

B.    **All Other Perils Deductible**

DEDUCTIBLE CLAUSE - All losses, damages, or expenses arising out of any one occurrence shall be adjusted as one loss and from the amount of such adjusted loss shall be deducted **$25,000**.

C.    **Allocated Premium –** $24,847

D.    **Special Terms & Conditions**

It is understood and agreed that with respect to the interests of Refac only, the Miscellaneous Unnamed Location limit shall be $250,000 per location as respects retail locations except $375,000 per location as respects nationwide locations.

(*Id.* at 98). Again, the Policy specifies an entity—this time, Refac Holdings, Inc.—and then

describes the characteristics of its coverage. Fiesta's endorsement, however, differs from

the others in one important way:

**Endorsement A1**

**With respects to the entity of, Fiesta Mart, the following terms and conditions shall apply:**

A.    **Named Insured –** ACON Fiesta Holdings, LLC

(*Id.* at 94). After identifying Fiesta, Endorsement A1 specifically states that the named

insured is not Fiesta, but rather ACON Fiesta Holdings, LLC. (*Id.*). And when Fiesta

14

joined the Policy, ACON Fiesta Holdings, LLC was owned by ACON.  (Dkt. No. 73-3 at 19).  Of the eight endorsements included in the Policy agreement, Fiesta's is the only endorsement that designates a different named insured than the entity listed in the first sentence of the endorsement.  (Dkt. No. 73-2 at 94–101).  This distinction means that the Parties understood how to designate subsidiaries as insured parties under the Policy, and for whatever reason, chose not to do so for Fiesta.  Therefore, the Court finds that the plain language of the Policy agreement unambiguously excludes Fiesta as an insured party.

### 2.    Certificates of Insurance

Alternatively, Fiesta argues that even if it was not an insured party under the Policy agreement, it became an insured party via "certificates of insurance" administered by Willis.  (Dkt. No. 93 at 16).  Fiesta builds its argument around a clause in the Policy agreement titled "CERTIFICATES OF INSURANCE."  It reads:

> 57.    CERTIFICATES OF INSURANCE - It is understood and agreed that Willis of Illinois, Inc. is authorized to issue certificates of insurance naming additional insureds and/or loss payees and/or mortgagees and others for their respective rights and interests subject always to the terms, conditions, and limits of liability of this policy. The Company agrees to waive the issuance of formal Company endorsements in respect of such interests.

(Dkt. No. 73-2 at 85).  Fiesta contends that Willis issued three different "certificates of insurance" which converted Fiesta into an insured party under the Policy.  (Dkt. No. 73-2 at 97).  However, each of the documents submitted by Fiesta ("Exhibits 23–25") contain two flaws fatal to Fiesta's argument.  (*See* Dkt. Nos. 93-23–93-25).

First, Exhibits 23–25 are not "certificates of insurance" as required by the Policy agreement.  Rather, as boldly titled in all caps at the top of each document, Exhibits 23–25 are "EVIDENCE OF PROPERTY INSURANCE."  (Dkt. No. 93-23 at 2).[4]  While Fiesta argues that, on their own, the terms "evidence" and "certificate" are quite similar, (Dkt. No. 93 at 16–18), the boldface language immediately below the document titles demonstrates the functional difference in terms:

> **THIS EVIDENCE OF PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.**

(Dkt. No. 93-23 at 2).  This language makes clear that Exhibits 23–25 do not create any rights independent of the Policy agreement or alter any coverage afforded under the Policy.  And because Fiesta is specifically excluded as an insured party under the Policy agreement, Exhibits 23–25 do nothing to change Fiesta's status.

Several courts confronted with the same or similar language have found the same. *See, e.g., Lexington Ins. Co. v. Autobuses Lucano Inc.*, 256 F. App'x. 682, 684 (5th Cir. 2007) (per curiam); *AIG Specialty Ins. Co. v. Ace Am. Ins. Co.*, No. 2:18-CV-00016, 2019 WL

---

[4]     The three exhibits can be found at (Dkt. No. 93-23), (Dkt. No. 93-24), and (Dkt. No. 93-25).  Because the relevant portions of each document are the same, the Court only cites (Dkt. No. 93-23) going forward.

1243911, at *5 (S.D. Tex. Mar. 18, 2019).  In *Autobuses*, the Fifth Circuit reviewed a district court's decision on summary judgment that a "certificate of insurance" failed to extend coverage to an additional party not protected under a policy agreement.  256 F. App'x. at 684.  The Fifth Circuit affirmed, finding that the language included in the certificate "did not 'amend, extend or alter the coverage afforded by the policies'" because it "specifically provided that it 'confer[red] no rights[.]'"  *Id.*  In light of this language, the Circuit reasoned, "Texas law provides that the certificate of insurance does not supersede the plain language of the insurance policy."  *Id.*  Further, in *AIG Specialty*, the district court examined a certificate of insurance which included the exact same limiting language found in Exhibits 23–25 and "reject[ed] any argument that the Certificate evidence[d] the scope of the disputed insurance coverage afforded by the policy at issue[.]"  *AIG Specialty Ins. Co.*, 2019 WL 1243911 at *5.  In essence, courts that have been asked to interpret the same limiting language found in Exhibits 23–25 have concluded that the language means exactly what it says—i.e., that the documents do not amend, extend, or alter coverage afforded by the policy at issue.

Here, the Policy agreement's plain language excluded Fiesta as a named insured. And because of the limiting language included in Exhibits 23–25, these documents did nothing to change Fiesta's status as uninsured under the Policy.

Second, even assuming that Exhibits 23–25 could create additional insureds under the Policy, they were issued by the wrong entity.  Clause 57 of the Policy agreement, the "certificates of insurance" clause, clearly vests *one* entity with the authority to issue certificates of insurance—Willis of Illinois, Inc.  (Dkt. No. 73-2 at 85).  However, Willis of

Illinois, Inc., is not the listed entity on Exhibits 23–25.  Rather, in a box titled "AGENCY," Exhibits 23–25 read:

> Willis of New York, Inc.
> c/o 26 Century Blvd
> P.O. Box 305191
> Nashville, TN 372305191 USA

(Dkt. No. 93-23 at 2).  A court should construe an unambiguous contract according to the plain meaning of its express wording.  *See ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018).  Here, Clause 57 is unambiguous.  The Policy agreement plainly states that only Willis of Illinois, Inc., has the authorization to extend certificates of insurance. The Policy agreement says nothing about Willis of New York, Inc., the entity that issued Exhibits 23–25.

In sum, Fiesta's Evidence of Property Insurance documents are not the "certificates of insurance" referred to in Clause 57 because they each explicitly state that they do not create or impose any additional rights or coverage outside of the Policy.  And even if they did, they would still have no effect because they were issued by the wrong entity under the agreement.

### B.   WHETHER ACON VALIDLY ASSIGNED ITS RIGHTS TO DEPRECIATION HOLDBACK

The Insurers also argue that summary judgment is proper because Fiesta was not validly assigned any rights under the Policy.  (Dkt. No. 87 at 24).  In Fiesta's Response, it argues that it acquired ACON's rights under the Policy through the MIPA, or alternatively, through the parties' 2020 Settlement Agreement.  (Dkt. No. 93 at 20).

1.    **Under the MIPA**

First, Fiesta argues that it acquired ACON's remaining rights to the insurance proceeds when Fiesta and ACON signed the MIPA.  (*Id.*).  In essence, the relevant MIPA clause states that if Bodega receives any insurance proceeds pursuant to business interruption claims, it must send that money back to ACON.  (Dkt. No. 93-10 at 5).  Fiesta relies on the *expression unius* maxim to say that because this clause requires Bodega to send back business interruption proceeds, all other proceeds and insurance rights must have impliedly been acquired by Bodega as part of the sale.  (Dkt. No. 93 at 20).  However, this argument was raised by Fiesta for the first time in response to the Insurers' Motion for Summary Judgment.  (*Id.*).  As pointed out by the Insurers, (Dkt. No. 94 at 16), it is impermissible for Fiesta to now rely on it to avoid summary judgment.

"A properly pleaded complaint must give 'fair notice of what the claim is and the grounds upon which it rests.'"  *De Franceschi v. BAC Home Loans Servicing*, 477 F. App'x 200, 204 (5th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 698–99, 129 S.Ct. 1937, 1961, 173 L.Ed.2d 868 (2009)).  Therefore, in the Fifth Circuit, plaintiffs are precluded "from advancing a new claim or reframing a previously presented one in response to a motion for summary judgment."  *Pittman v. U.S. Bank NA*, 840 F. App'x. 788, 789–90 (5th Cir. 2021) (per curiam).  And "district courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment."  *De Franceschi*, 477 F. App'x at 204.

In its Second Amended Complaint, (Dkt. No. 46), Fiesta asserts three different ways that it could have obtained interests under the Policy.  First, Fiesta asserts that it

was an insured party under the Policy agreement from the onset. (*Id.* at 7). Second, Fiesta claims it *became* an insured party after receiving certificates of insurance. (*Id.* at 9). And third, Fiesta asserts that ACON assigned away its interests under the Policy as a part of Fiesta and ACON's 2020 Settlement Agreement. (*Id.* at 18). Noticeably absent from Fiesta's Complaint is any allegation or indication that Fiesta inherited ACON's insurance interests through the MIPA. In fact, while the sale between ACON and Bodega is acknowledged in one allegation, (*id.* at 11), Fiesta's Complaint does not even reference the purchase agreement—the MIPA—which it now claims gave rights under the Policy to Fiesta. Fiesta's argument is therefore not properly before the Court.

### 2.     Under the Settlement Agreement

Finally, on to Fiesta's last argument—the Settlement Agreement. Fiesta's position is that ACON assigned its Policy rights to depreciation holdback to Fiesta under the parties' February 2020 Settlement Agreement. (Dkt. No. 93 at 22). The Insurers move for summary judgment on this theory by arguing that any attempt to assign these rights to Fiesta should be deemed invalid for two reasons. (Dkt. No. 87 at 24). First, the Insurers argue that at the time of the Settlement Agreement, no rights to pursue depreciation holdback under the Policy existed to assign. (*Id.*). Second, the Insurers point to anti-assignment provisions contained in two of the Insurers' policies. (*Id.* at 25).

### a.     Whether ACON had rights to depreciation holdback at the time of the settlement agreement

In Fiesta and ACON's Settlement Agreement, ACON attempted to assign any rights it held to the depreciation holdback amounts available under the Policy. (Dkt. No.

93 at 9).   The Insurers move for summary judgment on the grounds that ACON's assignment was legally invalid.  (Dkt. No. 87 at 24).  On this issue, the Court agrees with Fiesta.

The disagreement on this point concerns the "Property Valuation" clause in the Policy agreement—Clause 10.  (Dkt. No. 87-2 at 22).  Clause 10 details the depreciation holdback aspect of the Policy, and first explains it in subsection (h):

> If the property is not repaired, rebuilt or replaced with similar property on the same or another site, the Company shall not be liable for more than the actual cash value of the property damaged or destroyed.

(*Id*.).  The clause goes on to state in (h)(i) that the "repairs, replacement or reinstatement must be executed with due diligence and dispatch."  (*Id*.).  And finally, clarifying the replacement cost value the Insurers may be liable to pay out, the clause in (h)(ii) elaborates that:

> This Company's liability for loss or damage on a replacement cost basis shall not exceed the lesser of the replacement cost new of the property or any part thereof identical with such property intended for the same occupancy and use, including normal and customary profit and overhead even if the work is performed by the Insured; or the amount actually and necessarily expended in repairing or replacing said property or any part thereof including normal and customary profit and overhead even if the work is performed by the Insured.

(*Id.* at 22–23).

According to the Insurers, ACON's assignment was invalid because under Clause 10, ACON's rights to pursue depreciation holdback evaporated after it sold Fiesta.  (Dkt. No. 87 at 24–25).  Specifically, the Insurers argue that once ACON no longer had an

interest in Fiesta stores, ACON could no longer incur replacement costs[5] which, according to Clause 10, is a prerequisite for receiving any depreciation holdback amounts.  (*Id.*).  And because ACON no longer had this right, ACON could not simply assign the right to Fiesta as part of the Settlement Agreement, so the argument goes.  (*Id.*). But it fails.

The Insurers point to no caselaw for the proposition that ACON lost its rights to pursue depreciation holdback after selling Fiesta.  Instead, the Insurers rely on subsection (h)(ii) of Clause 10, where the agreement states that "[the Insurers'] liability for loss or damage on a replacement cost basis shall not exceed the lesser of the replacement cost new of the property . . . ; or the amount *actually and necessarily* expended in repairing or replacing said property[.]"  (Dkt. No. 87-2 at 23) (emphasis added).  The Insurers argue that once ACON sold Fiesta, it had no interests in any of the damaged stores, and therefore could not "necessarily expend[]" any replacement costs, as required by subsection (h)(ii).  (Dkt. No. 87-2 at 22).  In other words, after ACON sold its interest in the stores, it would not be *necessary* for ACON to spend money repairing or replacing them.  The Court finds this interpretation to be an extreme twist of the agreement's plain meaning.

Subsection (h)(ii) merely prescribes the method for calculating the Insurers' liability for loss on an RCV basis—i.e., how much depreciation holdback the Insurers *could* owe.  The plain meaning of subsection (h)(ii) is that the Insurers must pay the lesser

---

[5]    Replacement costs are costs spent to restore the insured property to its condition at the time the Policy was purchased—2015, in the case of the stores.

of (1) what it cost to fully repair the property to its pre-damage state, or (2) what is actually spent on repairing or replacing the properties. This language does not, as the Insurers contend, cut off the Insurers' obligation to pay in the event that another entity becomes responsible for repairs.

In sum, the Insurers' point to nothing in Clause 10, the remainder of the Policy agreement, or any caselaw that would have prevented ACON, after selling Fiesta, from spending on repairs or replacements for the stores and then seeking depreciation holdback from the Insurers.[6] And because ACON was free to exercise these Policy rights, it was also free to assign them. *See In re FH Partners, L.L.C.*, 335 S.W.3d 752, 761 (Tex. App.—Austin 2011, no pet.) ("[T]he presumption or general rule under Texas law . . . is that all contracts are freely assignable.") (citation omitted). The Court rejects the Insurers' argument that ACON's assignment was invalid.

> b.   Whether Westport and Aspen's anti-assignment provisions should be enforced

The Insurers also move for summary judgment on the basis that two Insurers, Westport and Aspen, included an anti-assignment provision in their policies. (Dkt. No. 87 at 25). If these anti-assignment provisions are enforceable, then Fiesta could only

---

[6]     As a practical matter, the Insurers' argument contradicts their previous arguments. This dispute arose because the Insurers continued paying ACON the proceeds afforded under the Policy, even after ACON sold Fiesta to Bodega. This implies that according to the Insurers, ACON's rights under the Policy did not disappear upon the selling of Fiesta.

pursue depreciation holdback amounts from the other five Insurers.[7]  Fiesta argues that the provisions are not enforceable.  (Dkt. No. 93 at 24).

Fiesta claims that Aspen and Westport's anti-assignment clauses are unenforceable because they would prevent a post-loss assignment and notes that "'the great weight of authority' holds that anti-assignment provisions in insurance policies do not prohibit post-loss assignments[.]"  (*Id.* at 24) (quoting *Conrad Bros. v. John Deere Ins. Co.*, 640 N.W.2d 231, 237 (Iowa 2001)).  Because the Supreme Court of Texas has not addressed whether policy considerations permit contractual prohibition of post-loss assignments, Fiesta suggests that the Court make an *Erie* guess.[8]  (*Id.* at 26).  To make this point, Fiesta relies in-part on a ruling from the Northern District of Texas, *McLaren v. Imperial Casualty & Indemnity Co.*, which explained:

> [T]he court has no doubt that a Texas court would hold that the policy prohibition against assignment of an interest under the policy is inapplicable to the assignment of causes of action that have come into existence after the loss has occurred.

---

[7]    The Insurers who did not include an anti-assignment provision in their policy agreements include Allied World Assurance Company (U.S.) Inc., Arch Specialty Insurance Company, HDI Global Insurance Company, Certain Underwriters at Lloyd's, London (Hiscox), and Indian Harbor Insurance Company.

[8]    Federal courts sitting in diversity, as is the case here, must apply substantive state law. *See Erie R.R. Co. v. Thompson*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).  And "[t]o determine state law, federal courts sitting in diversity look to the final decisions of the state's highest court."  *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).  However, when a state's highest court has not yet answered the question before the federal court, it becomes "the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same case."  *Id.*  This "best judgment" determination is known as an *Erie* guess.  *See Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 197 (5th Cir. 2003).

767 F.Supp. 1364, 1377 (N.D. Tex. 1991). However, as the Insurers point out, *McLaren* was abrogated by the Fifth Circuit in an unpublished opinion. *See Ins. Co. of Pa. v. Hutter,* 2002 WL 663778 (5th Cir. 2002) (per curiam). There, the Fifth Circuit held that "[t]he present state of the law in Texas and in this circuit (whatever may be the case elsewhere) is that no showing of prejudice is required to enforce the anti-assignment clause [within an insurance policy,] and that clause applies here to bar a post-loss assignment." *Id.* at *1; *see also ARM Props. Mgmt. Grp. v. RSUI Indem. Co.*, No. 1:07-CV-00718, 2009 WL 10669487, at *15 (W.D. Tex. Feb. 23, 2009) (finding an anti-assignment clause enforceable with respect to a post-loss assignment "under Texas and Fifth Circuit law"). With no indication that Texas law has changed, the Court sees no reason to depart from the Fifth Circuit's ruling in *Hutter*. The anti-assignment provisions are enforceable and prohibit Fiesta from pursuing depreciation holdback amounts from Westport or Aspen.[9]

## IV.   CONCLUSION

In sum, the Court holds that Fiesta was not an insured party under the Policy agreement and the "Evidence of Insurance" documents issued by Willis did nothing to change this reality. However, under the 2020 Settlement Agreement, ACON assigned its rights to pursue depreciation holdback amounts to Fiesta.

---

[9]   Fiesta also asserts that the anti-assignment clause should be set aside for an "independent reason"—that the law sometimes draws a distinction between assignment of performance under a contract and assignment of a right to receive payments or proceeds under the contract. (Dkt. No. 93 at 27). This is not an independent reason. Rather, it is a reframing of Fiesta's first argument. To be sure, this distinction between a duty and a right to payment is a policy consideration that has likely influenced other jurisdictions to set aside anti-assignment clauses when they would prevent assignments of post-loss causes of action. However, as explained below, Texas courts have not adopted such a rule, and the Court declines to do so here.

Therefore, the Court **GRANTS IN PART** and **DENIES IN PART** the Insurers' Motion. (Dkt. No. 87). Specifically, the Court **GRANTS** the Insurers' Motion with respect to any damages sought by Fiesta beyond depreciation holdback. The Motion, however, is **DENIED** with respect to the Insurers' arguments — excluding Westport and Aspen — that Fiesta has no rights to pursue depreciation holdback as a matter of law. And because Westport and Aspen are not liable on Fiesta's breach-of-contract claim as a matter of law, these two insurers are hereby **DISMISSED** from the lawsuit.

Fiesta's breach-of-contract claim may proceed against the Insurers — excluding Westport and Aspen — only to the extent that it alleges violations of its Policy rights to pursue depreciation holdback amounts.

IT IS SO ORDERED.

Signed on March 31, 2024.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**